# No. 13-4850

## In the United States Court of Appeals for the Second Circuit

**No. 13-4850**

JONATHAN B. KREISBERG, Regional Director of Region 34 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,
*Appellee/Petitioner,*

*vs.*

HEALTHBRIDGE MANAGEMENT, LLC
*Appellant/Respondent,*

and

107 OSBORNE STREET OPERATING COMPANY II, LLC D/B/A DANBURY HCC; 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC D/B/A LONG RIDGE OF STAMFORD; 240 CHURCH STREET OPERATING COMPANY II, LLC D/B/A NEWINGTON HEALTH CARE CENTER; 1 BURR ROAD OPERATING COMPANY II, LLC D/B/A WESTPORT HEALTHCARE CENTER; 245 ORANGE AVENUE OPERATING COMPANY II, LLC D/B/A WEST RIVER HEALTH CARE CENTER; 341 JORDAN LANE OPERATING COMPANY II, LLC D/B/A WETHERSFIELD HEALTH CARE CENTER,
*Respondents.*

*On Appeal from the contempt order entered by the United States District Court for the District of Connecticut dated December 23, 2013, in Civil Action No. 12-1299*

## BRIEF AND SPECIAL APPENDIX OF APPELLANT HEALTHBRIDGE MANAGEMENT, LLC

PAUL D. CLEMENT
ERIN E. MURPHY
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090

ROSEMARY ALITO
GEORGE PETER BARBATSULY
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
(973) 848-4000

*Attorneys for Appellant/Respondent*

# In the United States Court of Appeals for the Second Circuit

_____

**No. 13-4850**

_____

JONATHAN B. KREISBERG, Regional Director of Region 34 of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR RELATIONS BOARD,
*Appellee/Petitioner,*

*vs.*

HEALTHBRIDGE MANAGEMENT, LLC
*Appellant/Respondent,*

and

107 OSBORNE STREET OPERATING COMPANY II, LLC D/B/A DANBURY HCC; 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC D/B/A LONG RIDGE OF STAMFORD;  240 CHURCH STREET OPERATING COMPANY II, LLC D/B/A NEWINGTON HEALTH CARE CENTER; 1 BURR ROAD OPERATING COMPANY II, LLC D/B/A WESTPORT HEALTHCARE CENTER; 245 ORANGE AVENUE OPERATING COMPANY II, LLC D/B/A WEST RIVER HEALTH CARE CENTER; 341 JORDAN LANE OPERATING COMPANY II, LLC D/B/A WETHERSFIELD HEALTH CARE CENTER,
*Respondents.*

_____

*On Appeal from the contempt order entered by the United States District Court for the District of Connecticut dated December 23, 2013, in Civil Action No. 12-1299*

_____

## CORPORATE DISCLOSURE STATEMENT

_____

Appellant HealthBridge Management, LLC is a limited liability company, not a corporation, and it has no parent organization that is a corporation.

/s/ Rosemary Alito

_____

Rosemary Alito

Dated:  May 6, 2014

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .......................................................................iv

PRELIMINARY STATEMENT ................................................................1

STATEMENT OF SUBJECT MATTER AND
APPELLATE JURISDICTION ................................................................4

STATEMENT OF RELATED CASES ....................................................5

STATEMENT OF THE ISSUES..............................................................5

STATEMENT OF THE CASE..................................................................6

A.    Background ...................................................................................6

B.    The 10(j) Proceedings and Order..................................................7

C.    The Bankruptcy Court Granted and then Extended Interim
      Modifications to the Expired CBAs Pursuant to 11 U.S.C. § 1113(e)...........8

D.    This Court Affirmed the Injunction Order but Recognized the
      Bankruptcy Court's Authority to Modify the Expired CBA Terms..............11

E.    The District Court Held HealthBridge in Contempt for Not Maintaining
      CBA Terms Modified by the Bankruptcy Court ...........................................12

F.    The Bankruptcy Court Permanently Abrogated the Expired CBAs and
      Confirms the Centers' Amended Plan of Reorganization Containing a
      Global Non-Consensual Release as to HealthBridge ....................................15

G.    In Light of the Post-Contempt Bankruptcy Court Rulings, HealthBridge is
      Seeking Relief in the District Court under Fed. R. Civ. P. 60(b).................19

H.    This Court Expedites Briefing.........................................................................21

SUMMARY OF ARGUMENT ................................................................22

STANDARD OF REVIEW .....................................................................25

ARGUMENT ...........................................................................................27

POINT ONE

THE CONTEMPT ORDER MUST BE SET ASIDE BECAUSE THE
BANKRUPTCY COURT HAS REJECTED THE EXPIRED CBAs AND
APPROVED A GLOBAL RELEASE OF HEALTHBRIDGE FROM ANY
OBLIGATIONS THAT THE CONTEMPT ORDER MAY IMPOSE..................27

POINT TWO

THE CONTEMPT ORDER WAS IMPROPER WHEN ENTERED .....................30

A.    In Granting Interim Relief under Section 1113(e), the Bankruptcy Court
       Abrogated the Terms of the Expired CBAs for all Purposes ........................31

B.    The Injunction Did Not Clearly and Unambiguously Require
       HealthBridge to Guarantee the Centers' Financial Performance
       under the Expired CBAs ..................................................................................33

       1.    HealthBridge did not guarantee the Centers' financial
              performance in the status quo ...............................................................34

       2.    The injunction did not require HealthBridge to act as guarantor ........35

       3.    HealthBridge's alleged status as a joint employer did not make
              it a guarantor of the Centers' financial performance .........................36

C.    HealthBridge was Reasonably Diligent in Complying with the
       Injunction .........................................................................................................38

POINT THREE

THIS COURT HAS JURISDICTION OVER THIS APPEAL...............................41

A.    The Contempt Order is Appealable as a Final Decision of the
       District Court under 28 U.S.C. § 1291 ...........................................................41

B.    In the Alternative, the Contempt Order is Appealable as
       an Order Continuing or Modifying an Injunction under
       28 U.S.C. § 1292(a)(1) .....................................................................................47

CONCLUSION ..................................................................................50

CERTIFICATE OF BAR MEMBERSHIP.............................................51

CERTIFICATE OF COMPLIANCE....................................................52

CERTIFICATE OF SERVICE ............................................................53

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

AT&T v. NLRB,
67 F.3d 446 (2d Cir. 1995)....................................................................36

A.V. by Versace, Inc. v. Gianni Versace, SpA.,
87 F. Supp. 2d 281 (S.D.N.Y. 2000) .................................................33

Budinich v. Becton Dickinson & Co.,
486 U.S. 196 (1988)...........................................................................44

Catskill Dev., L.L.C. v. Park Place Entm't Corp.,
547 F.3d 115 (2d Cir. 2008)...............................................................25

Chao v. Gotham Registry, Inc.,
514 F.3d 280 (2d Cir. 2008)...........................................................30, 33

Darlington Mfg. Co. v. NLRB,
325 F.2d 682 (4th Cir. 1963), vacated on other grounds,
Textile Workers Union of Am. v. Darlington Mfg. Co.,
380 U.S. 263 (1965)............................................................................37

Dove v. Atlantic Capital Corp.,
963 F.2d 15 (2d Cir. 1992)..................................................................47

Dunn v. N.Y. State Dep't of Labor,
47 F.3d 485 (2d Cir. 1995).................................................................38

Forschner Group, Inc. v. Arrow Trading Co., Inc.,
124 F.3d 402 (2d Cir. 1997) ...........................................................46, 47

Hester Indus., Inc. v. Tyson Foods, Inc.,
160 F.3d 911 (2d Cir. 1998)...............................................................26

Hoffman v. Inn Credible Caterers, Ltd.,
247 F.3d 260 (2d Cir. 2001)...........................................................34, 48

King v. Allied Vision, Ltd.,
65 F.3d 1051 (2d Cir. 1995).................................................................33

King v. First Am. Investigations, Inc.,
287 F.3d 91 (2d Cir. 2002)................................................................................19

Kreisberg v. HealthBridge Mgmt., LLC et al.,
732 F.3d 131 (2d Cir. 2013)..............................................................5, 6, 11, 25, 32

Latino Officers Ass'n City of N.Y. v. City of N.Y,
558 F.3d 159 (2d Cir. 2009)........................................... 4, 25, 26, 30, 31, 40, 41, 42

Levin v. Tiber Holding Corp.,
277 F.3d 243 (2d Cir. 2002)...........................................................................30

Maxwell Commc'n Corp. v. Societe Generale,
93 F.3d. 1036 (2d Cir. 1996)..........................................................................28

NLRB v. 710 Long Ridge Rd. Operating Co., LLC,
Nos. 13-cv-3247 DMC et al. (D.N.J. Jan. 9 and 28, 2014). ...................................12

NLRB v. Noel Canning,
133 S. Ct. 2861 (2013) ..................................................................................6

New York v. Shore Realty Corp.,
763 F.2d 49 (2d Cir. 1985)....................................................................43, 45, 47

Morgan v. United States,
968 F.2d 200, 204-05 (2d Cir. 1992) ..................................................................45

Northwest Airlines Corp. v. Association of Flight Attendants-CWA,
483 F.3d 160 (2d Cir. 2007)....................................................................25, 31, 32

N.Y. State Nat'l Org. for Women v. Terry,
886 F.2d 1339 (2d Cir. 1989)..........................................................................33

O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.,
537 F.3d 153 (2d Cir. 2008)...........................................................................45

OSRecovery, Inc. v. One Groupe Int'l, Inc.,
462 F.3d 87 (2d Cir. 2006)............................................................................26

Perez v. Danbury Hosp.,
347 F.3d 419 (2d Cir. 2003)....................................................................33

Petereit v. S.B. Thomas, Inc.,
63 F.3d 1169 (2d Cir. 1995)....................................................................49

Ray Haluch Gravel Co. v. Cent. Pension Fund of Operating Eng'rs
& Participating Emp'rs, 134 S. Ct. 773 (2014) ......................................44

Schmitz v. St. Regis Paper Co.,
758 F. Supp. 922 (S.D.N.Y. 1991)..........................................................38

Seeler v. Trading Port, Inc.,
517 F.2d 33 (2d Cir. 1975)................................................................34, 48

Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.,
793 F.2d 1529 (11th Cir. 1986) ..............................................................43

Southern New England Tel. Co. v. Global NAPs Inc.,
624 F.3d 123 (2d Cir. 2010)....................................................................30

Synergy Gas Co. v. Sasso,
853 F.2d 59 (2d Cir. 1988)......................................................................45

Toliver v. County of Sullivan,
957 F.2d 47 (2d Cir. 1992)......................................................................20

Turner v. Orr,
759 F.2d 817 (11th Cir. 1985) ................................................................45

United States v. O'Rourke,
943 F.2d 180 (2d Cir. 1991)...............................................4, 38, 42, 43, 47, 48

Viking Indus. Sec., Inc. v. NLRB,
225 F.3d 131 (2d Cir. 2000)....................................................................37

Vincent v. Local 294, Int'l Bhd. of Teamsters,
424 F.2d 124 (2d Cir.1970)..........................................................42, 43, 47

## **STATUTES**

11 U.S.C. § 365 ...........................................................................................31

11 U.S.C. § 1113 .........................................................................................31

11 U.S.C. § 1113(b) ...............................................................................16, 28

11 U.S.C. § 1113(c) ......................................... 5, 11, 15, 16, 22, 25, 27

11 U.S.C. § 1113(e) .............................................................................passim

11 U.S.C. § 1129 ....................................................................5, 16, 22, 25

11 U.S.C. § 1141(a) ...................................................................................28

28 U.S.C. § 1291 ..............................................................................passim

28 U.S.C. § 1292(a)(1)...................................... 4, 5, 6, 24, 25, 41, 47, 48, 49

29 U.S.C. § 160(j) ..................................................................................1, 12

## **RULES**

Fed R. App. P. 8(a)(1) ...................................................................................2

Fed. R. Civ. P. 60(b) ..............................................................................3, 19

Fed. R. Civ. P. 62 .........................................................................................2

F.R.A.P. 32(a)(7)(B) ....................................................................................52

## **PRELIMINARY STATEMENT**

This case involves an appeal from an order holding Appellant HealthBridge Management LLC ("HealthBridge") in civil contempt for failure to comply with an obligation that the underlying injunction neither clearly nor unambiguously imposes, and that in any event has now been eliminated by subsequent bankruptcy court relief. HealthBridge is the contract manager for five long term nursing care facilities for the elderly (the "Centers"), employees of which are represented by New England Health Care Employees Union, District 1199 ("Union"). On December 11, 2012, the District Court issued an injunction under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j) ("Injunction Order") ordering the Centers to reinstate Union workers pursuant to the terms and conditions of expired collective bargaining agreements ("CBAs").

Although HealthBridge was a party to that Section 10(j) proceeding, HealthBridge was not a party to the CBAs. Nor has it ever—before or after the injunction proceedings—assumed financial liability for the Centers' compliance with their CBAs with their Union workers. Accordingly, when the District Court granted Section 10(j) relief returning the parties to the "status quo," the only reasonable understanding of the District Court's order was that it obligated the Centers—not HealthBridge—to reinstate the terms of the expired CBAs (an obligation that has since been eliminated by the Centers' interim and ultimately

final relief from the United States Bankruptcy Court for the District of New Jersey ("Bankruptcy Court"). Nonetheless, the District Court has now held HealthBridge in contempt for failing to assume financial responsibility for the terms and conditions of the expired CBAs on behalf of the Centers ("Contempt Order"). Among other things, the Contempt Order requires HealthBridge to assume these obligations (costing over $524,000 per month) and pay more than $7.5 million in back pay. If HealthBridge does not comply, the Contempt Order subjects it to daily compliance fines.[1]

The Contempt Order was improperly entered and should be set aside. First and foremost, since the Contempt Order was entered, the Bankruptcy Court has ordered permanent relief that explicitly relieves HealthBridge of the very obligations that the District Court has sought to impose. Not only has the Bankruptcy Court now approved the Centers' permanent rejection of the expired CBAs in their entirety, but it has also confirmed a reorganization plan that grants HealthBridge a non-consensual global release of all claims by all creditors entitled to receive distributions under the reorganization plan—including any claims that it must pay employees under the terms of the expired CBAs. Accordingly, even

---

[1] The District Court temporarily stayed the Contempt Order on December 26, 2013, pending that court's further consideration of HealthBridge's motion for a stay pending appeal pursuant to Fed. R. Civ. P. 62 and Fed R. App. P. 8(a)(1). The temporary stay remains in place but the District Court has not yet ruled on whether to continue the stay pending appeal.

Appellee National Labor Relations Board (the "NLRB" or the "Board") has now conceded, in proceedings below on HealthBridge's still-pending Fed. R. Civ. P. 60(b) motion to set aside the Contempt Order in light of the recent Bankruptcy Court rulings, that the Bankruptcy Court's confirmation of the plan's global release of HealthBridge bars enforcement of the Contempt Order at this time. Accordingly, the order should be set aside it in entirety.

Indeed, the Contempt Order never should have issued in the first place. It is settled in this Circuit that a contempt order should not issue if there is a fair ground of doubt as to the wrongfulness of the defendant's conduct. Here, there were more than ample grounds for doubt. The District Court punished HealthBridge for not assuming financial obligations under the expired CBAs that HealthBridge had not assumed under the status quo ante; that the Injunction Order did not clearly and unambiguously impose on HealthBridge; and that were, in any event, abrogated by the Bankruptcy Court's subsequent pre-contempt orders modifying the terms of the CBAs. At the very least, HealthBridge surely acted reasonably in not inferring from the mere fact that the District Court's injunctive order was directed generically to all "Respondents" that the court meant to impose upon HealthBridge substantial and costly obligations that it had never before undertaken.

For these reasons and others, discussed more fully below, the Court should set aside the Contempt Order.

## STATEMENT OF SUBJECT MATTER AND
## <u>APPELLATE JURISDICTION</u>

HealthBridge timely appealed from the District Court's Contempt Order on December 23, 2013, the same day the Contempt Order was entered.  (Joint Appendix ("JA") 21-23; Special Appendix ("SPA") 1-5).  As discussed in more detail <u>infra</u>, this Court has jurisdiction under 28 U.S.C. § 1291 because the Contempt Order disposes of civil contempt proceedings instituted after the conclusion of the principal action in the District Court.  See <u>Latino Officers Ass'n City of N.Y. v. City of N.Y.</u>, 558 F.3d 159, 163 (2d Cir. 2009) ("We conclude that we do have jurisdiction because where, as in this case, civil contempt proceedings are instituted after the conclusion of the principal action rather than during the pendency of the action, the order disposing of the contempt proceedings is appealable as a final decision . . . under 28 U.S.C. § 1291.").  The Contempt Order also is appealable under 28 U.S.C. § 1292(a)(1) as an order continuing or modifying an injunction because it imposes new and different obligations upon HealthBridge that were not clearly and unambiguously mandated by the Injunction Order, and that were, in any event, abrogated by subsequent orders of the Bankruptcy Court.  <u>United States v. O'Rourke</u>, 943 F.2d 180, 186 (2d Cir. 1991) ("Since we hereinafter conclude that the district court misconstrued the injunctive mandate contained in paragraph V of the Decree, the court was 'modifying' that

4

injunction, within the meaning of section 1292(a)(1), by ordering compliance with its misinterpretation.").

## STATEMENT OF RELATED CASES

This Court previously considered the appeal of HealthBridge and the Centers from the District Court's Injunction Order underlying the Contempt Order. Kreisberg v. HealthBridge Mgmt., LLC., 732 F.3d 131 (2d Cir. 2013) (No. 12-4890), reh'g denied (2d Cir. Feb. 19, 2014). The Centers until confirmation of the plan of reorganization were debtors-in-possession in Chapter 11 bankruptcy proceedings in the United States Bankruptcy Court for the District of New Jersey in In re 710 Long Ridge Rd. Operating Co., II, LLC, et al., No. 13-13653-DHS (Bankr. D.N.J. filed Feb. 24, 2013). The NLRB's and Union's appeals from the Bankruptcy Court's orders pursuant to 11 U.S.C. §§ 1113(c), 1113(e), 1129, among other orders, are pending in the United States District Court for the District of New Jersey. NLRB v. 710 Long Ridge Rd. Operating Co. II, LLC et al., Nos. 14-cv-00832-CCC et al. (D.N.J. filed Feb. 10, 2014).

## STATEMENT OF THE ISSUES

1.  Whether the Contempt Order should be set aside where, as here, subsequent to its issuance, the Bankruptcy Court approved the Centers' motion to reject the expired CBAs in their entirety under 11 U.S.C. § 1113(c), and then confirmed the Centers' Amended Plan of Reorganization, pursuant to 11 U.S.C. § 1129, granting HealthBridge a non-consensual global release.

2.  Whether the District Court properly adjudicated HealthBridge in contempt of the Injunction Order in the first place, where the sole basis for the

contempt finding—HealthBridge's failure to re-implement terms and conditions of the Centers' expired CBAs with the Union—was an obligation that HealthBridge had never before assumed, that the Injunction Order did not clearly and unambiguously require of HealthBridge, and that was, in any event, abrogated by subsequent orders of the Bankruptcy Court pursuant to 11 U.S.C. § 1113(e).

3.   Whether the Contempt Order is immediately appealable to this Court as a final judgment of the District Court pursuant to 28 U.S.C. § 1291, or as an order continuing or modifying an injunction pursuant to 28 U.S.C. § 1292(a)(1), where, as here, it immediately directs HealthBridge to implement financially crippling employment terms, imposes compliance fines, and imposes new and different obligations that the Injunction Order did not impose.

4.   Whether the Board lacked a quorum to authorize and bring contempt proceedings, thus depriving the District Court of jurisdiction to entertain the contempt motion.[2]

## STATEMENT OF THE CASE

### A.   Background

HealthBridge is the contract manager of sub-acute and long term nursing care facilities for the elderly in Connecticut and elsewhere.  The other respondents in the underlying action are current and former Centers managed by HealthBridge (the "Centers").   (JA-257, ¶ 2; JA-1069-70, ¶ 2; JA-1071-72, ¶ 2). This contempt

---

[2] The disposition of this last issue may be affected by NLRB v. Noel Canning, 133 S. Ct. 2861 (2013) (order granting certiorari), which has been fully briefed and argued in the Supreme Court.  Accordingly, HealthBridge lists this issue here to preserve it for further review, as appropriate, following the Supreme Court's decision in Noel Canning, but it does not substantively address the issue in this brief in light of the Court's rejection of HealthBridge's and the Centers' position on a substantially similar issue in affirming the underlying Injunction Order.  See Kreisberg, 732 F.3d at 137-40.

proceeding arises out of a labor dispute between the Centers and the Union that represents units of employees at each of the Centers for collective bargaining purposes. The Union has alleged that the Centers engaged in unfair labor practices during collective bargaining and has sought to force the Centers to reinstate the terms of CBAs that expired in March 2011.

The Centers were the sole parties to the expired CBAs and were financially responsible for complying with the expired CBA terms. (JA-1057, ¶ 3). HealthBridge is not and never has been a party to those expired CBAs; nor has HealthBridge ever paid the Centers' employees or guaranteed the Centers' performance under the CBAs. (JA-631, ¶ 6). Instead, HealthBridge is simply the contract manager for the Centers and, in that capacity, provides services such as back office administrative support. (Id.).

**B.    The 10(j) Proceedings and Order**

On September 7, 2012, the Board filed a petition for Section 10(j) relief in the District Court, seeking a return to the status quo prior to the Centers' alleged unilateral changes in terms and conditions of employment under the expired CBAs between the Centers and Union. (JA-24). Although HealthBridge was not a party to those CBAs, the Board nonetheless named HealthBridge as a Respondent. On December 11, 2012, the District Court granted the petition. (JA-51-55). The District Court concluded that "the requested injunctive relief is just and proper

because there is a pressing need to restore the status quo as it existed prior to respondents' unilateral implementation of its proposals as alleged in the Petition." (JA-53; <u>see</u> <u>also</u> JA-79). The District Court's Order directed Respondents to (i) offer reinstatement to the striking workers, (ii) reinstate the previous wages, benefits and other terms and conditions of employment under the expired CBAs in place on June 16, 2012, (iii) bargain in good faith with the Union, (iv) post copies of the injunction at each of the Centers, and (v) file an affidavit of compliance. (JA-54-55).

## C.    The Bankruptcy Court Granted and then Extended Interim Modifications to the Expired CBAs Pursuant to 11 U.S.C. § 1113(e)

In compliance with the injunction, the Centers offered reinstatement to all the strikers, offered to bargain with the Union, posted the injunction at the Centers, and filed a declaration of compliance. The Centers also reinstated the previous wages, benefits and other terms and conditions of employment that were in place on June 16, 2012, for all returning strikers and all bargaining unit employees who had continued to work during the strike. (JA-259-60, ¶ 6).

Because the Centers could not afford to continue operating under the terms and conditions of the expired CBAs, however, they filed petitions for bankruptcy protection on February 24, 2013, and moved for interim modifications of the continuing economic terms of their expired CBAs under 11 U.S.C. § 1113(e). (JA-630, ¶ 5).

8

Over the objections of the Board and Union, on March 4, 2013, the Bankruptcy Court granted the interim modifications through April 12, 2013. (JA-99-126). The Board and Union argued that bankruptcy relief should be denied because HealthBridge should be treated as jointly and severally liable with the Centers for compliance with the expired CBA terms. (JA-221, ¶ 50; JA-249-50, ¶ 53). The Bankruptcy Court rejected this argument, granting the requested relief without requiring HealthBridge or any other entity to assume the Centers' obligations under the expired CBAs as a condition of making these interim modifications. (See JA-122-24). Instead, the Court proceeded on the understanding that the Centers—and the Centers alone—were responsible for compliance with the expired CBA terms. The Bankruptcy Court reasoned that the District Court's Injunction Order did "not preclude the [Centers] from seeking an interim modification of the terms of the expired CBAs that continue to be in effect in order to avoid irreparable damage to the estate (i.e., closure of the Facilities) or if essential to the continuation of the Debtors' businesses." (JA-114). The Bankruptcy Court found that the Injunction Order was intended to "return the parties to the status quo," a status quo that was at all times subject to the possibility of interim relief under 11 U.S.C. § 1113(e). (JA-117).

The Bankruptcy Court found that absent relief, the Centers would "be unable to operate at a break-even level." (JA-120). It added that the evidence was

9

uncontroverted and that "the interim modifications sought in the Motion are essential to the continuation of the Debtors' business and are essential to avoid irreparable damage to the estate." (JA-122-23). It concluded that denial of relief would "result in immediate implementation of state-mandated closure plans, including the appointment of a receiver to effectuate relocation of patients and termination of operations." (JA-123).

After allowing the Board, Union, and other creditors a full opportunity to examine the Centers' finances and present evidence and expert testimony, the Bankruptcy Court, in an order dated April 10, 2013, extended the interim modifications to July 15, 2013. (JA-128-31). The Bankruptcy Court reasoned that the modifications remained "essential to the continuation of the [Centers'] business" and "essential to the [Centers'] immediate survival." (JA-130, JA-140). Again, the Bankruptcy Court did not require HealthBridge to assume the Centers' obligations under the expired CBAs as a condition of the interim modifications. (JA-128-31, JA-143-44).

On July 15, the Bankruptcy Court further extended the interim relief, as revised after compromise with the Official Creditors' Committee ("Creditors' Committee"), through October 11, 2013. (JA-598-602). In its July 15, 2013 Opinion, the Bankruptcy Court noted that, after consultation with the Creditors' Committee, the Centers revised their requests for wage and benefit cuts downward

by \$469,810.00.  (JA-617).  However, the Bankruptcy Court concluded that interim relief, as modified, remains "essential to the continuation of the [Centers'] business and necessary to avoid irreparable damage to the estate."  (JA-622).  The Bankruptcy Court again found that the Centers could not operate without continued interim relief, as modified, or "accept the risk of eliminating the revised changes, as urged by the Union, which could be injurious to the fragile nursing home population."  (Id.).  The Bankruptcy Court added that, "alarmingly, this does not seem to concern the Union and they offer no evidence this risk is contrived."  (Id.).

The Bankruptcy Court subsequently extended the interim relief several more times through February 3, 2014, when it granted the Centers' application for permanent rejection of the expired CBAs pursuant to 11 U.S.C. § 1113(c).  (JA-624-28; JA-633-88).

**D.    This Court Affirmed the Injunction Order but Recognized the Bankruptcy Court's Authority to Modify the Expired CBA Terms**

Meanwhile, on October 15, 2013, this Court affirmed the District Court's Injunction Order.  In doing so, this Court found that the Centers had not established that the injunction would bring about their financial ruin because "the Centers already have filed for bankruptcy protection in the Bankruptcy Court for the District of New Jersey, and that court has since authorized and extended modifications to the CBA[s] pursuant to 11 U.S.C. § 1113(e)." Kreisberg, 732 F.3d at 143.  The Court reasoned that HealthBridge had failed to present sufficient

11

evidence indicating how it would be further adversely affected financially by the District Court's temporary order enforcing the prior CBAs which, the Court found, "may be modified as necessary by the Bankruptcy Court." (Id.). Thus, this Court's opinion explicitly recognized the Bankruptcy Court's authority to modify the expired CBA terms underlying the Injunction Order. Relying on this Court's opinion, the United States District Court for the District of New Jersey dismissed the Board's interlocutory appeals from the Bankruptcy Court's orders granting interim relief pursuant to 11 U.S.C. § 1113(e), noting that this Court "recognized the authority of the United States Bankruptcy Court to modify expired collective bargaining agreements subject to the 10(j) order." NLRB v. 710 Long Ridge Rd. Operating Co., LLC, Nos. 13-cv-3247 DMC et al. (D.N.J. Jan. 9 and 28, 2014).

**E.    The District Court Held HealthBridge in Contempt for Not Maintaining CBA Terms Modified by the Bankruptcy Court**

On December 23, 2013, the District Court entered an order holding HealthBridge in contempt for purportedly violating the terms of its December 11, 2012, injunction issued under Section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). (SPA-1-5). Notwithstanding the Bankruptcy Court's order granting interim relief pursuant to 11 U.S.C. § 1113(e), and this Court's express recognition of the Bankruptcy Court's authority to grant such relief, the District Court concluded that HealthBridge violated the Injunction Order by failing to re-implement the terms and conditions of the expired CBAs after the Bankruptcy

Court authorized interim modifications to those CBA terms.   (SPA-2 & n.1).
HealthBridge and the Centers have complied with the injunction order in all other
respects, and the District Court did not find otherwise.  (Id.).

The Contempt Order directs HealthBridge to "comply with all the provisions
of the 10(j) Injunction and this Order."   (SPA-2, ¶ 2).  It adds that "HealthBridge
shall reinstate and maintain the previous wages, benefits, and other terms and
conditions of employment for the employees of the Centers that were in place on
June 16, 2012." (SPA-3, ¶ 3).  It further requires HealthBridge to "compensate and
make whole all employees of the Centers for wages, benefits, and other terms and
conditions of employment, since February 1, 2013, plus normal interest as
computed in Board proceedings, lost because of HealthBridge's failure to reinstate
and maintain the terms and conditions of employment in effect on June 16, 2012,
as required by the 10(j) Injunction."   (SPA-3, ¶ 4).  It directs HealthBridge to
"make available to Petitioner for inspection and copying all business records
necessary to determine the amount of pay and benefits the employees are entitled
to receive pursuant to the 10(j) Injunction and this Order."  (SPA-3, ¶ 5).

The Contempt Order also provides that, "[w]ithin seven days of the date of
this Order, HealthBridge shall post copies of this Order at each of the Centers in all
places where the 10(j) Injunction is posted; maintain such postings free from all
obstructions and defacements for the duration of the 10(j) Injunction; allow all

13

bargaining unit employees to have free and unrestricted access to said postings; and grant reasonable access to agents of Region 1 of the Board to all such locations to monitor compliance with this posting requirement." (SPA-3, ¶ 6). It further provides that "[w]ithin fourteen days of the date of this Order, HealthBridge shall serve copies of this Order on each owner, officer, and management employee of each of the Centers, as well as each owner, officer and management employee of HealthBridge, and obtain signed acceptances of such copies from each of them, and provide the signed acceptances to the Regional Director of Region 1 of the Board." (SPA-4, ¶ 7). The Contempt Order directs that, "Within twenty days of the entry of this Order, HealthBridge shall file and serve an affidavit by a responsible corporate official of HealthBridge setting forth with specificity the manner in which HealthBridge has complied with the terms of the 10(j) Injunction and this Order." (SPA-4, ¶ 8).

The Contempt Order also provides that upon HealthBridge's failure to comply with any of the paragraphs of the order, "HealthBridge shall pay the Board $10,000, and a daily compliance fine of $500." (SPA-4, ¶ 9). For any subsequent violation of the Injunction, "HealthBridge shall pay the Board a fine of $5,000." (Id.). The Contempt Order also provides, "Within twenty days of the entry of this Order, the Board may file and serve a motion for attorneys' fees and costs incurred in connection with the motion for contempt, and within twenty-one days thereafter,

14

HealthBridge may file a memorandum in opposition to the motion for fees and costs."  (SPA-4, ¶10).

HealthBridge immediately appealed the Contempt Order to this Court on December 23, 2013 (JA-20-23), and the following day it filed an emergency motion in the District Court for a stay of the Contempt Order pending appeal.  (JA-17-18; Dist. Ct. Doc. No. 113).  On December 26, 2013, the District Court granted a temporary stay of the Contempt Order pending full briefing and consideration of the issues raised in HealthBridge's stay motion.  (JA-18; Dist. Ct. Doc. No. 114).  The temporary stay remains in place and the stay motion has been fully briefed in the District Court.  (JA-18-19; Dist. Ct. Doc. Nos. 119-122).  On January 13, 2014, the District Court granted the Board's unopposed motion to extend the deadline to submit its fee application pending the outcome of the stay motion.  (JA-18; Dist. Ct. Doc. Nos. 117-118).

## F.   The Bankruptcy Court Permanently Abrogated the Expired CBAs and Confirmed the Centers' Amended Plan of Reorganization Containing a Global Non-Consensual Release as to HealthBridge

After the Contempt Order was entered, the Bankruptcy Court, in an extensive opinion and order dated February 3, 2014, granted the Centers' motion to reject the continuing economic terms of the expired CBAs with the Union, in their entirety, pursuant to 11 U.S.C. § 1113(c), and made permanent the interim modifications (among others) to the CBAs that it had previously ordered pursuant to 11 U.S.C. §

15

1113(e).  (JA-634-688).  The Bankruptcy Court also authorized the Centers to permanently implement their proposed modifications to the employment terms pursuant to 11 U.S.C §1113(b).  (JA -678-79; JA-687-88).  The Bankruptcy Court concluded that all requirements for obtaining permanent relief under Section 1113(c) had been met and found the evidence uncontroverted that the requested permanent modifications to the expired CBAs were necessary to prevent the Centers from being forced to liquidate.  (JA -667-78).  The Bankruptcy Court concluded:

> Based upon the record before it, the Court also finds that: (i) the Debtors have based their Proposal on reliable and credible information and provided details of the calculated savings associated with each modification; (ii) the Debtors have provided the Union with relevant information to evaluate the Proposal through production of thousands of documents and access to a data room; (iii) the Proposal treats all parties equitably and fairly through implementing cuts to non-Union wages and benefits, adding a snap-back provision, and receiving claims waivers from the Debtors' landlords and non-debtor affiliates; (iv) without the modifications, the Debtors would incur millions of dollars in negative operational cash flow and would be forced to immediately liquidate their Facilities; (v) the Union rejected the Proposal without good cause because it refused to negotiate with the Debtors; (vi) the balance of equities weigh in favor of the Proposal because the alternative is liquidation and the loss of hundreds of jobs; and (vii) the Debtors attempted to confer in good faith by proposing numerous dates for negotiations meetings, all of which have been rejected by the Objecting Parties.

(JA-678-79).

Then, in another extensive Opinion dated March 5, 2014, the Bankruptcy Court, acting under 11 U.S.C. § 1129, agreed to confirm in substantial part the

Amended Plan of Reorganization (the "Plan") submitted by the Centers, provided that the Centers agreed to make certain modifications to the Plan. (JA-718-62). On March 6, 2014, the Centers agreed to the Bankruptcy Court's modifications and on that same date, the Bankruptcy Court entered an Order confirming the Plan ("Confirmation Order"). (JA- 764-813). In pertinent part, and after considering extensive evidence during a multi-day hearing, the Bankruptcy Court approved the Plan's provision granting a non-consensual global release to HealthBridge and other entities not at issue here. (JA-750-52).

The non-consensual release approved by the Bankruptcy Court provides, among other things, that upon substantial consummation of the Plan as defined in section 1101(2) of the Bankruptcy Code, and then effective *nunc pro tunc* to the Effective Date,[3] holders of claims or equity interest that are entitled to receive distributions under the Plan (including the Board and the Union) shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against HealthBridge. (JA-730-32). In concluding that this non-consensual release

---

[3] On March 7, 2014, the Centers filed a *Notice of: (a) Order Confirming First Amended Joint Chapter 11 Plan of Reorganization of 710 Long Ridge Road Operating Company II, LLC, et al., As Modified; (B) Effective Date of Plan; and (C) Deadline for Filing Certain Claims*, which, among other things, advised creditors and parties in interest that the Centers have declared March 7, 2014, as the Effective Date of the Plan. In re 710 Long Ridge Rd. Operating Co., II, LLC, et al., No. 13-13653-DHS, Doc. No. 1000 (Bankr. D.N.J. filed Mar. 7, 2014).

17

was appropriate, the Bankruptcy Court found that HealthBridge had provided valid consideration for the release in the form of its agreement to waive $2.6 million in post-petition administration expense priority claims. (JA-729-30, 750-51). The Bankruptcy Court specifically emphasized that HealthBridge would agree to such a waiver only "if it would be able to continue to provide critical services without the distraction and financial harm of the potential liability for the alleged Back Pay Claims." (JA-751). The Bankruptcy Court also noted that the Board and Union were "receiving reasonable consideration in exchange for the release, as they are receiving more than they would in liquidation, in large part because of the contributions by HealthBridge," affiliated landlords, and other affiliates. (JA-751-52). The Bankruptcy Court further found that "[w]ithout the waivers, Plan confirmation is impossible and the Facilities would be closed, liquidated, and 1,100 jobs lost, including 700 Union Employees." (JA-751). Thus, the Bankruptcy Court concluded, "under the unique circumstances of this reorganization, these non-debtor releases are fair, and absolutely necessary in order to effect reorganization. Without them, the Debtors will be liquidated and all will suffer." (JA-752; JA-761).

The Board appealed the Bankruptcy Court's February 3 and March 6, 2014 orders of the Bankruptcy Court to the United States District Court for the District of New Jersey, and those appeals are pending. However, both the Bankruptcy

Court and the New Jersey District Court denied the Board's motion to stay these orders pending appeal. (JA-1030-55). The New Jersey District Court, in its March 21, 2014 opinion denying the NLRB's motion for a stay pending appeal of the Confirmation Order, found that, were it to grant a stay, the Centers, "operators of long-term nursing care facilities, their creditors, and their patients would all suffer significant, if not disastrous harm." (JA-1032). The New Jersey District Court added that the NLRB's argument in support of a stay "consists of conjectural statements which, contrasted with the sworn testimony and declarations put forth by the [the Centers], must fail." (JA-1034). The court concluded that "granting an order that would put many of the very workers the NLRB seeks to help in danger of permanently losing their jobs protects neither the workers themselves nor the public interest." (JA -1037-38). Thus, the Bankruptcy Court's orders remain in effect.

### G.    In Light of the Post-Contempt Bankruptcy Court Rulings, HealthBridge is Seeking Relief in the District Court under Fed. R. Civ. P. 60(b)

On February 5, 2014, in light of the permanent relief granted by the Bankruptcy Court, HealthBridge moved in the District Court for relief from the Contempt Order pursuant to Fed. R. Civ. P. 60(b). (JA-19; Dist. Ct. Doc. No. 125).[4] Then, on March 6, 2014, HealthBridge moved in the District Court for

---

[4] A motion under Rule 60(b) "can be made even though an appeal has been taken and is pending." King v. First Am. Investigations, Inc., 287 F.3d 91, 94 (2d Cir.

leave to supplement the record on its Rule 60(b) motion to bring the Bankruptcy Court's Confirmation Order to the District Court's attention. (JA-20; JA-711-16; Dist. Ct. Doc. No. 135). The proceedings on the Rule 60(b) motion remain pending in the District Court. (See JA-20).

On March 27, 2014, the Board moved in the District Court to hold further contempt proceedings in abeyance pending its appeal of the Bankruptcy Court's confirmation of the global release as to HealthBridge. (JA-20; Dist. Ct. Doc. No. 140). In its moving and reply papers in support of that motion, the Board acknowledged that the non-consensual release as to HealthBridge prevents the Board from seeking to enforce the Contempt Order at this time. (Dist. Ct. Doc. No. 140-1 at 2 (noting that "the third party releases to non-debtors contained in the Confirmation Order purport, inter alia, to release HealthBridge from this Court's contempt sanctions"); Dist. Ct. Doc. No. 142 at 6 ("But Petitioner agrees that HealthBridge is not responsible under paragraph 4 of the Contempt Order for any compensatory damages that accrue during the period between March 6, 2014, when the Confirmation Order issued, and the date on which the Confirmation

---

2002). The Second Circuit "allows a district court either to 'entertain and deny the rule 60(b) motion' without the circuit court's permission, or 'grant a rule 60(b) motion after an appeal is taken . . . if the moving party obtains permission from the circuit court.'" King, 287 F.3d at 94 (quoting Toliver v. County of Sullivan, 957 F.2d 47, 49 (2d Cir. 1992)). If the District Court decides in favor of the Rule 60(b) motion, "then and then only is the necessary remand by the court of appeals to be sought." Toliver, 957 F.2d at 49.

Order is reversed"); id. at 6 n.3 ("To be clear, HealthBridge's liability under the Contempt Order for compensatory damages that accrued prior to March 6, 2014 would remain stayed pending disposition of the NLRB's appeal of the Confirmation Order.")).  The Board's motion to hold the contempt proceedings in abeyance also remains pending in the District Court.  (See JA-20).

## H.    This Court Expedites Briefing

On February 7, 2014, HealthBridge moved in this Court for expedited briefing and argument of the Appeal.  (2d Cir. Doc. No. 24).  On February 12, 2014, the Board moved to dismiss the Appeal, purportedly for lack of appellate jurisdiction.  (2d Cir. Doc. No. 28).  On April 15, 2014, this Court granted HealthBridge's motion to expedite briefing and argument and denied the Board's motion to dismiss.  The Court noted that because the jurisdictional issues raised in the Board's motion overlap substantially with the merits, they would be addressed by the merits panel, and the Court invited the parties to address the jurisdictional issues in their merits briefs.  (2d Cir. Doc. No. 65).

## SUMMARY OF ARGUMENT

The Contempt Order at issue here must be set aside for multiple reasons. First and foremost, the Bankruptcy Court has now made crystal clear that HealthBridge has no obligations whatsoever with respect to the expired CBAs. Specifically, on February 3, 2014, the Bankruptcy Court granted permanent relief from the expired CBAs under 11 U.S.C. § 1113(c) and, in doing so, made clear that HealthBridge has no obligations under the expired CBAs. Then on March 6, 2014, the Bankruptcy Court, acting under 11 U.S.C. § 1129, approved a global, non-consensual release as to HealthBridge and, in doing so, definitively and permanently relieved HealthBridge of any obligations it may have previously had under the Injunction Order to fund the terms of the expired CBAs between the Centers and the Union. In light of these Bankruptcy Court orders, the Contempt Order can no longer stand. HealthBridge simply cannot be subjected to the harsh penalty of contempt for failing to taking actions that a duly authorized Bankruptcy Court has explicitly relieved HealthBridge of any obligation to take. Even the Board is in agreement that so long as the Bankruptcy Court's order confirming the non-consensual release as to HealthBridge remains in place, the District Court lacks authority to enforce its Contempt Order against HealthBridge. That being the case, the Contempt Order should be invalidated in its entirety.

Indeed, the Contempt Order never should have been entered in the first place. Precisely because contempt is an extraordinary measure, a contempt order is inappropriate if there is a fair ground of doubt as to whether the defendant engaged in wrongful conduct. Here, there were ample grounds for doubt. First of all, under controlling law in this Circuit, the effect of the Bankruptcy Court's interim relief orders under 11 U.S.C. § 1113(e) was to abrogate the terms of the expired CBAs in their entirety and replace them with the modified terms that the Bankruptcy Court approved. In other words, for all intents and purposes, the expired CBAs ceased to exist once the interim relief orders were entered, which makes it all the more remarkable to suggest that HealthBridge nonetheless was somehow obligated to ensure their continued operation. Thus, the District Court penalized HealthBridge for not complying with obligations it did not have, that it had never before assumed, and that the Bankruptcy Court had in any event eliminated. And all of this under an Injunction Order that does not come close to imposing such extraordinary obligations upon HealthBridge in a clear and unambiguous manner.

In all events, HealthBridge certainly acted reasonably in interpreting the District Court's Injunction Order directing a return to the status quo ante as not requiring HealthBridge to take on new and different obligations that had not been specifically ordered and that would have been contrary to the relief granted by the

Bankruptcy Court.  And there is no dispute that HealthBridge has complied with the order in all respects, except to the extent that it has been modified by the Bankruptcy Court's orders.  Accordingly, under the circumstances, HealthBridge was reasonably diligent in complying with the Injunction Order and cannot be subjected to the harsh sanction of contempt.

Finally, there is no merit to the Board's argument that this Court lacks jurisdiction over this appeal.  The Contempt Order is appealable under 28 U.S.C. § 1291 as a final decision of the District Court because it disposes of contempt proceedings instituted after the conclusion of the underlying litigation and subjects HealthBridge to unconditional present sanctions—including the threat of daily fines for non-compliance.  In the alternative, the Contempt Order is appealable as an interlocutory order "continuing" or "modifying" the Injunction Order upon which it was based.  See 28 U.S.C. § 1292(a)(1).  The original Injunction Order directed a return to the status quo ante; it did not require HealthBridge to independently guarantee the Centers' financial performance under expired CBAs to which HealthBridge was not a party.  In requiring HealthBridge to reinstate and maintain the wages, benefits, and other terms and conditions of the expired CBAs on behalf of the Centers, the Contempt Order imposed new and different obligations upon HealthBridge that were not clearly and unambiguously mandated

24

by the Injunction and that were, in any event, abrogated by subsequent orders of the Bankruptcy Court.

For all of these reasons, the Contempt Order should be set aside.

## STANDARD OF REVIEW

Whether the Contempt Order is appealable to this Court as a final judgment of the District Court pursuant to 28 U.S.C. § 1291, or as an order continuing or modifying an injunction pursuant to 28 U.S.C. § 1292(a)(1), are questions of law that this Court reviews de novo.  See Latino Officers Ass'n, 558 F.3d at 163 (noting the Court's independent obligation to ascertain its jurisdiction to entertain an appeal) (citing Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 123 (2d Cir. 2008)).

The impact of the Bankruptcy Court's orders pursuant to 11 U.S.C. §§ 1113(c), 1113(e), and 1129 on the Injunction Order and the Contempt Order are also questions of law that this Court reviews de novo.  See Northwest Airlines Corp. v. Association of Flight Attendants-CWA, 483 F.3d 160, 170 n.3 (2d Cir. 2007) ("a debtor who rejects a contract pursuant to [§ 1113] abrogates rather than breaches the CBA at issue," such that the CBA thereafter "cease[s] to exist."); Kreisberg, 732 F.3d at 143 (District Court's temporary order enforcing prior CBAs "may be modified as necessary by the Bankruptcy Court").

Putting aside the import of the Bankruptcy Court's rulings, when a district court's ruling on a contempt motion is challenged on appeal, "its interpretation of the terms of the underlying order or judgment is subject to <u>de novo</u> review." <u>Latino Officers Ass'n</u>, 558 F.3d at 164.  Although the District Court's "factual findings are accepted unless they are shown to be clearly erroneous; and its ultimate ruling on the contempt motion is reviewed for abuse of discretion," <u>id.</u>, this Court also has made clear that "because the power of a district court to impose contempt liability is carefully limited, [this Court's] review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." <u>OSRecovery, Inc. v. One Groupe Int'l, Inc.</u>, 462 F.3d 87, 93 (2d Cir. 2006) (quoting <u>Hester Indus., Inc. v. Tyson Foods, Inc.</u>, 160 F.3d 911, 916 (2d Cir. 1998)).  Ultimately, a contempt order is "inappropriate if there is fair ground of doubt as to the wrongfulness of the defendant's conduct." <u>Latino Officers Ass'n</u>, 558 F.3d at 164 (citation and internal quotation marks omitted)

# ARGUMENT

# POINT ONE

**THE CONTEMPT ORDER MUST BE SET ASIDE BECAUSE THE
BANKRUPTCY COURT HAS REJECTED THE EXPIRED CBAs AND
APPROVED A GLOBAL RELEASE OF HEALTHBRIDGE FROM ANY
OBLIGATIONS THAT THE CONTEMPT ORDER MAY IMPOSE**

The Contempt Order must be set aside because it is no longer viable in light
of the relief that the Bankruptcy Court has now granted. In granting the Board's
motion to hold HealthBridge in contempt, the District Court specifically relied on
its understanding that the Bankruptcy Court's prior orders under 11 U.S.C. §
1113(e) did not purport to relieve HealthBridge of any obligation it might have
under the District Court's Section 10(j) injunction to reinstate the terms of the
expired CBAs. (SPA-18). Because the Bankruptcy Court has since entered two
orders that have done just that, the Contempt Order can no longer remain in place.

First, on February 3, 2014, the Bankruptcy Court granted permanent relief
from the expired CBAs under 11 U.S.C. § 1113(c), thus abrogating those
agreements in their entirety. In concluding that all requirements for such relief had
been met, the Bankruptcy Court necessarily concluded that HealthBridge neither
has nor ever had any obligations under the expired CBAs. The Bankruptcy Court
found, among other things, that "without 1113(c) relief, the Debtors would be
forced to liquidate, shut down all facilities, and the Debtors' employees—both
Union and non-union—would all lose their jobs"—a finding that would make no

sense if the Centers had the option of shifting their obligations to HealthBridge. (JA-674). And the Bankruptcy Court specifically noted that the Union made no argument before it that any entities affiliated with the Centers "had any legal duty to fund the Debtors." (JA-651). Thus, in finding that the modifications that it approved under 11 U.S.C. § 1113(b) were the only alternative to the liquidation of the Centers, the Bankruptcy Court necessarily concluded that HealthBridge had no obligation to fund the expired CBA terms on behalf of the Centers.

If there were any doubt on this score, the Bankruptcy Court's approval on March 6, 2014 of the global non-consensual release as to HealthBridge has eliminated it. Section 1141(a) of the Bankruptcy Code provides that an order of confirmation is binding upon, among others, the debtor and any creditor, whether or not such creditor accepted the plan. 11 U.S.C. § 1141(a); see Maxwell Commc'n Corp. v. Societe Generale, 93 F.3d. 1036, 1044 (2d Cir. 1996) ("An order of confirmation concededly binds the debtor and its creditors whether or not they have accepted the confirmed plan. Thus, it has preclusive effect."). Here, by approving the Plan's non-consensual release as to HealthBridge, the Bankruptcy Court definitively and permanently relieved HealthBridge of whatever obligation it might have under the Injunction Order to fund the terms of the expired CBAs between the Centers and the Union. The Bankruptcy Court specifically found that the non-consensual release as to HealthBridge, including the release from back pay

claims under the expired CBAs, was "absolutely necessary in order to effect reorganization," and that without it, the Centers would be forced to close and liquidate, resulting in the loss of 1,100 jobs (including those of 700 Union employees). (JA-754, 761).

In light of these subsequent developments, even the NLRB acknowledged to the District Court below that "the third party releases to non-debtors contained in the Confirmation Order purport . . . to release HealthBridge from this Court's contempt sanctions." (Dist. Ct. Doc. No. 141-2). The NLRB further acknowledged that HealthBridge cannot be liable for any damages that accrued prior to the entry of the Confirmation Order on March 6, 2014, or that will accrue from that date until the Board's appeal from the Confirmation Order is resolved. (Dist. Ct. Doc. No. 142 at 6 & 6 n.3). Although the Board has appealed from both the February 3 and March 6 orders of the Bankruptcy Court, those orders have not been stayed pending appeal and remain in full force and effect. (JA-1030-55). Accordingly, the Contempt Order is no longer viable and must be set aside. HealthBridge cannot be forced to live under the continuing threat of being penalized for failing to take actions that the Bankruptcy Court orders explicitly relieve it of any obligation to take.

# POINT TWO

## THE CONTEMPT ORDER WAS IMPROPER WHEN ENTERED

Even setting aside the Bankruptcy Court's February 3 and March 6 orders, the Contempt Order should be set aside because it was improperly entered in the first place.  The standard for holding a party in contempt is a stringent one and "the judicial power of contempt is circumscribed."  Chao v. Gotham Registry, Inc., 514 F.3d 280, 291 (2d Cir. 2008).  Specifically, a party cannot be held in contempt unless the movant proves, by clear and convincing evidence, that:  (1) the proof of non-compliance is clear and convincing; (2) the decree alleged to have been violated was clear and unambiguous; and (3) the defendant has not been reasonably diligent and energetic in attempting to comply.  Chao, 514 F.3d at 291; see also Southern New England Tel. Co. v. Global NAPs Inc., 624 F.3d 123, 145 (2d Cir. 2010) (noting plaintiff's burden of proof).  The clear and convincing evidence standard "requires a quantum of proof adequate to demonstrate a 'reasonable certainty' that a violation has occurred."  Levin v. Tiber Holding Corp., 277 F.3d 243, 250 (2d Cir. 2002).  A contempt order is "inappropriate 'if there is fair ground of doubt as to the wrongfulness of the defendant's conduct.'"  Latino Officers Ass'n, 558 F.3d at 164 (citations omitted).  Moreover, "when a district court's ruling on a contempt motion is challenged on appeal, its interpretation of the terms of the underlying order or judgment is subject to de

novo review." Latino Officers Ass'n, 668 F.3d at 164. Here, the District Court was wrong to conclude that the Board satisfied even one of the elements of contempt, let alone all three.

## A.    In Granting Interim Relief under Section 1113(e), the Bankruptcy Court Abrogated the Terms of the Expired CBAs for all Purposes

In any event, even assuming the Injunction Order imposed on HealthBridge a new and substantial obligation to guarantee the Centers' compliance with the expired CBAs, the Bankruptcy Court's pre-contempt interim modification orders clearly relieved HealthBridge of that obligation. In concluding otherwise, the District Court plainly misapprehended the effect of the Bankruptcy Court's orders granting interim modifications to the expired CBAs under 11 U.S.C. § 1113.

As this Court has explained, the purpose of Section 1113 is to permit rejection of CBAs "in favor of alternate terms without fear of liability after a final negotiation before, and authorization from, a bankruptcy court." Northwest Airlines, 483 F.3d at 172. Thus, in contrast to contracts rejected under the ordinary process of contract rejection under 11 U.S.C. § 365, "a debtor who rejects a contract pursuant to [§ 1113] abrogates rather than breaches the CBA at issue." Northwest Airlines, 483 F.3d at 170 n.3. The effect of such abrogation under Section 1113 is that the CBA thereafter "cease[s] to exist." Northwest Airlines, 473 F.3d at 170. It follows that where, as here, a bankruptcy court authorizes interim modifications to CBA terms pursuant to 11 U.S.C. § 1113(e), the CBA

31

terms "cease to exist" for all purposes while the interim modifications remain in place. Cf. Northwest Airlines, 483 F.3d at 170.[5]

This is precisely what this Court recognized in affirming the Section 10(j) injunction in this case. The Court did not merely state that the Bankruptcy Court modified the Centers' obligations under the expired CBAs. It confirmed that the Bankruptcy Court "authorized and extended modifications to the CBA[s]" altogether under 11 U.S.C. § 1113(e). Kreisberg, 732 F.3d at 143. Thus, the effect of the Section 1113(e) relief granted and extended by the Bankruptcy Court was to temporarily "abrogate" the expired CBA terms to the extent of the interim modifications, such that these terms "cease to exist" for all purposes while the interim modifications remain in place. Cf. Northwest Airlines, 483 F.3d at 170 & 170 n.3. Accordingly, even if HealthBridge had been under any obligation to guarantee the Centers' performance under the expired CBAs in the first place, that obligation was abrogated when the Bankruptcy Court abrogated the CBAs themselves. Because the District Court cannot penalize in holding HealthBridge in contempt for not maintaining these expired CBA terms while the interim

---

[5] Although Northwest Airlines arose under the Railway Labor Act, the Court's analysis of CBA abrogation under Section 1113 applies equally to CBAs under the National Labor Relations Act. As the Court explained, "If successful procurement of a § 1113 order permits an employer to abrogate a CBA, it follows that a union subject to the NLRA would become free to strike . . . precisely because it would no longer be bound by any contractual no-strike clause to which it might at one point have agreed." Northwest Airlines, 473 F.3d at 173.

modifications ordered by the Bankruptcy Court remain in place, the District Court penalized it for failing to comply with obligations that were abrogated out of existence when the contempt proceedings were initiated, the Contempt Order must be set aside.

**B.    The Injunction Did Not Clearly and Unambiguously Require HealthBridge to Guarantee the Centers' Financial Performance under the Expired CBAs**

To ensure fair notice to the defendant, the decree or order underlying a contempt order must be sufficiently clear to allow the party to whom it is addressed to ascertain precisely what it can and cannot do.  King v. Allied Vision, Ltd., 65 F.3d 1051, 1058 (2d Cir. 1995); N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1351-52 (2d Cir. 1989).  "The proper measure of clarity, however, is not whether the decree is clear in some general sense, but whether it unambiguously proscribes the challenged conduct." Chao, 514 F.3d at 292 (citing Perez v. Danbury Hosp., 347 F.3d 419, 424 (2d Cir. 2003)).  Moreover, any ambiguities and omissions in the order are resolved to the benefit of the party charged with contempt. A.V. by Versace, Inc. v. Gianni Versace, SpA., 87 F. Supp. 2d 281, 291 (S.D.N.Y. 2000).  Nowhere does the Injunction Order here require HealthBridge to guarantee the Centers' performance under the expired CBAs, let alone clearly and unambiguously require HealthBridge to do so.

**1.  HealthBridge did not guarantee the Centers' financial performance in the status quo**

The Injunction Order directed a return to "the status quo as it existed prior to respondents' unilateral implementation of its proposals as alleged in the Petition." (JA-53; JA-79). The status quo preserved by Section 10(j) injunctions is that which was in existence before the alleged unfair labor practice occurred.  Hoffman v. Inn Credible Caterers, Ltd., 247 F.3d 260, 269 (2d Cir. 2001); Seeler v. Trading Port, Inc., 517 F.2d 33, 38 (2d Cir. 1975) ("section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices").  Under the status quo in effect as of June 16, 2012, HealthBridge was the contract manager for the Centers.  (JA-89-90, ¶ 2; JA-257, ¶ 2).  In that role, HealthBridge performed the day-to-day administrative management on behalf of the Centers.  (JA-631, ¶ 6).  It did not employ the employees of the Centers, was never a party to the expired CBAs, and had no collective-bargaining relationship with the Union.  (JA-257, ¶ 3; JA-631, ¶ 6; JA-1057, ¶ 3). It did not implement the allegedly unlawful unilateral changes that the Court ordered be rescinded.  (JA-1066-67, ¶¶ 33-34; JA-1073-1103).  Most importantly, it did not guarantee the Centers' performance under the CBAs, and it never funded the Centers' financial obligations under the CBAs.  (JA-631, ¶ 6).

34

**2.     The injunction did not require HealthBridge to act as guarantor**

Notwithstanding the undisputed fact that the status quo did not involve HealthBridge guaranteeing the Centers' performance under the CBAs, the District Court concluded that HealthBridge should have inferred this substantial new obligation from the Injunction Order because the order does not specifically differentiate among the various "Respondents" upon whom it imposes obligations. That is far too slim a reed upon which to base an argument that HealthBridge violated an obligation "clearly and unambiguously" imposed by the Injunction Order.  Under the District Court's proposed reading of the Injunction Order, each of the Centers would be jointly and severally liable for ensuring that the other Centers would comply with their obligations under the CBAs.  But this cannot possibly be what the Injunction Order meant.  To take an illustrative example, one of the Centers, Wethersfield, ceased operations in June 2012.  Even though Wethersfield is one of the named "Respondents" to the underlying Section 10(j) injunction and is not one of the parties to the bankruptcy proceedings, neither the District Court nor the Board has suggested that Wethersfield should be held in contempt because it, like HealthBridge, is one of the named "Respondents."  That is because both the District Court and the Board correctly recognize that the Injunction Order does not require all of the named "Respondents" to independently carry out every single requirement of the Order.  Rather, it requires only that each

of the named "Respondents" carry out the specific functions that it performed under the status quo in place as of June 16, 2012.  Under that status quo, the Centers were the employers and sole parties with collective bargaining relationships; HealthBridge was merely the contract manager of the Centers. Accordingly, HealthBridge was no more obligated than any other "Respondent" to guarantee the compliance of all other Respondents with the terms of the Injunction Order.

### 3. HealthBridge's alleged status as a joint employer did not make it a guarantor of the Centers' financial performance

Nor was HealthBridge's alleged status as a joint employer with the Centers' employees sufficient to put HealthBridge on notice that it was required to fund the Centers' financial performance under the expired CBAs following the relief granted by the Bankruptcy Court, as the District Court found.  (SPA-114-17).[6]  A party to a joint employment relationship is not automatically bound to all financial obligations of the other incident to the bargaining relationship solely by virtue of joint employer status.  See, e.g., AT&T v. NLRB, 67 F.3d 446, 451 (2d Cir. 1995)

---

[6] In support of its finding that HealthBridge was a joint employer, the District Court relied largely on a stipulation that HealthBridge had entered in separate unfair labor practice proceedings initiated prior to the unfair labor practice proceedings underlying the Injunction Order.  (SPA-116).  However, as HealthBridge later pointed out to the District Court in seeking reconsideration of that finding, the stipulation relied on by the District Court, by its terms, was limited to the prior unfair labor practice proceedings and expressly did not apply to any future proceedings.  (Dist. Ct. Doc. No. 83; see also JA-593-97).

("Even if we were to conclude that AT&T was a joint employer with ECS, AT&T still could not have violated the Act because it played no role in the decision to terminate [cleaning services] contract with ECS, nor was it a party to the contract. . . . Thus, AT&T could not have violated the Act by failing to bargain with the union about the decision to terminate.").  Moreover, liability under a joint-employer or single-employer theory is a doctrine of derivative liability for the conduct of another entity.  Viking Indus. Sec., Inc. v. NLRB, 225 F.3d 131, 134 (2d Cir. 2000) ("an entity could be held derivatively liable for unfair labor practices committed by affiliated entities only upon a showing of alter ego, successorship or single employer status.") (citations and internal quotation marks omitted); see also Darlington Mfg. Co. v. NLRB, 325 F.2d 682, 687 (4th Cir. 1963) ("our decision that Darlington is without liability, of course, bars such expansion of responsibility"), vacated on other grounds, Textile Workers Union of Am. v. Darlington Mfg. Co., 380 U.S. 263, 268, 275-76 (1965).

Here, the Board did not argue, and the District Court did not find, that the Centers were in contempt of the Injunction Order for not funding the expired CBA terms after the Bankruptcy Court granted interim modifications to those terms pursuant to 11 U.S.C. § 1113(e).  Absent a finding that the Centers were in contempt for not maintaining the expired CBA terms, HealthBridge could not be held in contempt derivatively for not doing so.

## C.    HealthBridge was Reasonably Diligent in Complying with the Injunction

In all events, even assuming HealthBridge somehow remained under a clear and unambiguous obligation to fund the expired CBAs even after the Bankruptcy Court abrogated those agreements pursuant to 11 U.S.C. § 1113(e), there was still no basis for holding HealthBridge in contempt of the Injunction Order.  "[T]he failure to meet the strict requirements of an order does not necessarily subject a party to a holding of contempt."  Dunn v. N.Y. State Dep't of Labor, 47 F.3d 485, 490 (2d Cir. 1995).  Rather, contempt is permissible only if a party has "not been reasonably diligent and energetic in attempting to accomplish what was ordered."  O'Rourke, 943 F.2d at 189.  When evaluating diligence, "courts examine the defendant's actions and consider whether they are based on a good faith and reasonable interpretation of the court order."  Schmitz v. St. Regis Paper Co., 758 F. Supp. 922, 927 (S.D.N.Y. 1991).  HealthBridge's actions clearly satisfy that standard.

At the outset, except to the extent modified by the Bankruptcy Court's order pursuant to 11 U.S.C. § 1113(e), there is no dispute that HealthBridge and the Centers have complied with the District Court's Injunction Order in all respects.  As directed by the Injunction Order, all strikers have been reinstated, the injunction order has been posted at the Centers, a declaration of compliance was filed, and the Centers remain ready and willing to bargain with the Union.  Moreover, by March

38

3, 2013, the Centers had restored the terms and conditions of employment that were in place on June 16, 2012 for all returning strikers and all bargaining unit employees who had continued to work during the strike. (JA-259-60, ¶ 6). These terms and conditions remained in place until after the Bankruptcy Court authorized the interim modifications under 11 U.S.C. § 1113(e) by Order dated March 4, 2013. (Id.). Had the Bankruptcy Court denied the Centers interim relief under Section 1113(e), the terms and conditions under the expired CBAs would have remained in place until the Centers were forced to close.

The District Court nonetheless concluded that HealthBridge was not sufficiently diligent in complying with the Court's order because it did not ask the Court for clarification before relying on the interim relief granted by the Bankruptcy Court. No such clarification was needed, however, as both controlling Second Circuit law and this Court's decision in this very case make crystal clear that the effect of the relief granted by the Bankruptcy Court pursuant to 11 U.S.C. § 1113(e) was to "abrogate" the expired CBA terms such that they "ceased to exist" for all purposes. (Point II.A, supra). Moreover, HealthBridge was never a party to the expired CBAs, never negotiated the CBAs on the Centers' behalf, never paid the Centers' employees, never guaranteed the Centers' performance under the expired CBAs, and never otherwise funded the Centers' obligations under the expired CBAs. (Point II.B, supra). Thus, HealthBridge reasonably

39

interpreted the District Court's Injunction Order directing a return to the status quo ante as not requiring HealthBridge to take on substantial new obligations that had not been specifically ordered and that would have been contrary to the relief granted by the Bankruptcy Court.

Indeed, during a conference call with the parties on July 23, 2013, the District Court expressly acknowledged that, in light of the relief granted by the Bankruptcy Court, Respondents "have produced what might be thought of as an uncertainty with regard to HealthBridge's obligation under the injunction." (SPA-119). The District Court also noted that it was reluctant to issue the requested contempt order because there was at least some "arguable merit" to HealthBridge's position that the Bankruptcy Court, in rejecting the Board's and Union's arguments that HealthBridge and other related entities could fund benefits due to the employees under the injunction, provided "at least a fair ground of doubt as to the alleged wrongfulness of HealthBridge's actions making a finding of contempt unwarranted." (SPA-120). Cf. Latino Officers Ass'n, 558 F.3d at 164. The Court repeated this view during another conference call with the parties on October 2, 2013:

> It also bears mention, however, that, as Ms. Alito said earlier, it's not like HealthBridge flouted the injunction, as would have been the case without resort to the bankruptcy court by the centers. If the centers had never gone to the bankruptcy court and the centers together with HealthBridge had failed to comply with the injunction, then I think we would have a somewhat different situation. The decision of the

40

bankruptcy court alleviating the centers of their obligation to comply gives HealthBridge a talking point that otherwise would not exist, and that is something that I also need to bear in mind.

So it's not as clear-cut as it might be, and I think that that's something that everybody needs to bear in mind.

(SPA-50).    Thus, the District Court's own comments demonstrate "a fair ground of doubt as to the wrongfulness of the defendant's conduct," making its contempt finding all the more inappropriate.  See Latino Officers Ass'n, 558 F.3d at 164.

## POINT THREE

### THIS COURT HAS JURISDICTION OVER THIS APPEAL

In response to the Court's invitation to the parties to address this Court's jurisdiction over the appeal (2d Cir. Doc. No. 65), as shown below, the Contempt Order is appealable either as a final decision of the District Court pursuant to 28 U.S.C. § 1291, or as an order modifying the District Court's Injunction Order pursuant to 28 U.S.C. § 1292(a)(1).

**A.    The Contempt Order is Appealable as a Final Decision of the District Court under 28 U.S.C. § 1291**

It is well settled in this Circuit that where "civil contempt proceedings are instituted after the conclusion of the principal action rather than during the pendency of the action, the order disposing of the contempt proceedings is appealable as a final decision . . . under 28 U.S.C. § 1291."   See Latino Officers Ass'n, 558 F.3d at 163.  "This rule encompasses appeals from orders both granting

41

and denying post-judgment civil contempt sanctions." Latino Officers Ass'n, 558 F.3d at 163.  This rule is especially important as to orders granting contempt sanctions, as "a finding of non-appealability would effectively foreclose any review of the issues involved in the contempt order" and "leave [the appellant] subject to continuing liabilities under the civil contempt order." O'Rourke, 943 F.2d at, 186 (quoting Vincent v. Local 294, Int'l Bhd. of Teamsters, 424 F.2d 124, 127 (2d Cir.1970)).

Moreover, an order granting a post-judgment motion for civil contempt is final and appealable even if it imposes sanctions only if the defendant fails to purge its contempt. O'Rourke, 943 F.2d at 185.  As the Court noted in O'Rourke, "[t]his court has previously rejected the notion that the opportunity for purgation vitiates the finality of a contempt citation." O'Rourke, 943 F.2d at 186 (citing Vincent, 424 F.2d at 127).  Indeed, any such contention is at odds with the basic purpose of a purgation order.  When a district court imposes a prospective fine schedule:

> the court hopes that the threat of fines will coerce compliance so that actual imposition of fines is not necessary.  Thus, while in one sense a prospective fine schedule is a conditional future sanction, it also serves as an unconditional present sanction. Being placed under the threat of future sanction is a present sanction.... [A] party under a specific threat of future sanctions is in a different, more serious, often worse situation than one not under such a threat, even if the future sanctions are never imposed.  In at least one sense, then, the ... order imposes a present remedy and hence is appealable.

O'Rourke, 943 F.2d at 186 (alterations in original) (quoting Sizzler Family Steak

Houses v. Western Sizzlin Steak House, Inc., 793 F.2d 1529, 1533 n.2 (11th Cir.

1986)); see also New York v. Shore Realty Corp., 763 F.2d 49, 51 (2d Cir. 1985)

(allowing appeal from contempt order imposing $1,000 per day fine); Vincent, 424

F.2d at 127 (appeal proper under 28 U.S.C. § 1291 where the order and

adjudication in civil contempt "direct[ed] appellant to purge itself of civil contempt

by fully complying with [a prior] injunction order, and upon failure to do so, to pay

a fine of $200 a day for every day it continued in noncompliance with that order.").

Applying these standards, there can be no question that the Contempt Order

here is appealable as a final order under 28 U.S.C. § 1291.  The Contempt Order

finally disposes of contempt proceedings instituted after the conclusion of the

underlying Section 10(j) litigation.  Cf. Vincent, 424 F.2d at 128 (holding that a

civil contempt order based on an injunction issued under Section 10(*l*) of the

NLRA, 29 U.S.C. § 160(*l*), was appealable as a final order because it was issued

after the conclusion of the underlying Section 10(*l*) proceedings).  Moreover, the

Contempt Order imposes an unconditional present sanction upon HealthBridge.  It

directs HealthBridge to comply with all of the provisions of the Injunction and the

Contempt Order.  (SPA-2, ¶ 2).  It orders HealthBridge to reinstate and maintain

the terms of the Centers' expired CBAs with the Union; compensate and make

whole all of the Centers' employees from February 1, 2013, to the present; make

business records available to the Board so that it can assess HealthBridge's compliance with the back pay portion of the Contempt Order; post the Contempt Order at the Centers; serve the Contempt Order upon owners, officers, and management employees of HealthBridge and the Centers; and furnish an affidavit of compliance within twenty days of the Contempt Order.  (SPA-3-4, ¶¶ 3-8). Upon HealthBridge's failure to comply with any one of the paragraphs of the Contempt Order, HealthBridge is directed to pay the Board $10,000 plus a daily compliance fine of $500, with any subsequent violation of the Injunction triggering a $5,000 fine.  (SPA- 4, ¶ 9).

The Board nonetheless has challenged the finality of the Contempt Order on the grounds that the District Court had not resolved the issue of attorneys' fees and costs or calculated the amount of compensatory damages for back pay.  (2d Cir. Doc. No. 28 at 5, ¶ 8).  Neither issue deprives the order of finality.  As to the attorneys' fees issue, the Supreme Court has enunciated a "bright line rule" that "a decision on the merits is a 'final decision' for purposes of [28 U.S.C.] § 1291 whether or not there remains for adjudication a request for attorney's fees." Budinich v. Becton Dickinson & Co., 486 U.S. 196, 202-03 (1988); accord Ray Haluch Gravel Co. v. Cent. Pension Fund of Operating Eng'rs & Participating Emp'rs, 134 S. Ct. 773, 777 (2014) ("Whether the claim for attorney's fees is based on a statute, a contract, or both, the pendency of a ruling on an award for

fees and costs does not prevent, as a general rule, the merits judgment from becoming final for purposes of appeal."); O & G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153, 167-68 & 168 n.11 (2d Cir. 2008) (applying this "now uniform rule" in holding that undetermined award of attorneys' fees did not impair the finality of the underlying order nor divest the Court of jurisdiction to review the merits of the other issues on appeal) (citation and internal quotation marks omitted).

As to the back pay issue, "a contempt adjudication is a post-judgment proceeding from which an appeal may be taken, even if some aspects of the underlying litigation, such as damages, remain to be determined." Shore Realty, 763 F.2d at 51. Even in non-contempt cases, where all that remains for the District Court is the "ministerial task" of computing the damages amount, the judgment is final and appealable. Synergy Gas Co. v. Sasso, 853 F.2d 59, 62 (2d Cir. 1988) (holding that district court's order confirming arbitrator's decision to award attorneys' fees and union dues was a final decision appealable under 28 U.S.C. § 1291, even though the amounts of these fees and dues had yet to be calculated); see also Morgan v. United States, 968 F.2d 200, 204-05 (2d Cir. 1992) ("Since in the present case the order of the district court left essentially only an arithmetic task to be performed, we conclude that even if a final order were required, the present order was sufficiently final."); accord Turner v. Orr, 759 F.2d 817, 820 (11th Cir.

1985) (district court's order was an appealable final decision under 28 U.S.C. § 1291, despite court's failure to conduct the ministerial act of calculating the amount of back pay).  Here, the computation of back pay is nothing more than a ministerial task that the District Court left to the parties to resolve.  HealthBridge was ordered to pay the Centers' bargaining unit employees back pay running from February 1, 2013, and it is required to provide records sufficient to enable the Board to determine whether HealthBridge has calculated the amount properly. (SPA-3, ¶¶ 4-5).  The Contempt Order does not even contemplate any further proceedings in which the District Court would address the back pay calculation. (See id.).

The Board's reliance on Forschner Group, Inc. v. Arrow Trading Co., Inc., 124 F.3d 402, 410 (2d Cir. 1997)  (2d Cir. Doc. No. 28 at 5, ¶ 8), is misplaced.  In Forschner, the only sanction contemplated by the contempt order was an award of attorneys' fees and costs incurred by the moving party in prosecuting the contempt motion in an amount that the court was scheduled to determine at a subsequent hearing.  Forschner, 124 F.3d at 410.  The contempt order did not impose any kind of ongoing obligations, let alone set a schedule of financial sanctions for future non-compliance.  Accordingly, the Court concluded that the order was not final for purposes of appeal because it, in effect, did not impose any sanction at all.  Here, by contrast, the contempt order imposes many obligations upon HealthBridge, each

enforceable with the threat of daily compliance fines.  (SPA-2-4, ¶¶ 2-9).  Thus, the Contempt Order imposes "an unconditional present sanction" that renders the order immediately appealable under 28 U.S.C. § 1291.  O'Rourke, 943 F.2d at 186; see also Shore Realty, 763 F.2d at 51; Vincent, 424 F.2d at 127.[7]

**B.    In the Alternative, the Contempt Order is Appealable as an Order Continuing or Modifying an Injunction under 28 U.S.C. § 1292(a)(1)**

Even if the Contempt Order were not appealable as a final order under 28 U.S.C. § 1291, it would be appealable as an interlocutory order "continuing" or "modifying" the Injunction Order upon which it was based.  See 28 U.S.C. § 1292(a)(1).  Nowhere did the original Injunction Order require that HealthBridge independently guarantee the Centers' financial performance under the expired CBAs in the event that the Centers obtained relief from those obligations pursuant to 11 U.S.C. § 1113.  Rather, the Injunction Order directed a return to "status quo as it existed prior to respondents' unilateral implementation of its proposals as

---

[7]Forschner is in apparent conflict with Dove v. Atlantic Capital Corp., 963 F.2d 15 (2d Cir. 1992), also relied upon in the Board's motion to dismiss.  (2d Cir. Doc. No. 28 at 4, ¶ 6).  In Dove, the Court explained that "our Circuit has adopted a rule allowing for an appeal from a finding of contempt prior to the imposition of sanctions."  Dove, 963 F.3d at 18.  The Court noted that, while the rule originated as a "limited exception for government employees asserting a nonfrivolous governmental privilege at the request of a government agency," the rule had since been transformed "into a general rule ... that only a citation for contempt, not the imposition of sanctions, is necessary for appellate review."  Dove, 963 F.3d at 18 (citations and internal quotation marks omitted).  This Court need not resolve this apparent conflict since the Contempt Order in this case not only includes a finding of contempt, but it also imposes an unconditional present sanction that is immediately appealable under 28 U.S.C. § 1291.

47

alleged in the Petition." (JA-53). As noted above, the status quo preserved by Section 10(j) injunctions is that which was in existence before the alleged unfair labor practice occurred. Inn Credible Caterers, 247 F.3d at 269; Seeler, 517 F.2d at 38. Under the status quo to which the Court ordered the parties to return, the Centers were the sole parties to the CBAs with the Union, and were the parties with the collective bargaining relationship with the Union. (JA-1057, ¶ 3). HealthBridge was the contract manager of the Centers, but it was not a party to any of the expired CBAs, never paid the Centers' employees, and never guaranteed the Centers' performance under the expired CBAs. (JA-631, ¶ 6). Thus, by requiring that HealthBridge "reinstate and maintain the previous wages, benefits, and other terms and conditions of employment for the employees of the Centers that were in place on June 16, 2012" (SPA-3, ¶ 3), the Contempt Order imposes new and different obligations upon HealthBridge that were not clearly and unambiguously mandated by the Injunction, and that were, in any event, abrogated by subsequent orders of the Bankruptcy Court. As such, the Contempt Order is appealable as an order "modifying" an injunction under 28 U.S.C. § 1292(a)(1). Cf. O'Rourke, 943 F.2d at 186 ("Since we hereinafter conclude that the district court misconstrued the injunctive mandate contained in paragraph V of the Decree, the court was 'modifying' that injunction, within the meaning of section 1292(a)(1), by ordering compliance with its misinterpretation.").

48

Independent of whether the District Court misconstrued its underlying Injunction, the Contempt Order imposes additional obligations upon HealthBridge that the original Injunction unquestionably did not require.  For example, unlike the original injunction, the Contempt Order imposes a new back pay requirement and requires HealthBridge to make available to the Board all business records necessary to enable the Board to calculate the amount of back pay and benefits that HealthBridge is required to pay the Centers' unionized employees.  (SPA- 3, ¶¶ 4 5).  The Contempt Order imposes a new and more expansive postings requirement upon HealthBridge.  (SPA-3, ¶ 6).  It requires HealthBridge to serve copies of the Contempt Order on each owner, officer, and managing employee of HealthBridge and the Centers; and it requires HealthBridge to obtain signed acceptances of such copies and provide them to the Board.  (SPA-4, ¶ 7).  It requires HealthBridge to file and serve a new affidavit of compliance.  (SPA-4, ¶ 8).  The Contempt Order imposes compliance fines in the event that HealthBridge fails to comply with any one of its decretal paragraphs.  (SPA- 4, ¶ 9).  For these additional reasons, the Contempt Order is an order "continuing" or "modifying" the original Injunction Order and is immediately appealable to this Court under 28 U.S.C. § 1292(a)(1).  See Petereit v. S.B. Thomas, Inc., 63 F.3d 1169, 1175 (2d Cir. 1995) ("[W]here a district court grants permanent injunctive relief but reserves decision on damages, we have jurisdiction to hear the appeal pursuant to § 1292(a)(1).").

49

## <u>CONCLUSION</u>

For all of the foregoing reasons, HealthBridge respectfully requests that this Court reverse the judgment of the District Court adjudicating it in civil contempt and vacate the Contempt Order in its entirety.

Respectfully submitted,

/s/ Rosemary Alito

_____

Rosemary Alito

Dated: May 6, 2014

## <u>CERTIFICATE OF BAR MEMBERSHIP</u>

I hereby certify that I am a member of the Bar of the United States Court of

Appeals for the Second Circuit.

<u>/s/ Rosemary Alito</u>
ROSEMARY ALITO

Dated:  May 6, 2014

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that, in compliance with F.R.A.P. 32(a)(7)(B), the within brief contains 12,133 words (as calculated using the word-counting feature of Microsoft Word) in 14 pt. proportional font, exclusive of corporate disclosure statement, tables, and certifications.

<u>/s/ Rosemary Alito</u>
ROSEMARY ALITO

Dated: May 6, 2014

# CERTIFICATE OF SERVICE

ROSEMARY ALITO certifies as follows:

(1)     On this date, I caused Appellants' Brief, the Special Appendix, and Joint Appendix to be electronically filed and served upon all counsel of record via the ECF filing system.

(2)   On this date, I caused six hard copies of Appellants' Brief and Special Appendix, and three hard copies of the Joint Appendix, to be sent via Federal Express to:

> Catherine O'Hagan Wolfe, Clerk of Court
> United States Court of Appeals for the Second Circuit
> Thurgood Marshall United States Courthouse
> 40 Foley Square, New York, New York 10007

(3)     On this date, I caused two hard copies of Appellants' Brief and Special Appendix, and one hard copies of the Joint Appendix, to be sent via Federal Express to:

> Laura T. Vazquez, Esq.
> Deputy Assistant General Counsel
> National Labor Relations Board
> 1099 14th Street, N.W.
> Washington, DC 20570

I certify under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

/s/ Rosemary Alito

_____
Rosemary Alito

Dated:  May 6, 2014

# No. 13-4850

## In the United States Court of Appeals for the Second Circuit

### No. 13-4850

JONATHAN B. KREISBERG, Regional Director of Region 34 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,
*Appellee/Petitioner,*

*vs.*

HEALTHBRIDGE MANAGEMENT, LLC
*Appellant/Respondent*

and

107 OSBORNE STREET OPERATING COMPANY II, LLC D/B/A DANBURY HCC; 710 LONG RIDGE ROAD OPERATING COMPANY II, LLC D/B/A LONG RIDGE OF STAMFORD; 240 CHURCH STREET OPERATING COMPANY II, LLC D/B/A NEWINGTON HEALTH CARE CENTER; 1 BURR ROAD OPERATING COMPANY II, LLC D/B/A WESTPORT HEALTHCARE CENTER; 245 ORANGE AVENUE OPERATING COMPANY II, LLC D/B/A WEST RIVER HEALTH CARE CENTER; 341 JORDAN LANE OPERATING COMPANY II, LLC D/B/A WETHERSFIELD HEALTH CARE CENTER,
*Respondents*

*On Appeal from the contempt order entered by the United States District Court for the District of Connecticut dated December 23, 2013, in Civil Action No. 12-1299*

## SPECIAL APPENDIX

PAUL D. CLEMENT
ERIN E. MURPHY
BANCROFT PLLC
1919 M Street NW, Suite 470
Washington, DC 20036
(202) 234-0090

ROSEMARY ALITO
GEORGE PETER BARBATSULY
K&L GATES LLP
One Newark Center, Tenth Floor
Newark, New Jersey 07102
(973) 848-4000

*Attorneys for Appellant/Respondent*

# SPECIAL APPENDIX TABLE OF CONTENTS

**DOCUMENT**                                                                    **PAGE**

Ruling and Order on Motion for Contempt
(12/23/2013) ...................................................................................SPA-1

Transcript of Proceedings before District Court
(12/23/2013) ...................................................................................SPA-6

Transcript of Proceedings before District Court
(10/02/2013) ................................................................................. SPA-27

Transcript of Proceedings before District Court
(08/20/2013) ................................................................................. SPA-55

Transcript of Proceedings before District Court
(07/23/2013) ................................................................................. SPA-85

Transcript of Proceedings before District Court
(06/06/2013) ............................................................................... SPA-125

Text of Significant Statutory Provisions

    11 U.S.C. § 1113 ................................................................. SPA-137

    11 U.S.C. § 1129 ................................................................. SPA-139

    29 U.S.C. § 160(j) ............................................................... SPA-144

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JONATHON B.KREISBERG,                 :
Regional Director of Region 34        :
of the National Labor Relations       :
Board, for and on behalf of the       :
NATIONAL LABOR RELATIONS BOARD,       :

                 Petitioner,          :

V.                                    :   3:12-CV-1299(RNC)

HEALTHBRIDGE MANAGEMENT, LLC,         :
ET AL.,                               :

                 Respondents.         :

<u>RULING AND ORDER ON MOTION FOR CONTEMPT</u>

Petitioner Jonathon B. Kreisberg, acting on behalf of the
National Labor Relations Board ("the Board"), brings this motion
for contempt (ECF No. 58) against HealthBridge Management, LLC
("HealthBridge") and Lisa Crutchfield, HealthBridge's Senior Vice
President of Labor Relations, alleging that they have failed to
comply with the injunction issued in this case on December 11,
2012 (ECF No. 46), pursuant to Section 10(j) of the National
Labor Relations Act, 2 U.S.C. § 160(j), enjoining temporarily,
pending a final adjudication by the Board, alleged unfair labor
practices relating to a dispute between HealthBridge and New
England Heath Care Employees Union 1199, SEIU. <u>See</u> <u>Kreisberg v.</u>
<u>HealthBridge Mgmt., LLC</u>, 2012 WL 6553103 (D. Conn. Dec. 14,
2012), <u>aff'd</u>, 732 F.3d 131 (2d Cir. 2013)(("the 10(j)
Injunction").

The intent of the 10(j) Injunction was to restore the status quo as it existed prior to the alleged unfair labor practices by requiring the respondents to reinstate Union employees to their employment at nursing facilities operated by HealthBridge in Connecticut ("the Centers") with the same wages and benefits that were in effect on June 16, 2012. Although the employees have been reinstated, it is undisputed that the wages and benefits have not been restored as required by the 10(j) Injunction.[1]

On May 30, 2013, petitioner filed the present motion for contempt pursuant to Fed. R. Civ. P. 70(e). After careful consideration, the Court finds that HealthBridge has failed to restore the employees' wages and benefits in violation of the 10(j) Injunction, and that HealthBridge is in civil contempt.

Accordingly, it is hereby ordered as follows:

1. The motion for contempt (ECF No. 58) is granted as to HealthBridge.

2. HealthBridge shall comply with all the provisions of the 10(j) Injunction and this Order;

---

[1] Petitioner has shown that HealthBridge has failed to: (a) provide employees with a paid lunch break; (b) pay employees daily overtime for hours worked in excess of eight hours per day; (c) allow employees to accrue sick leave at the pre-June 16 accrual rates; (d) provide employees with health insurance at no monthly cost; (e) contribute to the Union pension fund; (f) contribute to the Union training fund; (g) pay a yearly uniform allowance; (h) allow employees to accrue paid personal days; and (i) pay employees their wages on a weekly, rather than biweekly, basis.

3. HealthBridge shall reinstate and maintain the previous wages, benefits, and other terms and conditions of employment for the employees of the Centers that were in place on June 16, 2012;

4. HealthBridge shall compensate and make whole all employees of the Centers for wages, benefits, and other terms and conditions of employment, since February 1, 2013, plus normal interest as computed in Board proceedings, lost because of HealthBridge's failure to reinstate and maintain the terms and conditions of employment in effect on June 16, 2012, as required by the 10(j) Injunction;

5. HealthBridge shall make available to Petitioner for inspection and copying all business records necessary to determine the amount of pay and benefits the employees are entitled to receive pursuant to the 10(j) Injunction and this Order;

6. Within seven days of the date of this Order, HealthBridge shall post copies of this Order at each of the Centers in all places where the 10(j) Injunction is posted; maintain such postings free from all obstructions and defacements for the duration of the 10(j) Injunction; allow all bargaining unit employees to have free and unrestricted access to said postings; and grant reasonable access to agents of Region 1 of the Board to all such locations to monitor compliance with this posting requirement;

3

7.  Within fourteen days of the date of this Order, HealthBridge shall serve copies of this Order on each owner, officer, and management employee of each of the Centers, as well as each owner, officer and management employee of HealthBridge, and obtain signed acceptances of such copies from each of them, and provide the signed acceptances to the Regional Director of Region 1 of the Board;

8.  Within twenty days of the entry of this Order, HealthBridge shall file and serve an affidavit by a responsible corporate official of HealthBridge setting forth with specificity the manner in which HealthBridge has complied with the terms of the 10(j) Injunction and this Order;

9.  Upon the failure of HealthBridge to comply with each of the paragraphs of this Order, HealthBridge shall pay the Board $10,000, and a daily compliance fine of $500.  For any subsequent violation of any provision of the 10(j) Injunction, HealthBridge shall pay the Board a fine of $5,000.

10.  Within twenty days of the entry of this Order, the Board may file and serve a motion for attorneys' fees and costs incurred in connection with the motion for contempt.  Within twenty-one days thereafter, HealthBridge may file a memorandum in opposition to the motion for fees and costs.

So ordered this 23rd day of December 2013.

4

```
_____/s/ RNC_____
Robert N. Chatigny
United States District Judge
```

5

```
 1                     UNITED STATES DISTRICT COURT

 2
                     FOR THE DISTRICT OF CONNECTICUT
 3

 4     - - - - - - - - - - - - - - - x
                                     :
 5     JONATHAN B. KREISBERG,         :   No. 3:12CV1299(RNC)
                                     :
 6                     Plaintiff,     :
                                     :
 7             vs.                    :
                                     :
 8     HEALTHBRIDGE MANAGEMENT, LLC,  :
         dba DANBURY HCC, ET AL,      :   HARTFORD, CONNECTICUT
 9                     Defendants.    :   December 23, 2013
                                     :
10     - - - - - - - - - - - - - - - x

11

12
                          TELEPHONE CONFERENCE
13

14

15         BEFORE:

16

17              HON. ROBERT N. CHATIGNY, U.S.D.J.

18

19

20

21

22                            Darlene A. Warner, RDR-CRR
                              Official Court Reporter
23

24

25
```

```
1    APPEARANCES:

2        FOR THE PLAINTIFF:

3            NATIONAL LABOR RELATIONS BOARD
                 A.A. Ribicoff Federal Building,
4                450 Main Street, Suite 410
                 Hartford, Connecticut 06103
5            BY:  THOMAS EDWARD QUIGLEY, ESQ.
                 JOHN A. McGRATH, ESQ.
6
        FOR THE AMICUS 1199 NE:
7
             LAW OFFICES OF JOHN M. CREANE
8                92 Cherry Street
                 Milford, Connecticut 06460
9            BY:  JOHN M. CREANE, ESQ.

10
        FOR HEALTHBRIDGE MGT, LLC:
11
             K&L GATES, LLP
12               One Newark Center, 10th Floor
                 Newark, New Jersey 07102-5285
13           BY:  ROSEMARY ALITO, ESQ.
                 GEORGE P. BARBATSULY, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25
```

1                        10:00 A.M.

2

3              THE COURT:  Good morning.  Would you please

4    state your appearances for the record.

5              MR. McGRATH:  Thank you, Your Honor, John

6    McGrath and Thomas Quigley for petitioner.

7              MR. CREANE:  John Creane for amicus union.

8              MS. ALITO:  Rosemary Alito and George Barbatsuly

9    for respondents.

10             THE COURT:  All right, thank you.

11             This is a telephone conference to address the

12   pending motion for contempt.  The motion has been the

13   subject of previous discussions.  We stayed the case to

14   give the parties an opportunity to attempt mediation, and

15   that didn't work.  The parties' status reports offer

16   differing views of why it didn't work, but I don't think

17   that it is necessary for me to get into that.  As has been

18   pointed out, the mediation proceeding is supposed to be

19   confidential and for me to try to explore what happened

20   and why it happened would be inconsistent with the

21   confidentiality that properly surrounds the mediation.

22   Moreover, I'm prepared to assume that the mediation failed

23   largely because the board and the union have a strongly

24   held belief that the terms and conditions of the

25   employees' employment as they existed in June 2012 must be

1 | restored before any meaningful bargaining can take place.

2 | So in that framework, I'm prepared to address

3 | the motion for contempt.  Before I do that, I'll give each

4 | side an opportunity to make whatever statement they wish.

5 | Mr. McGrath, is there anything you want to add

6 | to what you've submitted in writing?

7 | MR. McGRATH:  I guess -- I think most of our

8 | arguments I think have been pretty well set forth in our

9 | previous submissions.  I could respond briefly to the

10 | latest status report filed by HealthBridge that addresses

11 | the issue of both the mediation and additional case law,

12 | the Northwest case, having to do with bankruptcy and the

13 | nature of those proceedings, but only if Your Honor thinks

14 | it's necessary and wishes us to address it.

15 | We certainly feel that that case is clearly

16 | distinguishable on the facts.  It was entered pursuant to

17 | a separate statutory scheme, the Railway Labor Act and has

18 | a different general purpose and doesn't speak to the

19 | liability of a non-debtor regardless, but I can go into

20 | that a little bit more if Your Honor prefers, or if Your

21 | Honor doesn't think the issue deserves too much attention,

22 | we can skip over that, I suppose.

23 | THE COURT:  Okay.

24 | Ms. Alito, anything you want to say in addition

25 | to what you've submitted in writing?

1          MS. ALITO:  I just think that the Northwest

2     Airlines case is very important and in fact dispositive of

3     the claims on the petition for contempt.  And even though

4     it is under the Railway Labor Act, I think that the

5     important holding of that case is that releases granted

6     under the bankruptcy code is different, it's not a

7     rejection to the contract, it's an abrogation of the

8     collective bargaining agreement.  And in the language of

9     the Second Circuit in that case, once relief is granted

10    under 1113, the contract ceases to exist.

11          Now, I think that that holding that the

12    collective bargaining agreements in their former form have

13    ceased to exist here ties in precisely with the Second

14    Circuit's decision in this case.  Where in the final

15    paragraph, the court talks about irreparable harm and the

16    financial impact on respondents.  And the language to

17    support is in that final paragraph and is significant,

18    because although it talks about the Centers have filed for

19    bankruptcy protection and that court has since authorized

20    extended modifications to the collective bargaining

21    agreement pursuant to 1113(e), and then in the next

22    sentence, the Second Circuit refers to HealthBridge, which

23    in that proceedings encompassed all of the respondents.

24          It says HealthBridge failed to present

25    sufficient evidence indicating how it would be further

1       adversely affected financially by this temporary order

2       enforcing the prior CBA under which the parties operated

3       for half a decade and which may be modified as necessary

4       by the bankruptcy court.

5               And I think that that ties in precisely with the

6       holding of Northwest, that once the 1113 release is

7       granted, the collective bargaining agreement as it

8       formerly existed ceases to exist as a consequence.

9               The Second Circuit in talking about the

10      financial impact of the injunction on all of the responses

11      referred to the bankruptcy court and referred to the

12      ability of the bankruptcy court to modify.  So as a

13      consequence we believe that those holdings, in addition to

14      all the other arguments we made, indicate that

15      HealthBridge is not in contempt because of the bankruptcy

16      proceedings in addition to the other arguments.  And that

17      consistent with the Second Circuit's ruling in the

18      Northwest case, and in this very case, HealthBridge should

19      not be held responsible for the now nonexistent collective

20      bargaining agreements or be held in contempt for not

21      reinstating their terms and conditions.

22              THE COURT:  Okay.  Any response to that, Mr.

23      McGrath?

24              MR. McGRATH:  Yes, Your Honor, thank you.  I

25      guess it's twofold.  One addressing the concept of

1    abrogation of the collective bargaining agreement, the

2    second having to do with the nature of the bankruptcy

3    ruling.

4           Regarding the collective bargaining agreement,

5    we are talking about a contract that has been shredded and

6    stepped on and thrown in the wastebasket more times than

7    one might be able to count before we even get into

8    bankruptcy court at this point.

9           The employer's unilateral change described in

10   the Fish decision began in 2009 and 2010.  The contract

11   expired by its own terms.  Is it March or May, 2012?  Then

12   at the time of the expiration, other parts of -- the

13   employer indicated that it would no longer be maintaining

14   the mandatory arbitration clause in the contract or the

15   dues checkup provisions.  So more bits of the contract

16   came off with expiration.  And then there was of course

17   the bargaining, the employer's declaration of impasse and

18   unilateral implementation on June 17, 2012.  The idea that

19   there's any contract left in these circumstances to

20   abrogate is something of a metaphysical mystery here.

21          It's clearly not what happened in the Northwest

22   case where you had an employer who was following a

23   contract right up until the point that bankruptcy court

24   granted it relief.  Here we have a contract that's been

25   breached, abrogated, whichever terminology you want to

1    work for, it simply didn't exist in any type of

2    recognizable or legal enforceable form.  All we have left

3    are the employer's statutory duties under Section 85 of

4    the Act, and we are left with the employer's duties as a

5    respondent under the 10(j) injunction.  And whether or not

6    bankruptcy court could abrogate the injunction, we

7    obviously disagree with that.  That is one of several

8    issues on appeal in the District of New Jersey that those

9    appeals are still pending.  So I don't think the --

10   itself, sort of the theoretical concept of abrogation

11   really works in this fact pattern.

12           Secondly, I want to come back to the nature of

13   1113(e) relief.  I think even if the Court was inclined to

14   accept the meaning -- that is the very narrow meaning that

15   is imputed to this very broad word, abrogation, in this

16   context -- I think if one looks at the actual language in

17   the bankruptcy code under Section 1113 of Title 11 of the

18   bankruptcy code, I don't think there's any basis to argue

19   that a non-debtor gets the same relief that a debtor or a

20   trustee might get under that provision.

21           So again, Northwest was a case where the issue

22   was whether or not the debtor's contractual obligations

23   had been abrogated or breached and more specifically, what

24   was the effect of the bankruptcy on the litigants' right

25   to strike in that case.

1           HealthBridge is not a debtor in this case, so

2   when you look at the language of 1113 where it says the

3   Court may authorize the trustee to implement interim

4   changes.  And in the context, trustee refers both to

5   trustees and debtors in possession.

6           As HealthBridge is not a debtor in position, it

7   isn't clear how it could be authorized under 1113(e) to

8   have interim modifications.  Indeed, HealthBridge's

9   original arguments in these contempt proceedings was it

10  wasn't an employer, that it wasn't bound to these

11  contracts.  For it now to claim that it is entitled to

12  contractual relief in bankruptcy court strikes me as plan

13  B.

14          And I don't think that Northwest Airlines case

15  is really dispositive in this, because if it were, we

16  would have heard about it much sooner than a week or two

17  ago.  And, you know, the fact that we haven't heard about

18  it up until this very point, I -- it doesn't -- I don't

19  think that HealthBridge was relying on the Northwest case,

20  you know, months ago and when it decided to, well, not

21  fully comply with the requirements of the injunction as

22  Your Honor articulated them back on July 23rd.

23          THE COURT:  Okay, thank you.

24          Mr. Creane, do you wish to be heard?

25          MR. CREANE:  No, Your Honor.

1           THE COURT:  All right, fine.

2           Well, what is the status of the bankruptcy

3      appeal in the District of New Jersey, please?

4           MR. McGRATH:  Your Honor, it hasn't gone

5      anywhere, I'm afraid.  It's still -- we are still waiting

6      for a ruling -- I believe we're waiting for a ruling from

7      the district court as to whether or not they can certify a

8      direct appeal to the Third Circuit on the issue, which is

9      what we've requested.

10          There was a motion to dismiss the appeal for

11     lack of standing and jurisdiction having to do with the

12     recess appointments issue.  I think that's that.  And the

13     government's shutdown and standstill agreement have sort

14     of held things where they are.

15          I'm not aware of any -- although I'm not

16     directly involved in those proceedings, so there may be

17     things that I'm not aware of, but my understanding is that

18     there hasn't been any movement there.

19          THE COURT:  How about the underlying

20     administrative proceeding?

21          MR. McGRATH:  The administrative proceeding is

22     continuing.  We were on the record -- I have to check my

23     calendar.  We were on the record last week for three days,

24     and we are resuming after the holidays for I think about

25     ten days in January, and we have also dates in February

1    and March scheduled -- I'm sorry, not -- looks like seven

2    days on the record in January.  We also have dates in

3    February and March set as well, so --

4              THE COURT:  Do you have any sense for how long

5    that proceeding is likely to take?

6              MR. McGRATH:  It is difficult to say.  There's

7    one, you know -- currently the respondents are presenting

8    a fair amount of detail testimony as to what happened at

9    the bargaining sessions with Mr. Kaplan.  There are

10   outstanding subpoena issues that we are also -- we had

11   been trying to resolve for awhile, but now we've requested

12   that the administrative law judge rule on.  And we

13   anticipate that he'll be doing that before we resume in

14   January.

15             And how quickly the subpoenas are complied with

16   may affect how quickly we can proceed, not only with the

17   merits of the bargaining dispute allegations, but also

18   regarding the merits -- the allegations that HealthBridge

19   and Care Realty and Care One are joint and single

20   employers with the nursing homes and constitute a single

21   integrated enterprise.

22             So it is difficult to determine.  I don't

23   have -- I haven't been given an estimate as to how much

24   longer the respondents anticipate keeping Mr. Kaplan on

25   the stand.

```
 1              THE COURT:  Okay, all right.  Well, I regret
 2   that the mediation was unsuccessful.  Each time I think
 3   about this case I can't help but wonder how it will
 4   ultimately end, but I've concluded that for me, given my
 5   responsibilities as the presiding judge in the 10(j) case,
 6   it's time to go ahead and address this motion for contempt
 7   on the merits.
 8              The Second Circuit has made it clear that a
 9   contempt finding, even a civil contempt finding, is a
10   potent weapon which should not be resorted to when there
11   is a fair ground for doubt as to the wrongfulness of the
12   defendant's conduct, and I understand HealthBridge to be
13   urging that as a result of the bankruptcy proceedings in
14   New Jersey, there was sufficient doubt about its
15   obligations under the injunction to relieve it of any
16   potential liability for contempt.
17              Having given careful consideration to
18   HealthBridge's position in that regard, I conclude that
19   the motion for contempt should be granted.  It appears to
20   me that HealthBridge knew it was bound by the 10(j)
21   injunction and took it upon itself to decide that it
22   didn't have to comply once the bankruptcy court granted
23   temporary relief to the Centers.
24              As I indicated, when we spoke about the contempt
25   motion early on, I think that at a minimum HealthBridge
```

1    was obliged to return to this Court and seek clarification

2    or perhaps modification of the injunction rather than

3    simply arrogate to itself the decision to fail to comply.

4    I think that HealthBridge's disregard of the authority of

5    this Court was sufficiently wrongful to justify a finding

6    of civil contempt.

7            Bankruptcy court did not purport to relieve

8    HealthBridge of its obligations under the injunction.

9    HealthBridge simply took it upon itself to follow this

10   course, without coming back to this Court, as I believe it

11   was required to do in order to avoid being found in

12   contempt.

13           So the motion is granted.  I'll be issuing a

14   written decision, but in the meantime, I will go ahead and

15   issue the order.

16           In that regard, I want to give the parties an

17   opportunity to address the terms of the order.  The

18   requested order is on the docket and we can all take a

19   look at that.  It's document 61 in the docket.

20           I should note that I make no finding with regard

21   to Ms. Crutchfield.  I should have mentioned that earlier.

22   I don't think that it's necessary for me to make a finding

23   as to Ms. Crutchfield, and I think that HealthBridge

24   should be given an opportunity to purge itself of

25   contempt, and if it does, then it seems to me that

1      Ms. Crutchfield doesn't need to be the subject of contempt

2      proceedings.

3              Under the proposed order, the board would have

4      me order as follows:

5              Respondents -- and I would limit it to

6      HealthBridge -- must comply with the injunction and this

7      order.  HealthBridge must reinstate and maintain the

8      previous wages, benefits and other terms and conditions of

9      employment for the employees that were in place on

10     June 16, 2012, and rescind any or all unilateral changes.

11             HealthBridge must compensate and make whole

12     employees for wages, benefits, compensation and other

13     terms and conditions of employment since February 1, 2013,

14     plus normal interest as computed in board proceedings lost

15     because of HealthBridge's failure to reinstate and

16     maintain the terms and conditions of employment in effect

17     on June 16, 2012.

18             HealthBridge would be ordered to determine the

19     amount of pay and benefits the employees would have

20     received during this time and make available to the board

21     for inspection and copying business payroll records

22     necessary to compute these amounts.

23             In addition, the board seeks an award of

24     attorney's fees and costs and calls on me to order that

25     the order itself be posted and circulated and that

1   HealthBridge be required to serve and file an affidavit of

2   compliance within 20 days.

3           In addition, the board asks me to impose

4   prospective compliance fines; specifically, a one-time

5   fine of $10,000 for any future non-compliance with a daily

6   compliance fine of $500, and for any other future

7   violation, a fine of $5,000.

8           Any comments on any of that, Mr. McGrath?  Is

9   that still the order that you want?

10          MR. McGRATH:  Yes, Your Honor.

11          As I was reading through it, that is the relief

12  that we requested.  I do want to especially emphasize that

13  at paragraph 7 there, in addition to serving copies of

14  district court opinion, in addition to posting them at

15  respondents at HealthBridge's facilities, to make sure

16  copies are served on each officer, agent, owner or

17  counselor of each of the centers, given the -- I think it

18  is important to make sure that all of the officers that

19  would be responsible for implementing this order are

20  ensured to be put on actual notice of the contents of the

21  order.  I think it will probably go a long way towards

22  making sure that compliance is taken seriously down the

23  road, Your Honor.

24          THE COURT:  Okay.  Any comments, Ms. Alito, on

25  any of these provisions?

1            MS. ALITO:  Yes, Your Honor.

2            As for the reasons set forth in our brief, we

3    submit that the imposition of sanctions in the

4    circumstance, as well as the award of attorney's fees,

5    should not be granted.  That in the decision whether to

6    award or impose sanctions, the willfulness of the conduct

7    is appropriately considered.  And in this case, although

8    of course the Court has held that HealthBridge should

9    have, upon the bankruptcy proceedings, have returned to

10   the Court for a clarification or a modification of the

11   order, this is not a case such as those where sanctions

12   are typically imposed where a party just said, I'm not

13   going to comply with an order that was entered in this

14   court.

15           For all of the reasons, HealthBridge believed

16   that the Court's order required it to return to the status

17   quo.  It was not an employer.  The status quo did not have

18   HealthBridge paying the employees under the collective

19   bargaining agreements.

20           In addition, there were the proceedings under

21   the bankruptcy code which have resulted in the abrogation

22   of the collective bargaining agreements.

23           The circuit court law, which we cited in our

24   brief, makes clear that a finding of contempt does not

25   necessarily justify the imposition of sanctions and fines,

```
 1    particularly in a case such as this one where we would

 2    submit it was not a willful violation of the Court's

 3    order.

 4              THE COURT:  Okay.

 5              MR. McGRATH:

 6              MR. BARBATSULY:  And, Your Honor, this is George

 7    Barbatsuly.  With respect to the issue of backpay that

 8    Your Honor ordered, we submit that for the reasons we

 9    previously argued in the injunction proceeding -- and

10    candidly, that backpay is not an appropriate remedy in an

11    junction proceedings in general.  And to the extent that

12    the board openly finds in the union and the board's favor,

13    that's where backpay should be addressed and not in the

14    context of this order.

15              THE COURT:  Okay.  Well, I appreciate your

16    comments.

17              I'll simply point out that in granting the 10(j)

18    injunction, I found that there was an urgent need to

19    restore the status quo as it existed before the alleged

20    unfair labor practices, and I think that against that

21    backdrop for me to decline to award backpay would be

22    inconsistent with the intent of the injunction.

23              All right.  We'll go ahead and we'll issue the

24    proposed order and we'll have a written decision for you.

25              While we're together on the phone, it may be an
```

1   opportune time to talk about where we go from here.

2   Perhaps not.  Perhaps HealthBridge needs some time to

3   think about the ruling and decide what it wants to do.

4   But Ms. Alito, can you give me any sense of where this is

5   likely to be headed?

6          MS. ALITO:  Well, I think we'll be making an

7   application for a stay, Your Honor.

8          THE COURT:  All right.  I guess I shouldn't be

9   surprised.  Okay, well --

10         MS. ALITO:  And of course --

11         THE COURT:  Go ahead.

12         MS. ALITO:  -- with regard to beyond that, I do

13   need to confer with my client.

14         THE COURT:  Okay.  Well --

15         MS. ALITO:  I mean, as we've said during these

16   proceedings, HealthBridge doesn't have the money to comply

17   with the collective bargaining agreements.

18         THE COURT:  Well --

19         MS. ALITO:  And so that certainly will color our

20   next steps and our application to Your Honor.  But I think

21   in light of today's ruling, I should consult with the

22   client before projecting more.

23         THE COURT:  That's fine.  I understand, and

24   that's fine.

25         I will say that if HealthBridge takes the

1    position that it can't comply because it simply doesn't

2    have the money, then I would suppose HealthBridge can do

3    just what the Centers did, and if that's what happens, so

4    be it.  From my point of view, any argument along that

5    line by HealthBridge is more properly addressed to the

6    bankruptcy court than it is to me, and that's how I read

7    the Court of Appeals decision.

8              I think that, like me, the Court of Appeals is

9    of the view that if the Centers can't afford it, then

10   their recourse is in bankruptcy, and if HealthBridge can't

11   afford it, the same applies.  On the record before me, I

12   think that that's the only view I can take of the matter

13   since HealthBridge hasn't undertaken to prove to me that

14   it's unable to comply.

15             So in asking you to forecast the road ahead, I

16   realize that you might not be able to say very much, and

17   so I understand, and that's fine.

18             Anything further?

19             MS. ALITO:  No, Your Honor.

20             MR. McGRATH:  No, Your Honor.

21             THE COURT:  I'm sorry that you're not able to

22   make any progress in trying to find a way forward.  It's

23   unfortunate, but I'll wish you all well, and have a good

24   holiday and have a happy new year.

25             MS. ALITO:  You too, Your Honor.

1          MR. McGRATH:  Thank you, Your Honor.

2          MR. CREANE:  Thank you, Your Honor.

3          THE COURT:  Thank you.

4               (Proceedings adjourned at 10:38 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      C E R T I F I C A T E

2

3              In Re: KREISBERG vs. HEALTHBRIDGE

4

5

6          I, Darlene A. Warner, RDR–CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15

16              /s/_____

17              DARLENE A. WARNER, RDR–CRR
                  Official Court Reporter
                450 Main Street, Room #223
18              Hartford, Connecticut 06103
                    (860) 547-0580

19

20

21

22

23

24

25

1                 UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF CONNECTICUT

3
     – – – – – – – – – – – – – – – – x
4                                    :
     JONATHAN B. KREISBERG,          :  No. 3:12CV1299(RNC)
5                                    :
                      Plaintiff,     :
6                                    :
             vs.                     :
7                                    :
     HEALTHBRIDGE MANAGEMENT, LLC,   :
8      dba DANBURY HCC, ET AL,       :  HARTFORD, CONNECTICUT
                      Defendants.    :  October 2, 2013
9                                    :
     – – – – – – – – – – – – – – – – x

10

11

12
                        TELEPHONE CONFERENCE
13

14

15        BEFORE:

16

17            HON. ROBERT N. CHATIGNY, U.S.D.J.

18

19

20

21

22                              Darlene A. Warner, RDR–CRR
                                Official Court Reporter
23

24

25

```
 1    APPEARANCES:

 2         FOR THE PLAINTIFF:

 3              NATIONAL LABOR RELATIONS BOARD
                    A.A. Ribicoff Federal Building,
 4                  450 Main Street, Suite 410
                    Hartford, Connecticut 06103
 5              BY:  THOMAS EDWARD QUIGLEY, ESQ.
                    JOHN A. McGRATH, ESQ.
 6
           FOR THE AMICUS 1199 NE:
 7
                LAW OFFICES OF JOHN M. CREANE
 8                  92 Cherry Street
                    Milford, Connecticut 06460
 9              BY:  JOHN M. CREANE, ESQ.

10
           FOR HEALTHBRIDGE MGT, LLC:
11
                K&L GATES, LLP
12                  One Newark Center, 10th Floor
                    Newark, New Jersey 07102-5285
13              BY:  ROSEMARY ALITO, ESQ.
                    GEORGE P. BARBATSULY, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25
```

1                              2:15 P.M.

2

3              THE COURT:  Hello.

4              MS. ALITO:  Good afternoon, Judge.

5              MR. McGRATH:  Good afternoon, Your Honor.

6              MR. CREANE:  Good afternoon, Your Honor.

7              THE COURT:  Good afternoon everyone.  Let me

8    begin by asking you to please identify yourselves for the

9    record.

10             MR. McGRATH:  Your Honor, John McGrath and

11   Thomas Quigley are here for petitioner.

12             MR. CREANE:  John Creane for 1199 New England,

13   the union.

14             MS. ALITO:  Rosemary Alito and George Barbatsuly

15   for the respondents.

16             THE COURT:  Is that everybody?

17             MS. ALITO:  That's everyone that's on today,

18   Judge.

19             THE COURT:  All right, very good, thank you.

20             Can everybody hear me all right?

21             MR. McGRATH:  Yes, Your Honor.

22             THE COURT:  Okay.  I can hear you as well.

23             I received a message indicating that Mr. McGrath

24   wanted to convene a telephone conference which I thought I

25   ought to go ahead and do, even after receiving the

1    response from the other side, mainly because I'd like to

2    know whether you've made any progress since we last spoke,

3    and in any event, where things stand.

4            So in that context, Mr. McGrath, let me begin

5    with you.  Can you tell me what has happened since we last

6    spoke and where things stand today as far as you know?

7            MR. McGRATH:  Yes, Your Honor.  When we last

8    spoke -- I apologize, just to clarify -- since our last

9    conversation with Your Honor or with Magistrate Judge

10   Martinez?  I'm sorry.

11           THE COURT:  With me, please.

12           MR. McGRATH:  Yes, Your Honor.

13           Well, since our last conversation back in July,

14   I believe, there hasn't been really any progress in terms

15   of -- there hasn't been any notable progress towards

16   either establishing terms of some sort of a global

17   settlement of the issue nor has there been any additional

18   steps taken to effectuate complete compliance, or at least

19   more complete compliance with the Court's December

20   injunctive order.

21           So there have been of course some very general

22   discussions, but at this point there's nothing that the

23   petitioner sees as warranting any further -- nothing it

24   sees for warranting the Court staying its hand any

25   further.

1          THE COURT:  Okay.

2          MR. McGRATH:  There haven't been any concrete

3    proposals made or offers made.  So as far as we know, the

4    terms and conditions are the same as they were in July.

5          No settlement talks have been made.

6          There has been some recent developments down in

7    the bankruptcy court.  Just last week they filed a motion

8    to permanently reject the expired CBAs -- those would be

9    the five healthcare centers that are the deters -- down in

10   bankruptcy.  So there's that.  Currently I believe things

11   are scheduled to proceed in October.

12         There was -- there's a date scheduled, I think

13   the 15th -- for a hearing, and I think there's some

14   discussions now about whether or not that will be affected

15   by the current government shutdown.  So that's where

16   things stand down there.

17         But the centers have requested that the

18   bankruptcy court grant permanent relief under 1113(c).

19         THE COURT:  All right, thank you.

20         Ms. Alito, let me ask you to please give me your

21   view of what has transpired since we last spoke and where

22   things stand now.

23         MS. ALITO:  Thank you, Judge.  We made a written

24   submission this morning, but it probably has not made it

25   to Your Honor yet so I will review that.

1          Since we were last together with Your Honor,

2    we've made multiple efforts to attempt to talk about a

3    global resolution on all of the matters pending in the

4    various venues and forums.  There was of course the

5    conference with Judge Martinez at which we requested that

6    the matters be sent to mediation.  Both of the unions

7    amicus and the NLRB at that time were opposed to that.

8          The judge asked us to a submit supplemental

9    description of how we would propose that the matters

10   proceed with regard to mediation, and we did that, and

11   that included a list of all of the various matters that

12   were pending in the various jurisdictions, the counsel

13   that we thought would need to be involved, and proposed

14   that JAMS or another similar organization providing

15   mediators, be utilized.

16         Most recently on Monday of this week, we met

17   with Mr. Kreisberg with regard to the question of

18   attempting to reach a global resolution and discussed a

19   possible process of mediation.  Mr. Kreisberg stated that

20   he agreed in principle to the concept of mediation.

21         We had some further discussions about aspects of

22   that; however, after that meeting, of course Mr. Kreisberg

23   advised that the Board would not be in a position to

24   participate in mediation until after a conclusion of the

25   partial shutdown.  He also advised that in response to our

1   request that the NLRB would not consent to a stay of the

2   present matter pending mediation.

3          So I think our perception is different from that

4   of Mr. McGrath's.  We believe that we've been pursuing the

5   idea of sitting down in mediation and attempting, pursuant

6   to the suggestion of Your Honor the last time we were

7   altogether, to try and end the many, many matters that are

8   in litigation among these parties.  We think that our

9   meeting with Mr. Kreisberg was very encouraging, and

10  although Mr. McGrath is correct that no concrete proposals

11  have been made yet, we are optimistic about proceeding

12  with this mediation and we'd like that to be with the

13  Court's agreement.

14         The one other thing that I would note is that

15  additional counsel has been brought in to assist with

16  mediation with the -- and if we did move forward, he,

17  who's a former general counsel of the NLRB --

18  communicating with Mr. Kreisberg.  That would I think give

19  a fresh face who has not been involved in a lot of the

20  back and forth and heat of the various prior proceedings

21  and would be helpful in attempting to reach a global

22  resolution.

23         THE COURT:  All right, thank you.

24         Mr. McGrath, any comments in reply to what has

25  just been said by Ms. Alito?

1          MR. CREANE:  Your Honor, John Creane, can I be

2     heard?  After Mr. McGrath is fine, but --

3          THE COURT:  Okay.

4          Mr. McGrath?

5          MR. McGRATH:  Yes, Your Honor, thank you.  I do

6     have a few responses.

7          The -- regarding the discussions for the process

8     of mediation, while Mr. Kreisberg did meet with -- Ron

9     Meisburg was the gentleman that Ms. Alito was referring

10    to.  But just for clarity, Ron Meisburg is not himself

11    being suggested, I don't believe, as a mediator, but he is

12    a representative of respondents and the related third

13    parties.  So just so that it's clear, it's my

14    understanding that Mr. Meisburg isn't to be any kind of a

15    mediator --

16         MS. ALITO:  Yes, if I gave a contrary

17    impression, I did not intend to.

18         MR. McGRATH:  I wasn't trying to suggest that --

19    any inference whatsoever, just so it's clear for the

20    record.

21         So regarding the possibility of speaking with

22    the mediator, my understanding is that Mr. Kreisberg did

23    meet with respondents and various counsel for respondents

24    and related parties regarding the possibility of setting

25    up some sort of a framework where a mediator may be able

1    to assist the union and the employer with reaching some

2    sort of a global resolution that would also address the

3    legal mission of this agency, something consistent with

4    what we've been seeking in our administrative proceedings,

5    but those are again very basic.  No proposals have been

6    made.

7            And certainly our position is and has been

8    that -- first of all, discussion of possible -- framework

9    for mediation down the road, I don't want that to be

10   construed as some sort of an agreement for the Court to

11   refer this case to mediation.  We're still at the very

12   early stages.  We're just exploring it.  And so at this

13   point we're not asking the Court to refer us to any type

14   of mediation.  It's still too early for that.

15           And we certainly aren't consenting to any kind

16   of a request for the Court to stay its hand in this

17   matter.  And while we are always trying to be optimistic

18   about mediations and discussions and while at some point

19   there could be some negotiated solution, at this point we

20   still have -- the issue of the injunction is out there,

21   it's in effect, and it still isn't being complied with.

22   Requiring HealthBridge to comply with the injunction,

23   holding in contempt, does not prohibit the parties from

24   proceeding with negotiation settlements after the fact.

25   It has been a frustratingly slow process.

1          I know the issue of mediation was first raised

2     in the letter that was sent to Magistrate Judge Martinez's

3     chambers, I think on August 20 or 19 or 21, right around

4     the time of the conference call with Judge Martinez, and

5     then the meeting with Mr. Meisburg and other counsel was

6     just this Monday.  I mean it's taken -- it's taken awhile

7     just to get to this point and this point really isn't all

8     that far from where we were a month ago or even two months

9     ago.  And certainly -- and perhaps a ruling from the Court

10    may speed these things along, the prospect of compliance,

11    fines and such, and the various remedies that we've

12    requested as part of the proposed contempt and purgation

13    order.

14          You know, again, these discussions -- and we're

15    happy to have Mr. Meisburg's participation -- but this

16    could have happened months ago or even years ago.  It's a

17    bit late, and this is all sort of being done on the backs

18    of these employees and their pension contributions.  It's

19    their health insurance we're talking about, it's their

20    terms and conditions of employment.  And it strikes me as

21    just terribly unfair that they should be forced to foot

22    the bill while the parties continue discussions.

23          THE COURT:  Even though discussions could lead

24    to a resolution that would produce relief for the

25    employees, whereas in the absence of discussions, the

1    employees might not ultimately get that relief?

2              MR. McGRATH:  Your Honor, first of all, I'm not

3    sure that the discussions will necessarily lead to the

4    relief that the employees need.  Again, no proposals have

5    been made.  We're just talking about a possible framework

6    for further discussions.  That's like a promise to

7    consider in the future.  It's very, very, very

8    preliminary.

9              The other part is, the respondent healthcare

10   centers, they are proceeding as normal in bankruptcy and

11   they have gone ahead last week and asked for the

12   bankruptcy court to give them permission to reject the

13   expired collective bargaining agreements.  And one of the

14   issues that they've raised in the bankruptcy filings last

15   week -- which is similar to an issue that HealthBridge has

16   raised in some responses to contempt -- are allegations

17   that the union is refusing to bargain, the union is

18   refusing to meet, that it's been impossible to deal with

19   the union.

20             I don't see how those claims that are currently

21   being made in another forum can really be squared with

22   claims of if we just have a little more time we can work

23   things out.  They just seem diametrically opposed

24   positions.

25             And so, you know, while we always appreciate,

1     you know, overtures for settlement, we can't be blind to

2     the fact that the parties are in a very difficult position

3     and the healthcare centers are, you know, making

4     representations to the bankruptcy court that they've been

5     unable to negotiate with the union and that because

6     negotiations haven't provided them with the relief that

7     they're seeking, they're going to need to get the relief

8     they want from the bankruptcy court instead of consensual

9     agreement with the union.  So I think those are a bit

10    incompatible.

11            So given the broader scope going on, I have few

12    illusions that a global settlement is going to happen

13    particularly soon.

14            MS. ALITO:  Our position in all of the

15    proceedings with regard to negotiations has been

16    absolutely consistent in that we want to sit down, we want

17    to try and reach a settlement of the bankruptcy, of the

18    RICO case, of this case, of the administrative

19    proceedings, and the delay between the last time we were

20    with the Court and now, is not due to respondents who have

21    been seeking mediation throughout that period.  It was the

22    NLRB and the union who told the magistrate judge on the

23    record that they were not willing to go to mediation.

24            And so the delay between then and our meeting on

25    Monday with the regional director does not reflect any

1    lack of desire or any lack of efforts on the part of the

2    respondents to try and resolve this morass of litigation.

3              And we are ready hoping to sit down immediately

4    as soon as the government is able to do so and this

5    partial shutdown ends.  And we've said that.  And we've

6    said that there would be no preconditions to sitting down,

7    and all of these matters would be on the table.  And we

8    think that is the best way to:  One, end the enormous

9    amount of litigation and to get the best results all

10   around for the employees and for the centers consistent

11   with the NLRB's interest in enforcing labor laws.

12             MR. CREANE:  Your Honor, may I be heard for a

13   moment on that?

14             THE COURT:  Sure.

15             MR. CREANE:  This is John Creane.

16             Ms. Alito has repeatedly misstated the position

17   of the union and I think the region as well in terms of

18   mediation.  Our position, or at least the union's position

19   is -- and this goes back to the very beginning of this

20   case, Your Honor.  And so much time has gone by that I

21   think we've lost sight of at times how the case began.

22             The respondents were ordered to restore the

23   terms and conditions that they have changed, in order to

24   create a level playing field, and those were the Court's

25   own words at the time the 10(j) was entered, to create a

1     level playing field so that negotiations would have a

2     chance of success.  The Court recognized that the union

3     was seriously disadvantaged and handicapped by the

4     unlawful conduct and until those terms and conditions were

5     restored, there would not be -- it would not be a level

6     playing field or any realistic possibility of negotiations

7     resolving it.

8              For nine months now, respondents have refused to

9     implement the terms and conditions that the Court ordered

10    last December.  And I think it would be helpful, Your

11    Honor, if we put the shoe on the other foot and imagine

12    the parties on different sides of this issue.

13             Let's suppose the union had called a strike, the

14    Board had determined that it was unlawful, the strike, had

15    gone to court, gotten 10(j) relief against the union, and

16    the Court ordered the union to immediately stop -- to end

17    the strike, and nine months later the union had not

18    stopped the strike, was still talking about let's go to

19    mediation, let's have talks to try to resolve these

20    underlying issues.  Can there be any doubt that long

21    before nine months went by, that the union would have been

22    hit with crippling fines and probably some incarceration

23    of union officials for flaunting the Court's order?

24             That's exactly what HealthBridge has done in

25    this case.  They've refused to restore the level playing

1   field.

2          When they comply with the Court order, then the

3   parties have a chance to go forward with negotiations or

4   mediation for that matter starting out on a level playing

5   field.  But to send it to mediation at this point with the

6   employer keeping all its ill gotten gains and having

7   reduced the terms and conditions to workers to near

8   destitution level, there's no chance that there will be

9   fair negotiations, much less produce a settlement.

10         So I think we've kind of lost sight of how the

11  case got started because it's gone on for so long with

12  their refusing to comply with Your Honor's order.  But

13  once the conditions are restored, then the parties -- of

14  course we're open to mediation and would like to resolve

15  it, but they're not going to have any chance of success

16  until they restore the status quo and restores the terms

17  and conditions that Your Honor ordered.

18         MS. ALITO:  The centers did not flaunt the

19  Court's order.  They went into bankruptcy.

20         MR. CREANE:  HealthBridge was one of the

21  defendants and they have flaunted it.

22         The other issue is one that hasn't been resolved

23  yet, but certainly HealthBridge is in contempt.

24         MS. ALITO:  We've made all of the arguments and

25  I'm sure the Judge doesn't want to hear them again with

1    regards to our interpretation of what the order required

2    on HealthBridge's account.

3         And of course we now know the Court's comments

4    in that regard, and I'm not attempting to be

5    disrespectful, I'm just simply explaining why HealthBridge

6    acted in the way they did then.

7         But it's also a fact that HealthBridge at

8    present does not have the money to fund the terms and

9    conditions and that will create other potential issues and

10   continued litigation and again preventing survival of

11   businesses, survival of the jobs, and some benefits to the

12   employees.

13        MR. CREANE:  Your Honor, there was a reference

14   in Ms. Alito's pleadings this morning that third

15   parties -- that HealthBridge couldn't comply unless third

16   parties who were not parties to the 10(j) agreed to fund

17   it.  What Your Honor may not be aware of is that these --

18   all these companies of which HealthBridge and the

19   operating companies are part of it, are all family owned,

20   they're owned by two brothers, Moshael and Daniel Straus,

21   and all of them are related, all of them are into walking.

22        And during -- our research shows that during the

23   last two years, they've withdrawn over $200 million, the

24   two brothers, from the operating companies, and including

25   money that should have gone to pay the health insurance

1    and pension benefits for the employees at the nursing

2    homes that are subject of the 10(j)s.

3            So the talk about not having money, you know,

4    it's all -- and eventually the Court may have to get into

5    the question of, you know, who's benefiting from this

6    violation of the Court order.  But there's lots of money

7    that's being taken out of these related family

8    corporations and that's something you should be aware of,

9    Your Honor.

10           THE COURT:  Which Court do you have in mind,

11    Mr. McGrath when you suggest that a Court will need to get

12    into the money?  Are you talking about me?

13           MR. McGRATH:  I believe that was Mr. Creane

14    speaking, Your Honor.

15           THE COURT:  I'm sorry, I apologize, I realize it

16    was Mr. Creane.  I simply misspoke.

17           Are you contemplating such a matter before me,

18    Mr. Creane?

19           MR. CREANE:  If HealthBridge comes in and says

20    yes, we're not in compliance, you found us in contempt,

21    but, gee, we don't have -- look, our pockets are empty,

22    then of course it will have to go further up the corporate

23    chain, because they're all related companies, Your Honor.

24    They can make the balance sheet look like anything they

25    want, either a lot of money or no assets and no money by

1    simply switching things around between the family-related
2    companies.
3          So yes, I think if they come in and take that
4    position, then I think it may require going further up the
5    corporate chain because I think we're all being played for
6    fools.
7          THE COURT:  In that event --
8          MR. CREANE:  At the --
9          THE COURT:  Excuse me, but if the response were
10   that HealthBridge is broke, if that's what you're
11   anticipating, what would prevent HealthBridge from going
12   into bankruptcy court?
13         MR. CREANE:  Nothing, Your Honor.  And then the
14   next step up would be -- including some are parties to the
15   NLRB proceedings, some care entities that are closely --
16   that oversee and operate the HealthBridge and operating
17   companies, they're named in the parties in the NLRB
18   proceeding.  If that's the position HealthBridge takes,
19   then it may require bringing those parties before the
20   Court in the 10(j) proceeding.
21         THE COURT:  So we would reopen the 10(j)
22   proceeding?
23         MR. CREANE:  That would be up the to the region,
24   I suppose, on adding additional parties, but it -- we
25   don't know what HealthBridge is going to do if they're

1    found in contempt, which they clearly are.

2            But if they do plead that they don't have the

3    money, then I think it's going to require finding out why

4    they don't have the money and where the money from these

5    operating homes is going.

6            MR. McGRATH:  Your Honor, if I may?

7            It sounds like things are I think escalating a

8    bit into sort of hypothetical territory in terms of what

9    HealthBridge will do if it is or not -- if it is or isn't

10   held in contempt.

11           I think the -- without having to hypothesize

12   what parade of horribles might happen, I think it's

13   mindful to keep in mind that although we have had, since

14   the contempt proceedings were filed, generalized

15   statements that HealthBridge can't pay.  There's been

16   nothing done by HealthBridge to substantiate that or to --

17   to either substantiate that they can't pay or to even

18   specify what they can pay and what they can't pay.

19           So -- you know, even if the whole issue of the

20   pension and medical insurance were out of the issue, we

21   haven't had any indication of, well, we can't pay for the

22   pension, but we can help out with the health insurance or

23   something like that.  We haven't gotten any sort of

24   specifics, we haven't even been measured with half

25   measures.  I'm not saying we would be satisfied with half

1    measures, but we haven't had any kind of showing that

2    they're trying to do what they can.  All we heard was we

3    can't.  And HealthBridge has in its most recent filings --

4    not today's, but before -- has refused to substantiate its

5    allegations that it can't afford to comply with the order.

6              I don't think that meets the legal standard of

7    the defense for contempt.  I think as long as the order is

8    out there, HealthBridge has an obligation to comply with

9    it until it can make a showing it can't.  And it hasn't

10   made any such showing yet.

11             Going back to respondents earlier comments about

12   being willing to negotiate but not receiving the responses

13   hoping for from the union or the NLRB, I -- it sounds -- I

14   don't mean to make a caricature of that argument, but it

15   almost sounds as though respondents are arguing that

16   they're the aggrieved parties here and that the NLRB and

17   the union need to come to its senses somehow.

18             I think that is, as Mr. Creane pointed out,

19   fundamentally at odds with everything that's happened in

20   these 10(j) proceedings leading up until this point.  The

21   fact that on December 11, respondents suggested the idea

22   that this Court send the union and the employer back to

23   negotiations without restoring the pre-implementation

24   terms and conditions of employment, and that this Court

25   rejected that suggestion, and the basis for that rejection

1    was the need for the parties to be put on a level playing

2    field so that negotiations can have some hope of

3    continuing, allowing HealthBridge to force the union to

4    negotiate while the pre-implementation terms have not been

5    put back in place is I think at odds with this Court's

6    original decision.

7              And while there's -- I think the Court has been

8    generous in allowing HealthBridge some time to make some

9    progress towards either settlement or towards compliance,

10   I don't feel that HealthBridge has really taken Your

11   Honor's suggestion that they begin to take seriously their

12   obligations under the 10(j) order.

13             THE COURT:  Okay.  Well, at this point the

14   question for me, I suppose, is whether it makes any sense

15   at all to try to take advantage of whatever opportunity

16   exists to promote a global resolution through mediation

17   by, in effect, staying this case and calling upon the

18   parties to stay all other proceedings, including the

19   bankruptcy proceeding, or whether I should give up on that

20   and simply issue a ruling on the motion for contempt.

21             My perception is that the Board and the union

22   assume that I will hold HealthBridge in contempt and they

23   would like me to do that and thereby establish what has

24   been referred to as a level playing field for any

25   negotiations that might or might not take place with

1    regard to what Ms. Alito has characterized as the morass

2    of litigation.  My perception is that HealthBridge has

3    taken steps and would like to have an opportunity to take

4    further steps to see if mediation can work.

5           I recognize that since we last spoke, not a lot

6    has happened, but there have been some discrete steps:

7    The conference with Judge Martinez, the bringing in of

8    additional counsel, the meeting with Mr. Kreisberg.  These

9    things seem to me to be in line with what I was hoping

10   would happen even though they didn't happen as quickly as

11   I had hoped.

12          I'm not responsible for conducting the

13   mediation, I'm not responsible for bringing about a global

14   resolution, and yet it seems glaringly obvious to me that

15   the interests of all concerned -- and I include the

16   employees who are very much in my mind -- would be better

17   served by taking advantage of whatever opportunity exists

18   to resolve these parties' differences rather than

19   continuing to expand the scope of the problem.

20          If I hold HealthBridge in contempt -- and it

21   appears that there is a distinct possibility that

22   HealthBridge will say it can't afford to make the payments

23   required to bring it into compliance -- and if past is

24   prologue, HealthBridge will go into bankruptcy court, and

25   we then have managed to create yet another litigation to

1    consume resources and to complicate the process.

2          As I mentioned when we last spoke, I think that

3    a responsible judge needs to hesitate before holding a

4    party in contempt because I view that as a very

5    significant thing for a court to do.  I think that it

6    reflects not only on the party, but on the party's

7    counsel, as I mentioned last time.  So I decided then that

8    it would be better to give people a chance to work toward

9    a negotiated resolution of this morass.  I didn't want to

10   cause more harm.

11         So at this point I think that the best thing to

12   do is to give Mr. Kreisberg an opportunity to take a

13   position on whether a global stay, if you will, should be

14   undertaken so that mediation can be pursued.  If he is

15   agreeable to that, fine, if he's not, fine.  But I think

16   that it's best for me to ask you to find out his position

17   and let me know.

18         If both sides are willing to stop what they're

19   doing and undertake mediation, then I would favor that.

20   If that is not what the petitioner wants to do, then

21   again, that's fine.  But I think that having come this

22   far, it makes sense for me to ask that Mr. Kreisberg

23   provide us with a definitive statement of the petitioner's

24   position rather than have me speculate about what it might

25   be.  So I would ask you to please do that and I would ask

1    you to get back to me and let me know, and in the meantime

2    I will stand by.

3             I would point out, so that there won't be a

4    misunderstanding about this, that I continue to believe

5    that HealthBridge was obliged to, at a minimum, come back

6    here and inform me that the centers were going into

7    bankruptcy; that HealthBridge didn't feel bound by the

8    injunction as a joint employer; and that the centers would

9    be relying on the bankruptcy court for relief.  I

10   explained that last time.

11            It also bears mention, however, that, as

12   Ms. Alito said earlier, it's not like HealthBridge flouted

13   the injunction, as would have been the case without resort

14   to the bankruptcy court by the centers.  If the centers

15   had never gone to the bankruptcy court and the centers

16   together with HealthBridge had failed to comply with the

17   injunction, then I think we would have a somewhat

18   different situation.  The decision of the bankruptcy court

19   alleviating the centers of their obligation to comply

20   gives HealthBridge a talking point that otherwise would

21   not exist, and that is something that I also need to bear

22   in mind.

23            So it's not as clear-cut as it might be, and I

24   think that that's something that everybody needs to bear

25   in mind.

1          In conclusion, objectively speaking, it seems to

2     me that no matter what I do, this morass is going to

3     persist until people sit down and talk.  It's a little

4     like the shutdown.  We can't make a lot of progress toward

5     an ultimate resolution if people aren't talking.  In my

6     experience, that's how you achieve peace, that's how you

7     achieve finality.  People finally agree, and that's the

8     end of it.  There are no more appeals, it's over.  It

9     would be nice for all concerned, including again the

10    employees, if that could happen.

11          So in that context, I ask you to please confer

12    and let me know.  Okay?

13          MS. ALITO:  Thanks so much, Judge.

14          MR. McGRATH:  Your Honor, by way of

15    clarification, if I might?

16          THE COURT:  Right.

17          MR. McGRATH:  The stay of proceedings, Your

18    Honor, we haven't received any indication that any of the

19    parties related to the respondents are -- have

20    contemplated either staying or withdrawing, say, the

21    bankruptcy proceedings, the RICO proceedings.

22          I'm not -- I just think when consulting with

23    Mr. Kreisberg in terms of clarifying what exactly the

24    Court envisions in terms of how things might be stayed and

25    who would be required to take what actions.  Because

1    frankly at this point the bankruptcy court proceedings

2    are, as far as I know, still proceeding full steam ahead

3    and we have a hearing scheduled for the 15th.

4           Since they aren't proceedings we really

5    initiated or controlled, I don't know what the prospect

6    for them being stayed is.

7           THE COURT:  Okay.  Well, I appreciate your

8    asking the question, and my hope and expectation is that

9    since we're talking about a global resolution,

10   HealthBridge and the centers would be agreeable to staying

11   all proceedings pending a mediation aimed at a global

12   resolution.  I don't think it would be fair or reasonable

13   for HealthBridge and the centers to proceed in bankruptcy

14   while I stay my hand here.  I think that it needs to be

15   global, the stay needs to be global, and the mediation

16   following the global stay would aim to achieve a global

17   resolution.

18          So that's what I'm talking about.  I can't speak

19   for HealthBridge or the centers, but that's my assumption

20   that that's what would happen.

21          Ms. Alito, if I'm mistaken, please correct me.

22          MS. ALITO:  That was my understanding too, Your

23   Honor.  I'll confirm that with my client and report back

24   to Your Honor as well, if that's agreeable.

25          THE COURT:  Okay.

1           MS. ALITO:  That if we had a stay, it would be a

2     stay of the entire list of matters that we submitted to

3     Magistrate Judge Martinez.

4           THE COURT:  Okay.

5           All right, McGrath?  Is that helpful?

6           MR. McGRATH:  Yes, Your Honor.  Thank you very

7     much.

8           THE COURT:  Okay, you're welcome.

9           Anything else for now?

10          Thank you for being available today.  I do

11    appreciate your cooperation, and I'll wait to hear from

12    you.  I expect that I'll hear from you in a matter of

13    days.

14          MS. ALITO:  We'll report back tomorrow, Your

15    Honor.

16          THE COURT:  Okay.

17          MR. McGRATH:  Your Honor, the shutdown may

18    complicate things, but we will do everything we can to get

19    back to you within -- by tomorrow.

20          THE COURT:  Okay.  Thank you again.

21          MS. ALITO:  Thank you, Judge.

22              (Proceedings adjourned at time 3:05 p.m.)

23

24

25

1              C E R T I F I C A T E

2

3              In Re: KREISBERG vs. HEALTHBRIDGE

4

5

6              I, Darlene A. Warner, RDR-CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15              /s/_____

16

17              DARLENE A. WARNER, RDR-CRR
                 Official Court Reporter
                450 Main Street, Room #223
18              Hartford, Connecticut 06103
                   (860) 547-0580

19

20

21

22

23

24

25

1                    UNITED STATES DISTRICT COURT

2                      DISTRICT OF CONNECTICUT

3

4          --------------------------x

5     JONATHAN B. KREISBERG,
                     Plaintiff,          3:12CV1299 (RNC)
6
                vs.
7
      HEALTHBRIDGE MANAGEMENT,           August 20, 2013
8     LLC, ET AL,
                     Defendants
9          --------------------------x

10                                        Federal Building
                                          450 Main Street
11                                        Hartford, Connecticut

12

13                      **TELEPHONE CONFERENCE**

14

15

16    Held Before:
            The Honorable Donna F. Martinez
17             U.S.D.C. Magistrate Judge

18

19

20

21

22

23              FALZARANO COURT REPORTERS, LLC
                    117 North Saddle Ridge
24               West Simsbury, CT 06092
                       860.651.0258
25

```
 1        TELEPHONIC APPEARANCES:

 2              For the Plaintiff:

 3                    National Labor Relations Board
                      450 Main Street
 4                    Suite 410
                      Hartford, CT 06103
 5                    860.240.3564
                      john.mcgrath@nlrb.gov
 6                          By:  JOHN A. McGRATH, ESQ.
                                 THOMAS E. QUIGLEY, ESQ.
 7
                For the Defendants:
 8
                      K&L GATES LLP
 9                    One Newark Center - 10th Floor
                      Newark, NJ 07102
10                    973.848.4022
                      rosemary.alito@klgates.com
11                          By:  ROSEMARY ALITO, ESQ.

12                    WIGGIN & DANA
                      One Century Tower
13                    265 Church Street
                      New Haven, CT 06508
14                    203.498.4313
                      jglasser@wiggin.com
15                          By:  JAMES I. GLASSER, ESQ.

16                    LAW OFFICES OF JOHN M. CREANE
                      92 Cherry Street
17                    Milford, CT 06460
                      203.878.2419
18                    jmcreane@aol.com
                            By:  JOHN M. CREANE, ESQ.
19
                Also Present:
20
                      Jeffrey Nichols
21                    Law Clerk

22

23

24

25
```

```
 1                    (Commenced:  2:08 p.m.)

 2

 3              THE COURT:  Good afternoon.  This is

 4         Kreisberg, K-r-e-i-s-b-e-r-g, versus

 5         Healthbridge Management, et al, 12CV1299,

 6         assigned to Judge Chatigny.

 7               Will you identify yourselves,

 8         please, for the record.

 9              MR. MCGRATH:  Good afternoon, your

10         Honor.  John McGrath.  And with me is

11         Thomas Quigley for Petitioner, Jonathan

12         Kreisberg.

13              MR. CREANE:  John Creane for AMICUS

14         union.

15              THE COURT:  Thank you.

16              MS. ALITO:  Rosemary Alito for the

17         respondent.

18              MR. GLASSER:  Your Honor, Jim Glasser

19         is on the line for the Respondent, as

20         well.  Good afternoon.

21              THE COURT:  Good afternoon.

22              MR. CREANE:  Bob Weinberg is also on

23         call for AMICUS union.

24              MR. WEINBERG:  Let me be clear.  I've

25         not entered an experience.  My name, for
```

4

1        the record, is Robert Weinberg.  I have

2        not entered an experience in this case

3        and I am not a member of the Bar of this

4        Court.

5             So, Mr. Creane asked me to be on the

6        line because I am counsel for this local

7        and another local in a related retail

8        action.

9             THE COURT:  Okay.  Does anybody

10       object to Mr. Weinberg's participation?

11            Okay.  All right.

12            MR. CREANE:  Your Honor, this is John

13       Creane.  The reason I asked Mr. Weinberg

14       to be on the call is that respondents

15       have made certain representations to the

16       Court about ongoing settlement

17       discussions that involve Mr. Weinberg,

18       and that's why I asked him to be on the

19       phone.

20            THE COURT:  All right.

21            MS. ALITO:  Well, your Honor, this is

22       Rosemary Alito, the conversation in

23       question occurred between Mr. Weinberg

24       and counsel from Hunton and Williams, who

25       are not on this call.  So to that extent,

```
 1            I'm not in a position to reply to
 2       additional comments by Mr. Weinberg.  I
 3       was not aware that he was going to be
 4       participating today for that purpose or I
 5       would have requested that counsel from
 6       Hunton and Williams join as well.
 7            THE COURT:  All right.  Well, I don't
 8       intend to do any fact finding nor do I
 9       intend to make any inquiry of
10       Mr. Weinberg.  He's not counsel of
11       record.  If anybody objects to his
12       listening to the conversation, then I'll
13       take that up.  But my question as to
14       whether anybody opposed his presence here
15       on the call really had to do with any
16       objection to his listening.  I don't
17       expect him to participate.
18            MS. ALITO:  We have no objection to
19       that.  Thank you, Judge.
20            THE COURT:  So let's go ahead.  Judge
21       Chatigny referred the case to me for a
22       status conference.  I see that the case
23       has a long history.  I have read through
24       some of the more recent submissions, and
25       I understand that the purpose of the
```

6

```
 1              status conference is really to inquire
 2              about the possibility of a settlement
 3              conference.
 4                   I'm mindful that we're on the record
 5              here, and I'm not asking anyone to, you
 6              know, discuss the various positions that
 7              you've taken.  If you feel a need to do
 8              that and you want to seek to keep that
 9              off the record, we'll take up that
10              question.
11                   But really now what I want to do is
12              talk to you about the possibility of
13              discussions.  I see that there's some
14              different points of view expressed in the
15              submissions.  At one point, one of the
16              parties asks for referral to a magistrate
17              judge.  Later on, there's a request for
18              referral to a third-party mediator.  I do
19              see that there's this back and forth
20              about whether there have been any
21              discussions so far.
22                   So, that's my understanding.  Why
23              don't we start with plaintiff and hear
24              what the plaintiff has to say.
25                   MR. McGRATH:  Thank you, your Honor.
```

```
 1              THE COURT:  I'm sorry to interrupt
 2         you.  For my sake and for the court
 3         reporter's sake, if you would identify
 4         yourself every time you speak.
 5              MR. McGRATH:  Certainly, your Honor.
 6         John McGrath for petitioner.  You know,
 7         certainly petitioner is always open to
 8         settlement discussions.  However,
 9         petitioner is of the position that
10         there's nothing at this point that would
11         warrant delaying the Court's ruling on a
12         petition at this point.  Settlement
13         discussions can occur before or after any
14         such ruling is made.
15              There's -- there really hasn't been
16         any tangible or concrete progress that
17         petitioner is aware of towards a
18         settlement, and so we, you know, we
19         understand that respondent yesterday, in
20         a letter, raised the possibility of
21         mediation at this point -- agreeable to
22         mediation or any kind of ADR or
23         alternative dispute resolution.  At this
24         time --
25              THE COURT:  I'm sorry, Mr. McGrath
```

```
 1              but you're coming in and out on me.  I'm
 2              not getting everything.
 3                   MR. McGRATH:  My apologies, your
 4              Honor.  I think our phone system is
 5              probably the most antique participating
 6              in the call right now.
 7                   Just to clarify.  For the
 8              petitioner, we don't believe that there's
 9              any reason to delay the Court's ruling on
10              the contempt motion.  We've never
11              rejected the possibility of some sort of
12              a settlement.  However, no settlement
13              agreement has been reached.  It has been
14              nearly a month now since the conference
15              call with the District Court.  And while
16              we are mindful that the Court gave us
17              approximately two weeks to work things
18              out and report back to them, a settlement
19              hasn't been reached.
20                   There hasn't been really any
21              tangible progress towards one,
22              unfortunately.  And whatever settlement
23              may ultimately be reached, at this point,
24              petitioner believes that it'll have to be
25              after the Court rules on the contempt
```

```
 1              motion.  And we do -- we would object to
 2              referring this case to mediation or any
 3              other kind of alternative dispute
 4              resolution at this point.
 5                   Given that, there's been no showing
 6              over the past month that Healthbridge has
 7              made any progress in making and achieving
 8              full compliance with the order that was
 9              issued back in December.  We feel that
10              the logical process at this point is to
11              proceed to a ruling by the Court and then
12              proceed from there.
13                 THE COURT:  Okay.  So you don't
14              object to mediation.  Your objection is
15              to taking any course that would hold up
16              the Court's ruling on the motion for
17              contempt?
18                 MR. McGRATH:  Your Honor,
19              respectfully, we do object to mediation
20              at this point.  We don't see -- we can't
21              think of any reason to suspect that
22              mediation would be helpful.
23                   To our knowledge, Healthbridge
24              hasn't changed its position at all in the
25              past month in regards into the --
```

```
 1              regarding its efforts to comply with the
 2              injunction.  And you know, there's a
 3              court order out there.  And unless
 4              Healthbridge is really taking steps to
 5              comply with it, I don't see how we could
 6              agree to mediation.  At this point, we
 7              are objecting to mediation.
 8                  I can't guarantee that that position
 9              won't change in the future.  It might be
10              different under different circumstances,
11              but at this point I would have to object
12              to any reference to mediation at this
13              point.
14                  THE COURT:  Okay.  Why don't we hear
15              from Mr. Creane next.
16                  MR. CREANE:  Yes, your Honor.  As you
17              know, the Court entered the 10(j)
18              injunction some eight months ago, and
19              through various stratagems the
20              respondents have avoided restoring the
21              terms and conditions that Judge Chatigny
22              ordered them to restore, and that
23              includes health insurance for its
24              employees and pension fund contributions,
25              among other terms that they unilaterally
```

1     changed.

2           In their filing in the bankruptcy

3     court, the operating companies estimated

4     the savings to the company of not

5     complying with Judge Chatigny's

6     injunctions at about $800,000 per month,

7     which means that they pocketed some $6.5

8     million by not complying with Judge

9     Chatigny's injunction.

10           The workers that were to be the

11     recipients of the change, the restored

12     terms and conditions, are suffering, many

13     of them without health insurance.  So we

14     strongly object to any further delay on

15     complying with the 10(j) injunction.

16           Once that's done, the parties have a

17     lot of disputes that were referred to in

18     the letter to you last night.  And it may

19     make sense to the parties, with or

20     without a mediator, to sit down and see

21     what they can do to resolve those.  But

22     that's an entirely separate issue from

23     compliance with the 10(j) injunction.

24           So, our position, you know, is the

25     same as the board, that it's long overdue

1     for the respondents to comply with the

2     injunction.

3         THE COURT:  So, I understand that.

4     And I understand that you don't want to

5     do anything that would delay the Court's

6     ruling on the motion for contempt, but do

7     you object --

8         MR. CREANE:  No, I was just going to

9     say if the injunction is complied with,

10     the parties still have a, you know, large

11     number of very thorny, complex issues, if

12     they're going to resolve them.  And I

13     guess once the respondents comply with

14     the injunction, we'll find out whether or

15     not they're seriously interested in

16     settlement talks or were just offering

17     mediation as a way to further delay and

18     benefit themselves financially by not

19     complying with the injunction.

20         If they're serious about it, after

21     they comply with the injunction, then, of

22     course, we would seriously entertain

23     entering settlement discussions with

24     them.

25         THE COURT:  All right.  Respondents?

```
1              MS. ALITO:  Thank you, Judge.  As the
2         Court is well aware, respondent has
3         repeatedly suggested that the parties to
4         all of the matters between the union and
5         the affiliated unions engage in
6         discussions in an attempt to resolve all
7         of the differences and reach a global
8         settlement.
9              Our understanding of Judge
10        Chatigny's comments when he last heard
11        argument with regards to the contempt was
12        that he thought that a global resolution
13        among the parties would be a preferable
14        way to go.  Respondents, in good faith,
15        have suggested various ways of
16        proceeding, whether it's in settlement
17        conference with your Honor or another
18        magistrate judge or whether it's in a
19        mediation session with a third-party
20        organization, such as JAMS or some other
21        organization.  We stand ready, willing,
22        and enthusiastic about attempting to
23        resolve the many matters in litigation
24        among these parties.
25              With regards to waiting until after
```

14

```
 1            a ruling on the contempt, I think that
 2            Judge Chatigny suggested, and we believe,
 3            that reaching a resolution prior to a
 4            ruling on contempt is more productive
 5            than going through continued litigation
 6            on that score.  As we've indicated in our
 7            papers, Healthbridge and Crutchfield
 8            don't have the financial ability to
 9            comply with the terms sought at this
10            time.
11                 So, it's our position, and we
12            believe a position consistent with the
13            Court's comments, that some effort be
14            made now to try and resolve the many
15            matters now pending in this jurisdiction,
16            in the District Court of New Jersey, and
17            with the NLRB.
18                 THE COURT:  Okay.  So, to the union
19            and the plaintiff, what would be the harm
20            in having these discussions?  In other
21            words, why not try to engage in
22            discussion?
23                 MR. McGRATH:  Your Honor, John
24            McGrath for the petitioner.  Just by way
25            of background, I think a little
```

```
 1              background would be helpful.  These cases
 2              have been going on for a couple of years
 3              now, your Honor.  And the underlying
 4              matter is, and I hope the irony isn't
 5              lost on anyone, the underlying proceeding
 6              is, essentially, a surface bargaining
 7              case, where the employer had bargained
 8              with the union over eighteen months in
 9              bad faith, only at the end to implement
10              their own proposals.
11                   And so, I mean, this very case
12              springs from a situation where there's
13              bad faith bargaining.  And I think all
14              sides can admit, I guess a nice way to
15              put it is a low trust situation.  And
16              given the long history that's been going
17              on, the long history of delays, there's
18              no good reason over the past two years
19              why it couldn't have settled already,
20              frankly.
21                   The board is always open during the
22              investigation, during the litigation, and
23              other proceedings, always to settle.
24              That's our policy as a rule, and we've
25              never rejected or refused to entertain
```

```
 1              settlement talks over the past two years.
 2              However, the allegations are surface
 3              bargaining, bad faith bargaining.  And
 4              back in December, we obtained an
 5              injunction requiring respondents to
 6              restore the June 16, 2012 terms and
 7              conditions of employment to try to level
 8              the playing field with the hopes that the
 9              parties could then be put in a position
10              where they could resume bargaining.
11              We're still not back at that position
12              yet, unfortunately.
13                   The pre-implementation terms and
14              conditions of employment still haven't
15              been restored.  And our theory of getting
16              the injunction in the first place was
17              that it was necessary to preserve the
18              board's remedial authority, and it was
19              necessary to preserve the bargaining
20              process itself to prevent the harm to the
21              bargaining process that were done by
22              respondent's unilateral changes all the
23              way back on June 17, 2012.
24                   So, our position has always been
25              that for real meaningful bargaining and
```

```
 1              negotiation to take place, the employer
 2              has to put the terms and conditions back
 3              to where it was.  And instead,
 4              respondents are arguing that they should
 5              be allowed to not do that, yet force the
 6              union to bargain from its knees.  That
 7              doesn't help the bargaining process,
 8              unfortunately.  And frankly, respondents
 9              understand this.
10                   You know, I don't want to accuse
11              anyone of bad faith, but this is -- I
12              have a hard time believing that these
13              suggestions for further discussion,
14              further negotiation, you know, after all
15              this time after these years are really
16              advanced in a good faith effort to comply
17              with the injunction, as opposed to an
18              effort to delay obeying the commands of
19              the court.
20                   We haven't had any movement in terms
21              of the employees' terms and conditions
22              since the, I believe, it was the July
23              23rd or July 24th conference call with
24              the District Court.  No changes on the
25              ground have been made.
```

1          While I understand that the District

2     Court did express the general hope that

3     the parties could reach some solution to

4     obviate the need for a ruling, I also

5     have to point out that I think the

6     Court's words on the record, starting on

7     page 36 and going on from that point,

8     speak for themselves.  Respondents did

9     request thirty days and the Court

10    rejected that request and gave them two

11    weeks to report back.

12          Instead, I think we do need to be

13    mindful of the time factor and the fact

14    that these employees have been through, I

15    think, a lot already.  And it only

16    further erodes the parties' ability to

17    find some sort of negotiated settlement

18    the longer this situation goes

19    unremedied.

20          I think, frankly, it'll put the

21    parties in a better position to negotiate

22    and bargain going forward, if

23    Healthbridge is forced to fully comply

24    with the injunction.

25          Regarding the inability to pay

```
 1              arguments, there's been no evidence or
 2              substantiation of that made.  I can't --
 3              all we have are bare assertions of an
 4              inability to pay.  I think Second Circuit
 5              case law is quite clear on the burden
 6              that a respondent in contempt faces when
 7              trying to show that they are unable to
 8              comply.  I don't think they've come
 9              anywhere near that by any stretch of the
10              imagination.
11                   I think Second Circuit case law is
12              also clear that it is not on the burden
13              of the party moving for contempt to show
14              that the alleged contemnor has an ability
15              to comply.  It's their burden to show
16              that they can't comply.  They haven't
17              done that yet.  They haven't made any
18              effort to do that yet.  All we hear are
19              generalized, well, financially we can't
20              do it.
21                   I don't even yet have a
22              specification of what they can do and
23              what they can't do.  Is it everything?
24              Is it some things?  We don't know.  And
25              the fact that we're in this position
```

1       nearly a month after the conference call

2       with the judge, I think is telling of

3       respondents' motivation to ever actually

4       really comply with the Court's orders.

5           So, I think further postponement of

6       efforts to make Healthbridge comply are

7       only going to thwart negotiation rather

8       than further it.

9       MS. ALITO:  May I reply briefly, your

10      Honor?

11          THE COURT:  Yes, please.

12          MS. ALITO:  With regard to the

13      history of the compliance with the

14      injunction, I think it's important to

15      point out that the respondents did comply

16      with the injunction in March.  And it was

17      only after the centers filed and obtained

18      relief in the bankruptcy in New Jersey

19      that that changed.

20          In the bankruptcy proceeding, the

21      NLRB and the union argued that bankruptcy

22      relief was inappropriate because

23      Healthbridge should be required to pay.

24      That argument was rejected by the

25      bankruptcy court and the relief was

1          ordered.

2                So that's the history with that.

3          You know we -- respondents have

4          attempted, in good faith, throughout this

5          process and throughout the course of the

6          -- throughout the bargaining process to

7          bargain in good faith.  And we have

8          suggested various methods of doing that

9          now and attempting to reach a resolution.

10         And I believe there is no harm to any

11         party and tremendous potential upside to

12         everyone involved, and particularly to

13         the employees, in attempting to reach a

14         resolution at this time.

15               The NLRB has suggested that

16         respondents are making the suggestion in

17         bad faith and that actual bargaining or

18         negotiation won't take place.  The facts

19         of proceeding in good faith can be

20         supervised by the Court.  And you know, I

21         think that's the way of dealing with that

22         potential allegation, instead of just

23         accepting the accusations that

24         respondents are offering to negotiate

25         solely for purposes of delay.  That's

1           certainly not the case.

2                   And you know, at this point, we're

3           the ones who have in the past weeks been

4           attempting to meet and proceed.  And it's

5           the NLRB and the union that at this time

6           are rebuffing our efforts to do so,

7           preferring to proceed with a ruling on

8           contempt, any proceedings that might be

9           required with regard to the issues of

10          ability to pay, appeals, and just

11          continuing the litigation here in New

12          Jersey and in the other courts.

13              MR. CREANE:  Are you through,

14          Ms. Alito?  Your Honor, may I be heard?

15          John Creane.

16              THE COURT:  Yes, you may.

17              MR. CREANE:  First of all, Attorney

18          Alito just said that they complied with

19          the injunction in March and it was only

20          after the bankruptcy court granted the

21          relief that it changed.  That's not

22          accurate.

23                  They timed the filing of the

24          bankruptcy so that when the workers

25          returned, the striking workers returned,

1          they got the relief from the bankruptcy

2          court and they never restored the terms

3          and conditions that Judge Chatigny had

4          ordered.

5               So, it's not accurate to say they

6          complied with the -- they've never

7          restored the terms and conditions of

8          employment.

9               Secondly, she says that nobody is

10         being injured by further delay beyond the

11         eight months that have already

12         transpired.  The workers are being

13         injured every single day that the

14         respondents do not comply with Judge

15         Chatigny's order.

16              Many are without health insurance,

17         which one of the terms and conditions was

18         that they restore the health insurance

19         for bargaining unit employees that under

20         the contract, last contract terms, is

21         fully paid by the employers.  So that

22         many employees cannot afford to go out

23         and get health insurance, many thousands

24         of dollars, so they're doing without

25         health insurance.  They're doing without

```
 1              the pension contributions of that the
 2              employer should be making, and many other
 3              terms and conditions as well.
 4                   Finally, we've all speculated on
 5              what Judge Chatigny told the parties.  My
 6              reading of that conference call was that
 7              he gave them two weeks to work out the
 8              injunction issue so that he would not
 9              have to label them as being in contempt
10              of court.  He did it, I think, as a
11              kindness to the respondents.  He also
12              encouraged the parties to try to resolve
13              all their issues.  But he gave them two
14              weeks to work out, with the board and the
15              union, compliance with the injunction.
16              That has not occurred.  We're now a month
17              later.  They haven't taken any steps to
18              do it.  And as John McGrath said, I don't
19              think they have any intention of doing
20              it.  And I think that's probably the
21              position they'll take in negotiations,
22              that they don't have the money to comply
23              this one corporate entity.
24                   So, it's unlikely that we're going
25              to get anywhere in discussions, given the
```

```
 1            respondents' current approach to the
 2            case.  So I think the only thing that
 3            might move the parties towards meaningful
 4            settlement discussions is once they're in
 5            compliance with Judge Chatigny's order.
 6            I don't think anything else will do.
 7                 MR. McGRATH:  Thank you, your Honor.
 8            If I may, John McGrath for petitioner.
 9                 THE COURT:  Yes.
10                 MR. McGRATH:  For the record, I do
11            want to note that at no point has the
12            board rebuffed any request to discuss
13            possible settlement at any time.  I don't
14            think that's a fair reading of it.
15                 Certainly, the board has objected to
16            further delay in the proceedings, but
17            we've never rebuffed offers for
18            discussions regarding settlement.  I
19            don't think that is a fair
20            characterization of the position that we
21            take.
22                 MR. CREANE:  Nor has the union, your
23            Honor.
24                 THE COURT:  Well, I'm a little
25            confused with that because you've, I
```

```
 1           think, both told me that you don't want
 2           to have any formal discussions scheduled
 3           either with me, another magistrate judge,
 4           a third-party mediator.
 5               MR. McGRATH:  Your Honor, if I may.
 6           This very possibility wasn't broached to
 7           us until after five o'clock yesterday.
 8           And it's my understanding that the offer
 9           to go to alternative dispute resolution,
10           was, at least from the use of the past
11           tense in the email.  I think we received
12           that after your Honor did.  Nobody's
13           suggested ADR until the eleventh hour and
14           forty five minutes, your Honor.  It's
15           awfully hard to take that in good faith
16           the way it's been done.
17                It is in fact very similar to
18           conduct by respondents previously when we
19           had been told to report back to the
20           district court after two weeks from the
21           original conference call.  Petitioner
22           heard nothing regarding any possible
23           settlement or resolution, until one week
24           and six days later, until the day before
25           our status reports were due.  And then we
```

```
 1              only heard vague, general notions of
 2              possible settlements and vast list of
 3              case numbers.
 4                   We've never said that we were
 5              inhospitable to settlement, but again,
 6              these offers aren't being made to us.
 7              They're really being made towards the
 8              Court.  I think's that problematic.  And
 9              I think it is telling that these offers
10              are really being made to delay a ruling
11              by the Court, as opposed to really
12              reaching a negotiated settlement.
13                   And again, I come back to the fact
14              that I don't understand why a ruling by
15              the Court should make settlement more
16              difficult than it already is.
17                   THE COURT:  All right.  Okay.  I
18              think I understand your positions.  Let
19              me think about it.  I do appreciate the
20              observation that the plaintiff and the
21              union haven't had a chance to digest the
22              notion of, you know, mediation or some
23              sort of intervention by a third-party,
24              and I did see the list of litigation that
25              would be on the table for discussion.
```

```
 1              And if that were taken up, it might be
 2         that it's appropriate for the defendants
 3         to refine that suggestion a little bit
 4         for the plaintiffs, suggest, you know,
 5         how they might approach such a
 6         discussion, who would participate,
 7         etcetera.
 8              But in the meantime, I hear the
 9         plaintiff clearly that they don't want to
10         -- they don't want to be heard to object
11         to a discussion, but they don't want to
12         suggest any course that would hold up the
13         Court's ruling.  And I understand what
14         the defendants have said as well.
15              So, with that, I think I'll let you
16         get back to work, unless there's anything
17         further anybody wants to bring up with
18         me.
19              MS. ALITO:  No, thank you, Judge.
20         Just that we will provide the refinement
21         that you suggested with respect to a
22         proposal.
23              THE COURT:  All right.  Anybody else?
24              MR. McGRATH:  Nothing from
25         petitioner, your Honor.  Thank you.
```

```
 1                    THE COURT:  Thank you all for
 2          calling.
 3                    MS. ALITO:  Thank you, Judge.
 4                    MR. GLASSER:  Thanks, your Honor.
 5
 6                    (Concluded:  2:41 p.m.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                        CERTIFICATE

 2

 3          I hereby certify that the foregoing 29

 4      pages are a complete and accurate

 5      computer-aided transcription of my original

 6      stenotype notes taken of the proceedings,

 7      which were held in re:  Jonathan Kreisberg

 8      versus Healthbridge Management, LLC, Et Al,

 9      held before the Honorable Donna F. Martinez,

10      USDC Magistrate Judge, U.S. District, 450

11      Main Street, Hartford, Connecticut on

12      August 20, 2013.

13

14

15

16          /s/Irma Sanchez-Farnham

17         IRMA SANCHEZ-FARNHAM
             Court Reporter
18

19

20

21

22

23

24

25
```

1                 UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF CONNECTICUT

3
   – – – – – – – – – – – – – – – – – x
4                                   :
   JONATHAN B. KREISBERG,           :  No. 3:12CV1299(RNC)
5                                   :
                      Plaintiff,    :
6                                   :
              vs.                   :
7                                   :
   HEALTHBRIDGE MANAGEMENT, LLC,    :
8     dba DANBURY HCC, ET AL,       :  HARTFORD, CONNECTICUT
                      Defendants.   :  JULY 23, 2013
9  – – – – – – – – – – – – – – – – – x

10

11

12
                     TELEPHONE CONFERENCE
13

14

15      BEFORE:

16

17          HON. ROBERT N. CHATIGNY, U.S.D.J.

18

19

20

21

22                          Darlene A. Warner, RDR–CRR
                            Official Court Reporter
23

24

25

                          SPA-85

```
1    APPEARANCES:

2         FOR THE PLAINTIFF:

3              NATIONAL LABOR RELATIONS BOARD
                    A.A. Ribicoff Federal Building,
4                   450 Main Street, Suite 410
                    Hartford, Connecticut 06103
5              BY:  THOMAS EDWARD QUIGLEY, ESQ.
                    JOHN A. McGRATH, ESQ.
6
         FOR THE AMICUS 1199 NE:
7
              LAW OFFICES OF JOHN M. CREANE
8                   92 Cherry Street
                    Milford, Connecticut 06460
9              BY:  JOHN M. CREANE, ESQ.

10
         FOR HEALTHBRIDGE MGT, LLC:
11
              K&L GATES, LLP
12                  One Newark Center, 10th Floor
                    Newark, New Jersey 07102-5285
13             BY:  ROSEMARY ALITO, ESQ.
                    GEORGE P. BARBATSULY, ESQ.
14
                    WIGGIN & DANA
15                  One Century Tower
                    265 Church Street, P.O. Box 1832
16                  New Haven, Connecticut 06508-1832
               BY:  JAMES I. GLASSER, ESQ.
17

18

19

20

21

22

23

24

25
```

1              3:30 P.M.

2

3          THE COURT:  Good afternoon.  Would you please

4    state your appearances, starting with counsel for the

5    board and the union.

6          MR. McGRATH:  Good afternoon, Your Honor, John

7    McGrath here for petitioner.

8          MR. QUIGLEY:  Tom Quigley.

9          MR. CREANE:  John Creane for New England

10   Healthcare Employees Union.

11         MS. ALITO:  Rosemary Alito for the respondents.

12         MR. BARBATSULY:  George Barbatsuly for the

13   respondents.

14         MR. GLASSER:  Jim Glasser is on the line as well

15   for the respondents.  Good afternoon.

16         THE COURT:  Good afternoon.  This is a

17   conference call on the petition submitted by the regional

18   director.  The parties have submitted briefs which I've

19   read.  The most recent being a surreply submitted by the

20   respondents.

21         I don't know if the petitioner proposes to file

22   something in writing in reply to that, but the purpose of

23   this call is to see where we are and see what more needs

24   to be done and to give you an opportunity to make

25   additional presentations if you wish.

1           When you speak during the call, please be good

2     enough to identify yourselves so Darlene can make an

3     accurate record.

4           With regard to where we stand, I'd like to begin

5     by getting clarification with regard to the relief granted

6     by the bankruptcy court.  Based on the record before me,

7     that relief was set to expire about a week ago.  Can

8     anybody tell me where that stands?

9           MS. ALITO:  Yes, Judge.  This is Rosemary Alito.

10          The bankruptcy court last week entered an order

11    extending the interim modifications in the collective

12    bargaining agreements as modified by agreement with the

13    creditors' committee.  The significant changes to the

14    interim relief going forward are the centers are returning

15    to daily schedules of eight hours per day, 30 minute paid

16    lunch periods, employees are receiving 12 sick days per

17    year, employees are also having personal days restored and

18    the centers are making contributions to the training fund.

19          THE COURT:  We're losing you, Ms. Alito.

20          MS. ALITO:  I'm so sorry, Judge.  I'm going to

21    get very close to the speaker and hope that that is

22    better.

23          To repeat the changes in the interim relief by

24    this most recent order are a return to daily schedules of

25    eight hours with 30 minute paid lunch, as opposed to the

1    seven and a half hour, a restoration of 12 sick days per

2    year, restoration of personal days, and a restoration of

3    making contributions to the union training fund.  And

4    during the extended period HealthBridge will continue to

5    forego our management fees.

6               MR. CREANE:  Your Honor, John Creane for the

7    union.

8               I believe the modifications in the relief that

9    the operating companies requested for the continued

10   modifications is somewhere in the neighborhood of about 15

11   to 20 percent of what the total cost of complying with the

12   injunction would have been.  For example, they haven't

13   made any changes in the health insurance or pension fund

14   contributions in the revised interim relief.

15              They had I think a positive cash operating flow

16   of almost $5 million through June 2013, the operating

17   companies, so they really felt they had to do something to

18   modify the -- the relief they were requesting from the

19   bankruptcy court.

20              THE COURT:  Okay.  Can anybody update me with

21   regard to where the other matters stand that are pending?

22   And I refer to the administrative proceeding, the appeals.

23   Can anybody give me an update as to where these other

24   matters stand?

25              MS. ALITO:  The appeal in Second Circuit from

Case: 13-4850   Document: 70   Page: 154   05/06/2014   1218063   208

1    the injunction order, as the Court is aware, was argued

2    and we are awaiting decision of the Second Circuit.

3              The administrative proceeding is scheduled to

4    continue.

5              MR. CREANE:  Your Honor, John Creane.

6              The administrative proceedings before the board,

7    the administrative law judge on the underlying case

8    continues to proceed at a snail's pace.  For some reason

9    respondents certainly seem in no hurry to move that along.

10   They had one witness on the stand for about 15 days of

11   cross-examination, and it's just proceeding at a

12   remarkably slow pace.

13             THE COURT:  How about the status of the appeals

14   from the bankruptcy court decision?  My understanding is

15   that the district court in New Jersey permitted an appeal

16   but decided to wait to see if there would be a direct

17   appeal to the Third Circuit.  Can you clarify where that

18   stands, please?

19             MR. McGRATH:  Yes, Your Honor, John McGrath for

20   petitioner.

21             Regarding the proceedings in the bankruptcy

22   appeal in New Jersey, my understanding is that the board

23   has requested certification directly to the Third Circuit.

24   The last information I had is that we are still awaiting

25   word on whether or not the Third Circuit will grant

1   certification to hear the appeal directly, and so it's

2   ending.

3            THE COURT:  Okay, thank you.

4            Are there any other pending proceedings that I'm

5   not aware of involving these parties?

6            MR. CREANE:  Your Honor, John Creane.

7            There is another lawsuit pending between the

8   parties.  It doesn't directly impact this one.  There was

9   some RICO lawsuit that was brought by respondents against

10   the union and another union in New York, but it's not

11   directly tied in with this case.  That's pending in

12   New Jersey also.

13            THE COURT:  Who are the parties in that case,

14   please?

15            MR. CREANE:  The parties are the respondents,

16   and I think a related company, Care Realty, and they

17   brought a suit against the New England District and the

18   New York 1199 District, a separate local union, and it

19   arrises out of the same fight between the unions and the

20   respondents.

21            Currently the defendants' motion to dismiss is

22   pending in the district court in New Jersey.

23            MS. ALITO:  Well, it involves those matters plus

24   many others, and it includes a list of plaintiffs that's

25   more than a page long.  So unless the Court would like me

1    to read them, I will refrain from doing so.  They include

2    centers in jersey and --

3              THE COURT:  We lost you again, I'm afraid.

4              MS. ALITO:  I apologize, Judge.

5              I said that the parties to the case that

6    Mr. Creane was referring to are quite numerous and the

7    caption is longer than a page, so I don't know that the

8    Court would care to have me read all those names at this

9    time.

10             THE COURT:  Is HealthBridge Management, LLC a

11   plaintiff?

12             MS. ALITO:  It is.

13             THE COURT:  Along with the centers?

14             MS. ALITO:  And many others.

15             THE COURT:  Okay.  Thank you.

16             Any other pending proceedings in any forum that

17   I'm not aware of?

18             MR. McGRATH:  Yes, Your Honor, there is another

19   administrative proceeding, a ULP proceeding, regarding the

20   discharge of two employees at one of the five healthcare

21   centers who is a respondent in the 10(j) proceedings and

22   the -- that is of course involving the NLRB.

23             The union is participating as intervenor and the

24   respondents in that case are Long Ridge of Stamford and

25   HealthBridge.

1          THE COURT:  Okay.  Does that cover everything?

2          I hear no response, so I guess it must.

3          MR. McGRATH:  I believe it does, Your Honor.

4          THE COURT:  Okay, thank you.

5          With regard to the matter before me, does either

6     side seek an opportunity to present evidence?

7          MS. ALITO:  We do not, Your Honor.  We would

8     submit to the Court the most recent orders from the

9     bankruptcy court, but of course that's not in the nature

10    of an evidentiary hearing.

11         THE COURT:  How about the other side, please?

12         MR. McGRATH:  Yes, Your Honor, John McGrath

13    again.

14         The petitioner is not seeking an evidentiary

15    hearing at this point.

16         THE COURT:  Okay.  Does the petitioner want to

17    file anything in writing in response to the surreply?

18         I ask only because ordinarily when leave to file

19    a surreply has been granted, the other side will ask for a

20    chance to respond in writing, and when a surreply has been

21    filed without leave, typically the response is a motion to

22    strike it or alternatively an opportunity to file

23    something in writing.

24         I'm not suggesting that you should be looking

25    for an opportunity to submit something more in writing,

1    I've got plenty of papers here already, but I want to be

2    sure that you are aware that you have that opportunity if

3    you wish to go ahead and submit something in response to

4    the surreply.

5         I mean, the surreply makes points and cites

6    cases that you haven't addressed specifically, and on that

7    basis you might want to consider that; but again, you

8    don't need to.  If you want to stand on what's been

9    submitted so far, that's okay with me.

10        MR. McGRATH:  Your Honor, certainly we feel that

11   the -- we hadn't anticipated filing anything in writing.

12   I have to admit I wasn't quite sure exactly what the

13   procedure on surreply and responding to surreply is.

14        Certainly going and reviewing respondents'

15   reply, we disagree with it on several accounts, but -- I

16   don't know if the Court wanted -- we weren't sure whether

17   or not the Court preferred to make that -- to have us

18   voice those orally or in writing, whether or not the Court

19   had any preference as to the procedure.

20        Certainly we feel that the -- many of the cases

21   cited by respondents are distinguishable on their facts,

22   especially regarding the issues surrounding joint

23   employers.  And regarding the additional arguments raised

24   regarding lacking authority to institute contempt, that

25   was frankly a bit unclear to us because, as you recall,

1   earlier in these proceedings, we had requested a partial

2   order to stay briefing on the issue of the

3   constitutionality of the recess appointments because that

4   is -- obviously it is a weighty issue that has been

5   briefed extensively on appeal in this case before the

6   Second Circuit.  But given that this Court felt that it

7   sufficient to rule that it had jurisdiction to hear the

8   10(j) petition based alternatively on either the board

9   having a valid quorum or the delegation, we had requested

10  a partial stay of the briefing on the issue of the

11  constitutionality of the recess appointments.  And so

12  we -- frankly given the order granting the stay, I wasn't

13  sure how to respond.

14          I can understand that respondents, you know,

15  wish to, I'm sure, preserve whatever rights they have on

16  appeal to make whatever arguments they wish on appeal, but

17  it didn't strike us, frankly, as what -- we weren't sure

18  whether or not it was appropriate to respond to those, the

19  new advanced arguments, in light of the Court's previous

20  order.

21          THE COURT:  Okay.  Well, I appreciate your

22  statement.

23          With regard to how best to proceed, why don't we

24  see where we are at the end of this call.  You'll have an

25  opportunity during the call to make whatever points you're

1     able to make orally.

2              On that note, I would ask you to focus on the

3     argument by HealthBridge that even assuming the injunction

4     order applies to HealthBridge as a joint employer,

5     HealthBridge should not be held in contempt because the

6     decision of the bankruptcy court altered the situation in

7     a material way creating, at a minimum, enough doubt about

8     HealthBridge's obligations under the injunction order to

9     preclude a finding of contempt.

10             Were you able to follow that question?

11             MR. McGRATH:  Yes, Your Honor.  Yes, I do.

12             The issue -- the -- I -- our response to the

13     issues raised regarding the contractual modifications

14     granted by the bankruptcy court is to emphasize two

15     issues.

16             One, we feel that HealthBridge's defenses are

17     based on contractual arguments when it is -- the

18     injunction itself is seeking the protection of statutory

19     rights and the enforcement of statutory duties.

20             Regarding the issue of how the bankruptcy of the

21     centers might affect HealthBridge's liability, I believe

22     we already briefed in our reply brief citing case law

23     under board law stating that where one -- I believe they

24     were alterego cases -- where one alterego declares

25     bankruptcy, the other alterego is not alleviated of its

1   responsibilities to remedy unfair labor practices and to

2   honor bargaining obligations and such.

3           I understand that in their surreply, respondents

4   have pointed out that joint employer cases are different

5   from alterego cases in many respects.  That's a difference

6   I think we all acknowledge.  However, when the issue of

7   talking about the protection of the bankruptcy court, I

8   think most folks would agree that alter egos stand closer

9   to each other than joint employers do.  And so if the

10  protection of the bankruptcy court does not extend to an

11  alter ego, I don't think there's any analogous argument to

12  extend it even farther to cover joint employers.  And I

13  think we've already briefed that issue.

14          Again, the, you know, the language of the order

15  itself speaks to restoring, you know, the terms and

16  conditions that were in place on the 16th.  Those are, you

17  know, clearly ascertainable, historical facts.  And we

18  know the benefits that the employees were being paid on

19  the 16th and the wages they were being paid and the paid

20  lunch breaks and such that they were receiving.  And the

21  terms that they're working under now are not the same.

22          So, you know, in that sense, our main reply is

23  that the contractual arguments are beside the point

24  because the duty to refrain from unilateral changes is an

25  extension of the bargaining obligation.  It's not a

1    contractual duty.  Obviously these contracts had expired

2    prior to the implementation.  Whatever was left of those

3    contracts was very clearly shredded on the 17th anyway.

4         The violation of Section 85 of the act is a

5    violation of the duty to bargain, it's not the violation

6    having to do with midterm contract changes.

7         So to the degree that, you know, one employer in

8    a joint employer duo is unable to comply with the remedy

9    ordered in the 10(j) injunction, the others are liable to

10   make sure that that affirmative relief is in fact carried

11   out.

12        THE COURT:  And you believe that the law on that

13   point is sufficiently clear that a finding of contempt is

14   warranted?

15        MR. McGRATH:  I do, yes.  I mean, I know in our

16   reply brief, one of the cases we cited -- or -- I'm sorry,

17   I'm blanking whether or not it was our reply brief.  I

18   think it was reply brief where we cited the Whitewood

19   Maintenance Co., which is an NLRB case, 292 NLRB 1159.

20        That was a case -- I understand the surreply the

21   respondents feel is analogous to this case, but I would

22   disagree with that.  That was a situation where the board

23   reversed the administrative law judge on a case where

24   there were essentially three employers involved.  There

25   was respondent HealthBridge, respondent World and

1    respondent Lucky.  And the board held that respondent

2    Whitewood and respondent World were joint employers and

3    respondent World and respondent Lucky were joint

4    employers.  And that because -- and because of that mutual

5    joint employer status, the bargaining obligation of

6    Whitewood also applied to respondent World and it also

7    applied from respondent World to respondent Lucky.  And

8    that's the essence of the issue here is the bargaining

9    obligation, it's good faith bargaining, which was

10   addressed fairly extensively in the briefs.

11            And the idea that the need to preserve the

12   status quo is the status quo of the relative -- the rights

13   of the parties and the relative bargaining position, not

14   so much an issue of remediating, you know, the financial

15   issues, which of course are very serious for the employees

16   here, but it's also the ability for the bargaining process

17   to work itself out.

18            And right here I mean we can see how the

19   bargaining process is experiencing extreme difficulty.  I

20   think that's a way to put it mildly, where HealthBridge is

21   insisting that it not be at the bargaining table, even

22   though it is at the bargaining table, it's insisting that

23   it not be at the bargaining table, and that the union be

24   limited to bargaining with five entities that are

25   themselves in bankruptcy.

1          THE COURT:  All right, thank you.

2          Let me turn to counsel for respondents.  Is

3   there anything that you would like to add to the papers on

4   file?

5          Ms. Alito?

6          MS. ALITO:  Thank you, Judge.  I'd like to

7   respond briefly to Mr. McGrath's comments.

8          And I think one of the most important things,

9   perhaps the most important thing in this proceeding that

10  was referenced by Your Honor is the fact that we are in a

11  contempt proceeding.  We're not like the initial 10(j)

12  proceeding.  The standards established by the Second

13  Circuit for a finding of contempt are very stringent,

14  quasi criminal finding.  And the first prong that needs to

15  be proven by clear and convincing evidence by the NLRB is

16  that the order clear -- that allegedly was violated -- was

17  clear and unambiguous.

18          So in this situation, the question is, was the

19  injunction -- did the injunction order clearly and

20  unambiguously order HealthBridge to take over the

21  obligations of the centers in the event that the centers

22  went into bankruptcy.  And I would submit that the NLRB in

23  this case has not come close to meeting that standard or

24  to meeting the other two prongs of proof of contempt.

25          The alter ego cases relied on by Mr. McGrath, I

1    think they're different from the joint employer cases.

2    There are no joint employer cases requiring payment of

3    obligations fully on the basis of a finding of joint

4    employer status.

5            And I think the Second Circuit's decision in the

6    AT&T case that was cited in our surreply is controlling

7    and it's right on point in that respect.

8            So the situation we have here, we would submit

9    is effectively an end run against the bankruptcy

10    proceeding in New Jersey.  The NLRB and the union argued

11    to the bankruptcy court that the interim relief should not

12    be granted because HealthBridge could and should carry the

13    day financially.  Bankruptcy court rejected those

14    arguments and granted the interim relief.

15            So I think those are our main points that the

16    NLRB has not come close to meeting the very stringent

17    standards for contempt for its order on the 10(j)

18    injunction, the status quo ante, that was done.  Prior to

19    that order, HealthBridge was and always was contract

20    manager.  They returned to that status.

21            As to the joint employer argument, this Court

22    did not make a determination of joint employer status, did

23    not make a determination that every one of the respondents

24    was responsible for compliance with every aspect of the

25    relief ordered.  Rather we would submit a reasonable

1        reading of the order was that all of the respondents would

2        be obligated under the order to go back to fulfilling

3        those parts of the obligations that they had before the

4        order was entered.

5                Also with regard to the joint employer issue, we

6        cited the cases establishing that joint employer

7        liability, in this case the actual employers, the centers,

8        can't be liable in contempt because they exercised their

9        statutory rights under the bankruptcy code.  As a

10       consequence, derivative liability for the centers' actions

11       should not flow through HealthBridge as an alleged joint

12       employer.

13               Ms. Crutchfield I think made -- papers are clear

14       with respect to Ms. Crutchfield.  The allegations with

15       respect to her are absolutely minimal.

16               It's alleged by the NLRB in its reply brief they

17       said they met the standard because Crutchfield had

18       knowledge.  Knowledge isn't enough.  There's been nothing

19       submitted in the record to suggest that Ms. Crutchfield

20       had the power either to tell the centers not to enter

21       bankruptcy or to require HealthBridge to assume the

22       obligations of the centers.

23               I think we've briefed this brief extensively.

24       Those are the arguments, a very brief summary.

25               I would highlight and I'd welcome answering any

1    questions that the Court has.

2              THE COURT:  All right, thank you.

3              Any comments in response?

4              MR. McGRATH:  Yes, Your Honor.  I think taking a

5    couple of the issues in turn.

6              Regarding -- starting off basically with the

7    evidentiary standard, the clear and convincing, the

8    respondents have accused petitioner of ignoring or

9    misstating the evidentiary burden.  I don't think that's a

10    fair reading of our memorandum.  I do think we set that

11    out in quoting from Powell v. Ward.

12              Starting with the second prong regarding proof

13    of non-compliance, I mean, I think the evidence there is

14    clear and convincing.  Because if there aren't any

15    disputes over what the employees are being paid or what

16    they're earning, there isn't an evidentiary dispute as to

17    the terms and conditions of employment that they're

18    working under at the moment.  So I think the parties are

19    all on the same page, and so there really isn't an issue

20    there.  I think that's certainly clear and convincing.

21              Regarding the clarity of the order, unclear and

22    ambiguous, I think restating it as an issue of whether or

23    not the order requires HealthBridge to assume contractual

24    obligations, which is how respondents had stated it

25    previously, is something of a strawman.  Again we're

1     talking about the statutory bargaining obligations here.

2              The fact that the order did not use the magic

3     word "guaranty," is not significant here.  What is

4     significant here is that the petition alleged that

5     HealthBridge controls the labor relations of the centers

6     and that they're a joint employer with the centers.  And

7     that reviewing the petition it states that respondents

8     unilaterally implemented.  Not the centers, it says

9     respondents.

10             And the petitioner submitted in the record of

11    the underlying Fish proceedings a whole lot of un-rebutted

12    evidence that HealthBridge was involved in the negotiation

13    of previous contracts, that HealthBridge was involved in

14    the policing of the contracts, the grievance procedure,

15    interpreting the contracts, applying the contracts.  The

16    evidence submitted by respondents further shows

17    HealthBridge's integral role in the bargaining

18    relationship, especially the 2010 addenda to the

19    Wethersfield agreement signed by Lisa Crutchfield.

20             HealthBridge is an employer here, they really

21    are.  In any board decision where there's unfair labor

22    practices committed by one or another or both joint

23    employers, the joint employers are jointly and severally

24    liable for each other's unfair labor practices.

25             Thus, when this Court stated that it found

1    reasonable cause to believe that respondents had violated

2    the act as alleged in the petition, that was the narrow

3    finding that this center had done X and that center had

4    done Y and another center had done Z.  That isn't a fair

5    reading of the decision, that isn't a fair reading of the

6    petition.  The petition says respondents did this.

7            Does it make sense that the language of the

8    order says respondents shall do this, respondents shall do

9    that, not this center has to do this and that center has

10   to do that and HealthBridge has to -- well, frankly if we

11   are to believe respondent's interpretation of the order,

12   it isn't clear to me that HealthBridge has to do anything.

13           And I understand that HealthBridge has made the

14   argument that petitioner's view of the order would produce

15   absurd results.  I don't think that's true.  I think the

16   absurd results would be for HealthBridge to essentially

17   grant its own motion to dismiss that it never ever filed

18   regarding HealthBridge by alleviating it of any

19   obligations under the order.

20           THE COURT:  All right.

21           MR. McGRATH:  I do think it's clear at the point

22   that the order was issued, a finding that HealthBridge --

23   that the respondents collectively as joint employers, that

24   there was reasonable cause to believe that they had

25   committed the unfair labor practices alleged in the

1    complaint.  That finding would entail joint/several

2    liability on behalf of the joint employers with each

3    other.  And so it makes sense that the language of the

4    proposed order -- of the order as adopted would have

5    respondents are liable for this, respondents are liable

6    for that.

7         So the affirmative obligations to put the

8    employees back to the wages and benefits and terms and

9    conditions they were earning on the 16th, that's the only

10   way you can read the order unless you take out a pen and

11   start changing the words around.  You would have to change

12   it from "respondents" to "the centers."

13        The argument over Wethersfield, that just

14   doesn't make any sense to me because I'm not aware of any

15   authority that says that we are under some kind of legal

16   obligation to pursue contempt against Wethersfield.  I

17   think the parties all agree that Wethersfield is closed

18   and not in the picture, so I don't think -- I mean, I

19   think, you know, nobody's pursuing contempt against them.

20   I don't think there's any requirement to do that, so I

21   don't see how the reading would create that sort of absurd

22   result.

23        Regarding the liability of Lisa Crutchfield, we

24   didn't request anything from Ms. Crutchfield.  We

25   requested that the order require an affidavit of

1    compliance from a responsible official.  Tellingly,

2    respondents produce one declaration and it came from

3    HealthBridge.

4         So no, the claim that Ms. Crutchfield isn't

5    responsible, it just doesn't seem realistic at this point.

6    I mean, who should have provided the affidavit then?  I

7    mean, if that's the case, then they're never in compliance

8    because they never provided a declaration from a

9    responsible official.

10        It's respondents who offered Crutchfield up as a

11   responsible official.  They're the ones who said she's

12   responsible, take her declaration.  And there you have a

13   HealthBridge individual attesting that all the centers are

14   in compliance with the injunction.  That itself is

15   evidence of the joint employer status.

16        And finally coming back to the AT&T case, that

17   case is clearly distinguishable on the facts.  The Second

18   Circuit case law does refer to joint employer status as

19   being primarily an issue of fact particularly well-suited

20   to the expertise of the NLRB.  Thus, in the underlying

21   proceedings we were not required to prove that

22   HealthBridge was a joint employer.  Burden was to prove

23   reasonable cause to believe that HealthBridge was a joint

24   employer.

25        The un-rebutted evidence entered by the

1    petitioner there in the Fish decision, the evidence

2    entered by respondents only strengthened that position.

3    None of it weakens that position.  And so there was really

4    not much where else to go there to see that there was

5    reasonable cause for HealthBridge to be a joint employer.

6         You know, AT&T is different.  One, it's a

7    different standard.  It's a substantial evidence standard

8    on review.  Two, that case took place within the context

9    of a subcontract where the appellate court found that AT&T

10   wasn't liable for the decision to terminate the -- and

11   when they refer to terminating the contract, that was a

12   subcontract between a company called TCA and another

13   company called ECS.  And that was a case where the circuit

14   court looked at the legal relationships between the

15   entities and they concluded that AT&T didn't have the

16   contractual ability to stop TCA from canceling its

17   subcontract with ECS because AT&T was only a 49 percent

18   minority stakeholder in the joint venture.  Furthermore,

19   AT&T had relinquished its rights to select the building

20   service contractors in its contract with ECS and with ABL

21   Management.

22        So to the extent that the AT&T case, the Second

23   Circuit looked at AT&T and said that, well, they're not

24   really a joint employer.  I mean, that was a case where

25   the administrative law judge had looked at the evidence of

1    AT&T's involvement and the daily operations of the

2    subcontractor and found that there wasn't really all that

3    much involvement.

4         If I recall correctly, it was pretty much one

5    lunch meeting in which an AT&T official generally

6    discussed rates.  That's not what we're talking about

7    here.  We're talking about 38 bargaining sessions with

8    HealthBridge officials at the table.  That's not one lunch

9    meeting.

10        We're talking about a human resources manual

11   that had the provisions in it that are virtually identical

12   to the proposals advanced in collective bargaining.

13        Specifically looking at page -- if you're

14   looking at Exhibit B of our reply brief, the page 171 of

15   214 where it describes the HealthBridge 401(k) plan where

16   it talks about how employees can contribute to the 401(k)

17   plan and HealthBridge will match 25 percent of the

18   employee's contribution, up to 3 percent of the employee's

19   compensation.  That's exactly what they proposed at the

20   bargaining table.  We're not even talking about a

21   one-to-one match.

22        We're looking at page 164, the same attachment

23   where they talk about enrollment for health insurance.

24   They talk about it is the responsibility of the HR payroll

25   coordinator for center-based employees.  For center-based

1    employees.

2             THE COURT:  Mr. McGrath, I'm sorry to interrupt

3    you but we lost you.

4             MR. McGRATH:  My apologies.

5             THE COURT:  If you could go back to the start of

6    the quote.

7             MR. McGRATH:  It is the responsibility of the HR

8    payroll coordinator -- and this is on page 164 out of 214

9    on petitioner's Exhibit B to the reply brief -- it is the

10   responsibility of the HR payroll coordinator for

11   center-based employees or the regional human resources

12   department for regional employees to enroll eligible

13   employees in the selected health plan in a timely fashion.

14   And that section, generally that's page 404 of policy HR

15   5-1 discussing the health plans available to employees.

16   And, you know, throughout this human resources manual,

17   they're referring to the regional employees and, you know,

18   center-based employees.

19             They're clearly referring to the CNAs and other

20   nursing staff employees.  We know this because when they

21   show examples of the form that folks have to fill out,

22   they fill them out by using certified nursing systems as

23   an example.

24             When we look at the employment applications -- I

25   know this was an issue raised in the surreply, how the

1    employment applications that were part of the record in

2    the Fish decision, how they referred to HealthBridge

3    Management, Inc., which we pointed out is not the same

4    name as HealthBridge Management, LLC.  However -- and

5    respondents have attached some great weight to this in

6    their surreply saying that, well, that's an unrelated

7    entity.

8         The fact is if one looks at page 42 of

9    petitioner's Exhibit B, they'll see the employment

10   applications in the HealthBridge human resources manual

11   and they still say HealthBridge Management, Inc. at the

12   top.  And it is clear that those applications that were

13   filled out and were part of the record in the Fish case --

14   and those were filled out in 2010 when HealthBridge LLC

15   was in place -- those were taken out of the HealthBridge

16   human resources policy manual.  And some were, you know,

17   changed in part, but they all kept references to

18   HealthBridge, HealthBridge Management, Inc.

19        And so this is the same human resources policies

20   manual that Ms. Crutchfield testified that she helped to

21   draft and that is put at each of the centers and that the

22   centers are to follow except where they conflict with

23   collective the barring agreement.

24        And its large, it covers pretty much all the

25   main terms and conditions of employment.  And it really

1       shows that HealthBridge is inextricably involved in

2       setting the terms and conditions of employment.

3               I mean, furthermore, the insurance summaries

4       submitted as Exhibit C, we may have HealthBridge stamped

5       on each page.  The employers -- the bargaining notes refer

6       to the employer being self-insured.  I think Mr. Kaplan

7       makes that reference several times.  Well, none of these

8       centers are big enough to self insure themselves.  It's

9       too small of a risk pool.  They're all pooled.  None of

10      these centers are individual.  They're just legs on a

11      spider.

12              So regarding that, I mean, I think the evidence

13      in the Fish decision clearly set out reasonable cause to

14      believe that HealthBridge was a joint employer.

15              I think that is, you know, I think a plain

16      commonsense reading of the -- this Court's decision

17      regarding finding reasonable cause to believe that

18      respondents violated the act as alleged in the petition

19      and a commonsense reading of the affirmative relief

20      required in the order, respondents shall, respondents

21      shall under joint employer -- joint employer law -- joint

22      employers are no less -- as they say in the Whitewood

23      Maintenance decision -- that one joint employer is no less

24      responsible for the bargaining obligation of itself than

25      the other.  Words to that effect.  I apologize, I'm

1    probably mangling it.  So once there is an unfair labor

2    practice by one, it is the obligation of the others, the

3    other joint employer, to remedy it.

4         Here HealthBridge was alleged to be the joint

5    employer with each of the centers and so it falls on

6    HealthBridge just as it would in a board proceeding.  If

7    the order had been an order issued by the board, they

8    would clearly be jointly and severally liable.  I don't

9    see any reason to read the 10(j) injunction any different

10   than one would read an order from the board.

11        MS. ALITO:  Judge, may I respond briefly?

12        THE COURT:  I think the petitioner is entitled

13   to the last word, Ms. Alito.  I don't want to cut you off

14   if you have something new to say, but I do think that

15   they're entitled to the last word on the points that have

16   been addressed thus far.

17        MR. McGRATH:  Your Honor, I certainly have no

18   problem if time allows for Ms. Alito to make a response if

19   I can have some time to respond to Ms. Alito's response.

20        THE COURT:  Then what happens if Ms. Alito wants

21   to respond to that?  This is why we usually just have one

22   complete round.

23        MR. McGRATH:  I apologize, Your Honor.

24        THE COURT:  Unless there's some exceptional

25   reason for departing from that.

1          Ms. Alito, is there something that you have not

2     had an opportunity to say?

3          MS. ALITO:  Not a new topic, Judge, but I would

4     direct the Court to the AT&T decision on page 451 because

5     I believe that Mr. McGrath has repeatedly misstated the

6     rule of the Second Circuit with regard to the liability of

7     joint employers.

8          THE COURT:  Okay.  Let me tell you what I see.

9     I don't want to go on too long, but let me begin by saying

10    that I recognize that the elements of contempt do rightly

11    impose a significant burden on the party seeking a

12    contempt order.  The test is stringent.  The decree

13    imposing the obligation at issue has to be clear and

14    unambiguous, proof of non-compliance must be clear and

15    convincing, and it must be established that the respondent

16    has not been reasonably diligent in attempting to comply.

17         Recognizing that this test is appropriately

18    strict, I am inclined to find that it has been met.  The

19    principal argument presented by HealthBridge in opposition

20    to the effect that the injunction is unclear insofar as it

21    applies to HealthBridge strikes me as somewhat

22    disingenuous.

23         The case was litigated aggressively and at no

24    time did HealthBridge appear to contest the allegation in

25    the petition that it was a joint employer, an allegation

1   that is well supported by the Fish opinion on which the

2   board relies.

3        The petition specifically alleged "At all

4   material times respondent HealthBridge has possessed and

5   exercised control over the labor relations policy of the

6   respondent healthcare centers and administered a common

7   labor policy with respect to the respondent healthcare

8   centers for the employees of the respondent healthcare

9   centers."

10        In addition, the petition specifically alleged,

11   "At all material times respondent HealthBridge and

12   respondent healthcare centers have been joint employers of

13   the employees of respondent healthcare centers."

14        In response to the petition, HealthBridge filed

15   five briefs totalling nearly 200 pages along with hundreds

16   of pages of exhibits and affidavits.  We held several

17   conferences by telephone.  We had an evidentiary hearing

18   in court.  I invited HealthBridge to make whatever points

19   it wished to make and I think gave HealthBridge ample

20   opportunity to present all the points that one could

21   advance in opposition to the requested injunction.  At no

22   time did HealthBridge ever suggest in any way, shape or

23   form that it was anything other than a joint employer

24   exercising control over the center's labor policies.

25        I proceeded on the understanding that this was

1    uncontested, as indeed it was uncontested, and wound up

2    granting the requested injunction against all the

3    respondents and ordered all the respondents to comply.

4         HealthBridge did not raise the argument that it

5    is not a joint employer and should not have been a

6    respondent until after the bankruptcy court ruled and

7    HealthBridge filed its reply brief in the Court of

8    Appeals.

9         I think for HealthBridge to point the finger at

10   the other side and argue that its presentation was lacking

11   is contrary to equity, and if accepted would be contrary

12   to the interests of justice.  I think that HealthBridge

13   waived the argument in failing to contest the issue at any

14   point during proceedings before me.

15        The failure of HealthBridge to contest the issue

16   made sense to me at the time because HealthBridge had

17   stipulated in the proceedings before Judge Fish that it

18   was a joint employer.  In Judge Fish's opinion, he found

19   "Respondent HealthBridge has been at all times material

20   herein, a joint employer with each of the respondent

21   healthcare centers of the employees of each of the

22   respondent healthcare centers."

23        Quoting further from his lengthy opinion, "As

24   noted above, the parties have agreed that respondent

25   HealthBridge has been and is a joint employer of the

1    employees of the six individual respondent healthcare

2    centers."

3             You know, given that agreement contained in the

4    Fish opinion which was submitted by the board in support

5    of its claim against HealthBridge, I was not surprised

6    that HealthBridge did not contest the issue.  What did

7    surprise me was finding out that HealthBridge was raising

8    the issue after the fact, so I hope you can understand why

9    I say that I regard the argument as somewhat disingenuous.

10   I think it's hard to avoid the inference that at some

11   point along the way after the injunction was issued it

12   dawned on somebody that maybe this was an argument that

13   could be made.

14             At any rate, I believe that HealthBridge's

15   failure to raise the point earlier constitutes a waiver

16   and I believe it is properly deemed to be a joint employer

17   for purposes of these proceedings.

18             As to the requirement that the decree be clear

19   and convincing, by its terms the injunction order applies

20   to all respondents, HealthBridge included.

21             I agree with Mr. McGrath's observations that a

22   plain commonsense reading of the injunction order allows

23   for only one reasonable conclusion, which is that it

24   applies to HealthBridge.

25             I specifically found reasonable cause to believe

1    that HealthBridge had violated the act as alleged in the

2    petition and I ordered HealthBridge to take steps to

3    remedy that violation.

4         It's undisputed that the employees are not

5    receiving the various benefits that HealthBridge

6    unilaterally terminated.  Those benefits have not been

7    restored as required by the injunction, and because that's

8    undisputed, the second prong of the three-prong test is

9    satisfied.

10        This leaves the third prong requiring a showing

11   that HealthBridge has not been reasonably diligent in

12   attempting to comply, and this is where I have some

13   misgivings about the requested contempt order.

14        I think that in the circumstances it was

15   incumbent on HealthBridge if it was truly in doubt about

16   its obligations to come here and seek clarification.  I

17   think reasonable diligence requires no less.  If

18   HealthBridge was of a mind to put the centers in

19   bankruptcy, all well and good, but if HealthBridge was of

20   a mind to treat the injunction order as inapplicable in

21   the event the bankruptcy court granted relief, then I

22   think HealthBridge needed to come here and explain that to

23   me and show me why that was correct and give the other

24   side an opportunity to show me why it was not correct.  I

25   don't think in the circumstances HealthBridge should have

1    taken it upon itself to basically relieve itself of an

2    obligation under the injunction even though by its terms

3    the injunction applies to HealthBridge, and there's really

4    no other sensible reading.

5              If HealthBridge were not a joint employer, what

6    was it doing in the case?  If it wasn't a joint employer

7    liable to take steps to remedy the wrong alleged here,

8    what were they doing in the case?  I think for

9    HealthBridge to arrogate to itself the authority to simply

10   walk away was not a good thing.

11             That said, I come back to where I began.  I

12   recognize that the test for contempt is appropriately

13   stringent.  When a judge finds a party in contempt, that's

14   pretty strong medicine.  That implies something about the

15   party that is quite negative, and I'm reluctant to brand

16   HealthBridge and its counsel with such a contempt order

17   unless it's clear to me that they deserve it.

18             What concerns me is what I'll refer to as the

19   bankruptcy aspect of this.  If the respondents had not

20   gone to bankruptcy court, we would have a different case,

21   we would have a clearer case.  Having gone to bankruptcy

22   court and having obtained relief there, the respondents

23   have produced what might be thought of as an uncertainty

24   with regard to HealthBridge's obligation under the

25   injunction.

1      In HealthBridge's papers, the argument is made

2   that the board and the union urged the bankruptcy court to

3   deny relief on the ground that related entities including

4   HealthBridge could fund the benefits due the employees

5   under the injunction, as indeed they did.  I've reviewed

6   the pertinent filings and I find that arguments along that

7   line were advanced by the board and the union in the

8   bankruptcy court.  HealthBridge goes on to say in its

9   papers here, the bankruptcy court's rejection of the

10   Board's arguments provides fair ground of doubt as to the

11   alleged wrongfulness of HealthBridge's actions making a

12   finding of contempt unwarranted.

13      I think that there is some arguable merit to

14   that point and that's what causes me some reluctance to

15   issue the requested contempt order.  Accordingly, this is

16   what I would suggest:  If I step back and look at what has

17   gone on here, and many other forums, I see a picture that

18   really doesn't appeal to me.  I see proceedings

19   multiplying, and in the meantime, as Mr. McGrath pointed

20   out, the bargaining process is experiencing extreme

21   difficulty.  This is not good.

22      As a district judge, I'm not supposed to have

23   much of a role here.  The very fact that you're back

24   underscores for me how there's something wrong with this

25   picture and I think you need to find a way to repair the

1    harm that has been done and is being done and figure out a

2    way to live together and get past this.  Litigating here

3    and there and everywhere else is not a good thing.

4          Sure, the law gives people a right to sue.

5    Sure, you can charge somebody with being a racketeer.

6    Sure, you can seek to hold people in contempt, including

7    this individual respondent.  I'm not casting aspersions

8    when I say that, but my point is, does that serve people's

9    interests?  Does that serve the public interest?  Is that

10   the best way to fulfill your respective responsibilities?

11   I would respectfully submit that there's a better way and

12   the sooner you turn away from this course you're on, the

13   better for everybody.

14         I think that HealthBridge should recognize its

15   responsibility as a joint employer; to take the actions

16   required by the injunction order; and I think that to the

17   extent HealthBridge can claim that it was uncertain, I

18   hope that my remarks today have provided necessary

19   clarification.  In my opinion, the order plainly applies

20   to HealthBridge and it does require HealthBridge to take

21   the specified actions.  I would urge HealthBridge to take

22   that under advisement.

23         If you can find a way to work this out, then I

24   won't need to make a final decision on whether to hold

25   HealthBridge or anybody else in contempt.  I'm going to

1      give you an opportunity to reflect and speak about this

2      with your respective principals and to confer with each

3      other and to get back to me.  If you're able to resolve

4      it, fine, if you're not, then I'll rule.

5               I hope that's clear enough.

6               MS. ALITO:  It is, Judge.

7               THE COURT:  I don't mean to be outspoken in my

8      view.  I don't want to be heavy-handed, but at the same

9      time I feel strongly that people need to see what is going

10     on here and recognize that it's not good.  I appeal to you

11     to please consider what I have said.

12              How much time would you like to have to follow

13     up and get back to me?

14              MS. ALITO:  Thirty days, Judge?

15              THE COURT:  Is there anything objection to that?

16              MR. CREANE:  John Creane.  Your Honor, that

17     seems a very long time given the delay in complying with

18     the injunction.  I would think two weeks should be more

19     than enough time for people to take into account what

20     you've told them today.  I would think two weeks would be

21     plenty.

22              THE COURT:  Mr. McGrath?

23              MR. McGRATH:  Your Honor, given the extensive

24     amount of time between the stays and such that, you know,

25     the employees haven't been given the relief, I'd have to

1    say a month would be far too long.  I would agree that the

2    shorter the better.  Frankly, two weeks or even one week.

3              MS. ALITO:  I think one week will not give us --

4    I think would be extremely difficult.  Of course we'll do

5    whatever the Court suggests, but --

6              THE COURT:  All right.  I want to give you

7    enough time to do what needs to be done and so I'll go

8    along with two weeks.  I think that two weeks in the

9    circumstances makes sense.  So why don't we say that I

10   will hear from the parties in two weeks' time with regard

11   to the next step with regard to the requested relief.

12             MS. ALITO:  Thank you, Judge, we will do that.

13             THE COURT:  All right?

14             MR. McGRATH:  Thank you, Your Honor.

15             THE COURT:  You're welcome.  I will look forward

16   to hearing from you and I hope that you'll have good news

17   for me when the time comes.

18             Thank you for being available today.

19                  (Proceedings adjourned at 4:50 p.m.)

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3              In Re: KREISBERG vs. HEALTHBRIDGE

 4

 5

 6              I, Darlene A. Warner, RDR-CRR, Official Court

 7    Reporter for the United States District Court for the

 8    District of Connecticut, do hereby certify that the

 9    foregoing pages are a true and accurate transcription of

10    my shorthand notes taken in the aforementioned matter to

11    the best of my skill and ability.

12

13

14

15
                    /s/_____
16
                        DARLENE A. WARNER, RDR-CRR
17                        Official Court Reporter
                        450 Main Street, Room #223
18                      Hartford, Connecticut 06103
                            (860) 547-0580
19

20

21

22

23

24

25
```

```
 1              UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF CONNECTICUT

 3
      - - - - - - - - - - - - - - - - x
 4                                    :
      JONATHAN B. KREISBERG,          :  No. 3:12CV1299(RNC)
 5                                    :
                        Plaintiff,   :
 6                                    :
               vs.                    :
 7                                    :
      HEALTHBRIDGE MANAGEMENT, LLC,   :
 8       dba DANBURY HCC, ET AL,      :  HARTFORD, CONNECTICUT
                        Defendants.  :  June 6, 2013
 9                                    :
      - - - - - - - - - - - - - - - - x
10

11

12
                   TELEPHONE CONFERENCE
13

14

15        BEFORE:

16

17        HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

18

19

20

21

22                          Darlene A. Warner, RDR-CRR
                            Official Court Reporter
23

24

25
```

1    APPEARANCES:

2         FOR THE PLAINTIFF:

3              NATIONAL LABOR RELATIONS BOARD
                    A.A. Ribicoff Federal Building,
4                   450 Main Street, Suite 410
                    Hartford, Connecticut 06103
5              BY:  THOMAS EDWARD QUIGLEY, ESQ.
                    JOHN A. McGRATH, ESQ.
6
         FOR THE AMICUS 1199 NE:
7
               LAW OFFICES OF JOHN M. CREANE
8                   92 Cherry Street
                    Milford, Connecticut 06460
9              BY:  JOHN M. CREANE, ESQ.

10

         FOR HEALTHBRIDGE MGT, LLC:
11
               K&L GATES, LLP
12                  One Newark Center, 10th Floor
                    Newark, New Jersey 07102-5285
13             BY:  ROSEMARY ALITO, ESQ.
                    GEORGE P. BARBATSULY, ESQ.
14

15

16

17

18

19

20

21

22

23

24

25

1                          10:00 A.M.

2

3            THE COURT:  Hello.

4            SPEAKER:  Good morning.

5            THE COURT:  Yes.  Would you please identify

6    yourselves for the record.

7            MR. McGRATH:  Good morning, Your Honor, John

8    McGrath with the petitioner here as well, and Tom Quigley

9    is also with me.

10           MR. CREANE:  John Creane for intervening union,

11   Your Honor.

12           MS. ALITO:  Rosemary Alito for the respondent.

13           MR. BARBATSULY:  And also George Barbatsuly for

14   the respondent.

15           THE COURT:  Anybody else?

16           Okay, thank you.

17           We asked to speak with you regarding the latest

18   developments in this case, specifically a motion for

19   contempt filed on May 30.

20           Has respondent's counsel had an opportunity to

21   review the papers that have been filed here?

22           MS. ALITO:  We have, Judge, and we're in the

23   course of preparing their opposition, which by our

24   calculation is due on the 20th.

25           THE COURT:  All right.  I wanted to get together

1    on the phone to see if I could save people time and

2    expense by getting a handle on exactly what's happening

3    and what the petitioner has in mind and how the

4    respondents would propose to deal with the situation.  So

5    if you don't mind, I thought we might spend just a few

6    minutes talking about these things and hopefully it will

7    wind up saving people time and expense.

8              Mr. McGrath, I've read the paperwork and in

9    essence I see that the NLRB is seeking to hold

10   HealthBridge responsible for failing to comply with the

11   injunction.  Is that the gist of it?

12             MR. McGRATH:  Yes, Your Honor.

13             THE COURT:  Okay.  I understand that the centers

14   are not the subject of the request that you have made

15   because the bankruptcy court has authorized the centers to

16   implement the requested modifications to the expired CBAs

17   and that apparently is in effect through July 15.  Is that

18   right?

19             MR. McGRATH:  Correct, Your Honor.  We have --

20   we have appealed the bankruptcy court's decision and --

21   but we're processing that through the appellate channels

22   and we're not seeking to involve the centers or the

23   debtors in these contempt proceedings.

24             THE COURT:  So you're not inviting me to second

25   guess the decision of the bankruptcy court.  That's the

```
1    subject of an appeal now pending in the District of

2    New Jersey, is that right?

3              MR. McGRATH:  Yes, Your Honor.  More recently I

4    believe the request to appeal -- the request for leave to

5    appeal was granted by the district court, and so that

6    matter is on appeal.

7              THE COURT:  Okay.  As you point out, the appeal

8    from the injunction that I entered was argued a couple of

9    weeks ago?

10              MR. McGRATH:  Yes, Your Honor, on May 15.

11              THE COURT:  All right.  So in that framework you

12    would like me to issue an order to HealthBridge requiring

13    HealthBridge to explain why it should not be held in

14    contempt?  That's what's before me at this point in time?

15              MR. McGRATH:  Yes, Your Honor.

16              THE COURT:  Ms. Alito, you're in the process of

17    preparing papers that you would file in response?

18              MS. ALITO:  That's correct, Your Honor.

19              THE COURT:  Can you give me a sense of what your

20    position will be?

21              MS. ALITO:  Among other things, Your Honor, I

22    think the basic argument is that HealthBridge is the

23    management company, it wasn't the employer.  It has no

24    power to comply with this aspect of the Court's order.

25              THE COURT:  Okay.  So that would be the gist of
```

1    the response.

2            What about Ms. Crutchfield, what would be her

3    position in this?

4            MS. ALITO:  We don't think that Ms. Crutchfield

5    is a proper party to this, Your Honor.

6            THE COURT:  Okay.  Would you be appearing on her

7    behalf?

8            MS. ALITO:  We anticipate that we will, Your

9    Honor.

10           THE COURT:  Okay.  So in this context, would it

11   make sense for me to go ahead and issue an order directing

12   HealthBridge and Ms. Crutchfield to file a response on or

13   before the date that you have in mind?

14           MS. ALITO:  Well --

15           THE COURT:  That seems like an orderly way to

16   proceed and it will be clear on the record what we're

17   doing.

18           Is there any objection to that?

19           MS. ALITO:  I don't know that an order to show

20   cause is necessary, Judge, but I suppose -- I would think

21   just a scheduling order for our opposition to the petition

22   would suffice.  And I think we also need a date for our

23   opposition to Mr. Creane's pending application to -- for

24   the union to appear as amicus.

25           THE COURT:  With regard to your response to the

1    application for an order of contempt, what day do you have

2    in mind, please?

3            MS. ALITO:  We had calculated that it was due on

4    June 20, Judge.

5            THE COURT:  Okay, then that's fine.

6            With regard to your response to Mr. Creane's

7    application, what date would you suggest?

8            MS. ALITO:  We could have that in next week,

9    Judge, next Friday, if that was acceptable to everyone.

10           THE COURT:  Okay.

11           MS. ALITO:  The 14th.

12           THE COURT:  All right.  With regard to further

13   proceedings following the filing of the responsive papers,

14   Mr. McGrath, what would you have in mind?  I've got a

15   number of trials scheduled, but perhaps we would be able

16   to get on the phone together and have argument if need be.

17           MR. McGRATH:  I think that would be fine, Your

18   Honor.  I frankly don't anticipate a whole lot of disputes

19   over what the employees are being paid and such, so I

20   think there's probably agreement on most of the material

21   facts.  It sounds like the respondents have legal defenses

22   that they want to raise.  So I think that can be certainly

23   done without having to do any hearing or something like

24   that, so --

25           THE COURT:  All right.

1          MS. ALITO:  Your Honor, of course a telephone

2    conference is fine if that's the Court's preference.  I

3    always prefer for oral argument to appear in person if

4    it's not inconvenient for the Court.

5          THE COURT:  Okay.  Then Mr. McGrath, do you

6    think you're going to want to file a reply?

7          MR. McGRATH:  I anticipate so, yes.

8          THE COURT:  Okay.  Do you have a sense of when

9    you would want to do that?

10          MR. McGRATH:  Well, not having seen respondent's

11    response, I would ballpark it at, say, two weeks.

12          THE COURT:  So if it's filed on the 20th, that

13    would put us at, would it be July -- let's see -- I guess

14    that's July 4th, Mr. McGrath.

15          I don't know if you plan on having a cookout

16    that day or whether you're going to be working, but we

17    could give you until Monday the 8th.

18          MR. McGRATH:  Until Monday, July 8th?

19          THE COURT:  Right.

20          MR. McGRATH:  Certainly.  I'm sure we can get it

21    done by then, and if we can get it done earlier, we will.

22          THE COURT:  All right.  We do have trial

23    scheduled that week and the next week, but what we'll do

24    is see if we can't be in touch with you after the reply

25    comes in and we have a clearer sense of our schedule and

1    try to come up with a mutually convenient time for a

2    telephone conference.

3         Ms. Alito, I appreciate your offer to come in

4    but I don't want to drag you up here from New Jersey if

5    it's just going to be a short conference.

6         MS. ALITO:  Whatever the Court prefers, Judge.

7         THE COURT:  Okay.  So we'll look forward to

8    getting these papers in due course and we'll plan on

9    setting up a telephone conference as soon as possible

10   after the reply is filed.

11        Is there anything else that either side would

12   like to raise while we're on the phone together?

13        MR. CREANE:  Your Honor, John Creane for the

14   union.

15        If the Court grants the union's motion for

16   amicus status, would we have an opportunity to file a

17   short brief in response to the employer's opposition?

18        THE COURT:  Yes.

19        MR. CREANE:  All right.  So we'll be bound by

20   the same guidelines and we'll get any written submission

21   in on or before the region does.

22        MS. ALITO:  Your Honor, since this is going to

23   be the union's -- basically if that is in fact what occurs

24   and the union files a brief, that would be its first

25   brief.  We'd like to preserve the right, if the union

1    raises issues different than those raised by the NLRB, to

2    respond to the union's brief.

3            THE COURT:  That's fair and reasonable.

4            MR. CREANE:  In that case, Your Honor, we would

5    agree to get our brief in within one week of the

6    respondent's filing their opposition, which would then

7    give Ms. Alito a week to respond to that and not delay it

8    beyond the region's submission of its reply brief of July

9    8.  Obviously we're looking to -- not in any way to

10   prolong the proceedings.

11           So we would be willing to get our brief in

12   within a week of receiving the opposition from Ms. Alito.

13           THE COURT:  Okay.  You know, it sounds like the

14   issue is going to be a legal one, and with that in mind,

15   it may be that there won't be anything new or different

16   and so we don't need to be too concerned today about fine

17   tuning things.  But if you're able to get something in on

18   the assumption that your request to participate is

19   granted, that's fine.

20           I appreciate your interest in keeping things

21   moving and avoiding delay, and we will have a conference,

22   so I think everybody's due process interests will be

23   protected and there won't be any unfair surprises or

24   matters that people haven't had a chance to address.

25           Before I let you go, I have a question:  Has

1    bargaining taken place during these months?

2             MR. CREANE:  It has not, Your Honor.  John

3    Creane here.

4             It has not because the parties are at an impasse

5    over the issue of what the starting point is for

6    negotiations.  The employer wants the interim relief given

7    by the bankruptcy court to be the starting point.  The

8    union has said we're prepared to bargain when they comply

9    with the injunction on restoring the terms and conditions

10   of employment.

11            So there has been no bargaining, Your Honor.

12            THE COURT:  I take it then that the parties

13   don't anticipate resuming bargaining until after the

14   courts have issued rulings in the pending matters?

15            MR. CREANE:  That's correct, Your Honor.

16            THE COURT:  Okay.  Well, thank you for being

17   available today.  I'll look forward to receiving your

18   papers.

19            (Proceedings adjourned at 10:30 a.m.)

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3                      In Re: KREISBERG vs. HEALTHBRIDGE

4

5

6                      I, Darlene A. Warner, RDR–CRR, Official Court

7    Reporter for the United States District Court for the

8    District of Connecticut, do hereby certify that the

9    foregoing pages are a true and accurate transcription of

10   my shorthand notes taken in the aforementioned matter to

11   the best of my skill and ability.

12

13

14

15
                         /s/_____
16
                           DARLENE A. WARNER, RDR–CRR
17                            Official Court Reporter
                             450 Main Street, Room #223
18                           Hartford, Connecticut 06103
                                 (860) 547-0580
19

20

21

22

23

24

25

## TEXT OF SIGNIFICANT STATUTORY PROVISIONS

11 U.S.C. § 1113:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)

(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)

(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1129:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5)
(A)
(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—

(A) such class has accepted the plan; or
(B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

(B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—

(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;

(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—

(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;

(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and

(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(14) If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date

that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

(16) All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(b)

(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)

(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

(C) With respect to a class of interests—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

(c) Notwithstanding subsections (a) and (b) of this section and except as provided in section 1127(b) of this title, the court may confirm only one plan, unless the order of confirmation in the case has been revoked under section 1144 of this title. If the requirements of subsections (a) and (b) of this section are met with respect to more than one plan, the court shall consider the preferences of creditors and equity security holders in determining which plan to confirm.

(d) Notwithstanding any other provision of this section, on request of a party in interest that is a governmental unit, the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933. In any hearing under this subsection, the governmental unit has the burden of proof on the issue of avoidance.

(e) In a small business case, the court shall confirm a plan that complies with the applicable provisions of this title and that is filed in accordance with section 1121(e) not later than 45 days after the plan is filed unless the time for confirmation is extended in accordance with section 1121(e)(3).

29 U.S.C. § 160(j):

> (j) Injunctions.
>
> The Board shall have power, upon issuance of a complaint as provided in subsection (b) charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order. Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.